**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CHARLES TIPTON; KELLI JOHNSON and AARON JOHNSON; DOREENE CHRISTIE and JAMES CHRISTIE; and BILLY TIPTON, all individually and on behalf of a Class of persons similarly situated,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | No. 3:15-cv-00311-TAV-CCS |
| **CSX TRANSPORTATION, INC. and UNION TANK CAR COMPANY,** | ) ) ) | **CLASS ACTION** |
| **Defendants.** | ) ) ) | **JURY TRIAL DEMANDED** |

<u>**MASTER CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Charles Tipton, Kelli Johnson, Aaron Johnson, Doreene Christie, James Christie, and Billy Tipton (collectively, "Plaintiffs"), on behalf of themselves and on behalf of a Class of other people similarly situated, file this Master Consolidated Class Action Complaint against Defendants CSX Transportation, Inc. ("CSX") and Union Tank Car Company ("UTLX") (collectively, "Defendants"), which supersedes the *Tipton* and *Jones* Consolidated Class Action Complaint (*Tipton* Doc. 54), the original Jones Complaint in Civil Action 3:15-cv-00337, Doc. 1, and the First Amended Class Action Complaint in *Johnson, et al. v. CSX Transportation, Inc.*, Civil Action No. 3:15-cv-00497 (*Johnson* Doc. 23). Plaintiffs by and through counsel allege as follows:

<u>**STATEMENT OF THE CASE**</u>

1. This is a proposed class action on behalf of Plaintiffs, and on behalf of a class of

other people similarly situated, against Defendants for private nuisance and negligence as a result of the catastrophic derailment of a train hauling toxic chemicals in Maryville, Blount County, Tennessee, on or about July 1, 2015 ("Train Derailment"). The resulting fire and release of toxic chemicals, including acrylonitrile and hydrogen cyanide, into the air, soil, and water has caused and will continue to cause direct and substantial damages to Plaintiffs and a Class of other people similarly situated.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a), because the Plaintiffs are citizens of the State of Tennessee and the named Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.     This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(d)(2)(A), which grants federal subject matter jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of Plaintiffs is a citizen of a state different from any Defendant. Plaintiffs are residents of the State of Tennessee, and the named Defendants are residents of different states.

4.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e), in that a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Tennessee, Northern Division.

### PARTIES

5.     Plaintiff Charles Tipton is a resident of Maryville, Blount County, Tennessee, who resided on and owned property located at 2022 Grey Ridge Road, Maryville, Tennessee, within

the mandatory evacuation zone established after the Train Derailment. Plaintiff Charles Tipton was evacuated from his home by Blount County Sherriff's Deputies at approximately 1:00 am on July 2, 2015, shortly after the Train Derailment. He was within sight of the fire and breathed the smoke and fumes. He was first evacuated to the Foothills Mall and then to Heritage High School. He was unable to return home until the evacuation was lifted and missed one day of work as a result. As a result of the Train Derailment Plaintiff suffered property damages, aggravation and inconvenience, fear, anxiety, and mental anguish. Plaintiff also lost income and incurred out-of-pocket expenses.

6.      Plaintiff Kelli Johnson is a resident of Maryville, Blount County, Tennessee, who resided on and leased property located at 721 Janes Road, Maryville, Tennessee, within the mandatory evacuation zone established after the Train Derailment. Plaintiff Kelli Johnson was evacuated from her home on July 2, 2015, shortly after the derailment. She breathed the smoke and fumes and suffered coughing and dizziness. Plaintiff Kelli Johnson suffered property damages, aggravation and inconvenience, fear, anxiety and mental anguish.  Plaintiff Kelli Johnson also incurred out-of-pocket expenses.

7.      Plaintiff Aaron Johnson is a resident of Maryville, Blount County, Tennessee, who resided on and leased property located at 721 Janes Road, Maryville, Tennessee, within the mandatory evacuation zone established after the Train Derailment. Plaintiff Aaron Johnson was evacuated from his home on July 2, 2015, shortly after the derailment. Plaintiff Aaron Johnson suffered property damages, aggravation and inconvenience, fear, anxiety and mental anguish. Plaintiff Aaron Johnson also incurred out-of-pocket expenses.

8.      Plaintiff Doreene Christie is a resident of Maryville, Blount County, Tennessee, who resided on and leased property located at 651 Old Glory Road, Maryville, Tennessee,

within the mandatory evacuation zone established after the Train Derailment. Plaintiff Doreene Christie was not evacuated from her home after the derailment but instead was ordered by emergency responders to shelter in place. Plaintiff Doreene Christie suffered aggravation and inconvenience, fear, anxiety and mental anguish. Plaintiff, Doreene Christie also incurred out-of-pocket expenses.

9. Plaintiff James Christie is a resident of Maryville, Blount County, Tennessee, who resided on and leased property located at 651 Old Glory Road, Maryville, Tennessee, within the mandatory evacuation zone established the Train Derailment. Plaintiff James Christie was not evacuated from his home after the derailment but instead was ordered by emergency responders to shelter in place. Plaintiff James Christie suffered aggravation and inconvenience, fear, anxiety and mental anguish. Plaintiff James Christie also incurred out-of-pocket expenses.

10. Plaintiff Billy Tipton is a resident of Maryville, Blount County, Tennessee, who resided on and owned property located at 634 Cyrus Way, Maryville, Tennessee, within the mandatory evacuation zone established after the Train Derailment. Plaintiff Billy Tipton was evacuated from his home at approximately 2:00 am on July 2, 2015, shortly after the Train Derailment. He breathed the smoke and fumes, and suffered watery eyes and a burning sensation in his mouth and throat. He first evacuated to his mother's home, but was forced to evacuate again when the evacuation area was expanded. He then evacuated to temporary lodging outside of Maryville. As a result of the Train Derailment, Plaintiff Billy Tipton suffered property damages, aggravation and inconvenience, fear, anxiety, and mental anguish. He also incurred out-of-pocket expenses.

11. Defendant CSX is a for-profit corporation organized under the laws of the State of Virginia with its principal place of business located in Jacksonville, Florida. At all times relevant

4

to this action, CSX operated the train that derailed in Maryville, Tennessee, on July 1, 2015, and owned the tracks upon which the train was operated when it derailed.

12.     Defendant Union Tank Car Company ("UTLX") is a for-profit corporation organized under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. At all times relevant to this action, UTLX owned the rail car that derailed and caught fire in Maryville, Tennessee, on or about July 1, 2015.

## FACTUAL ALLEGATIONS

13.     On July 1, 2015, Defendant CSX was operating a train consisting of two locomotives, 45 loaded rail cars carrying mixed freight, and 12 empty rail cars, traveling from Cincinnati, Ohio, to Waycross, Georgia. The CSX train included 27 rail cars that were carrying hazardous substances, specifically, nine with acrylonitrile, sixteen with propane and two with asphalt.

14.     Shortly before midnight on July 1, 2015, one of the rail cars carrying acrylonitrile derailed north of the Singleton Station Road crossing in Blount County, Tennessee. CSX then dragged the derailed car approximately 9 miles before eventually stopping the train near Old Mount Tabor Road, located off of Highway 321 and just west of the Foothills Mall in Maryville, Tennessee. At some point in that 9 miles, but before the train was stopped, the tank car caught fire.

15.     Upon information and belief, the rail car derailed as a result of one or more wheel roller bearings' failure due to overheating.

16.     Upon information and belief, either CSX's nearest trackside overheat sensor (called a "defect detector" or "hot-box detector") failed to detect the overheated wheel roller bearings, or the CSX crew failed to heed the warning provided by the overheat sensor via radio message.

17.     Upon information and belief, the CSX crew failed to keep an adequate lookout for the condition of the train and railcars from which it would have been obvious that the locomotive was dragging a derailed tank car. As a result, CSX failed to stop the train in time to prevent the tank car from rupturing and catching fire.

18.     Upon information and belief, the rail car that derailed and caught fire is owned by Defendant UTLX, which rail car was leased by UTLX for transport of acrylonitrile.

19.     Upon information and belief, UTLX manufactured the rail car that derailed, ruptured and caught fire.

20.     Upon information and belief, UTLX inspected, maintained, and repaired the rail car that derailed and caught fire.

21.     CSX knew the contents of the rail car that derailed, ruptured, and caught fire and was required to inspect the rail car before the operation of the train that resulted in the derailment and toxic chemical fire on July 1, 2015.

22.     CSX did not notify first responders of the identity of the chemical contained in the ruptured tank car, the immediate hazards to health, the risks of fire or explosion, the immediate precautions to be taken in the event of an accident or incident, the immediate methods for handling fires, or the immediate methods for protecting against the hazards of exposure to the released chemicals until at least an hour after the Train Derailment and toxic chemical fire.

23.     Acrylonitrile has been classified by the U.S. Environmental Protection Agency ("EPA") as a probable human carcinogen. Acute (short-term) exposure to acrylonitrile via inhalation causes mucous membrane irritation, headaches, nausea, feelings of apprehension and nervous irritability, limb weakness, labored and irregular breathing, dizziness and impaired judgment, cyanosis, nausea, collapse, and convulsions. Chronic (longer-term) exposure can result

in lung cancer, headaches, fatigue, nausea, and weakness.

24.     As a result of the derailment and the resulting fire, the combustion of acrylonitrile produced hydrogen cyanide gas, which can be rapidly fatal to people if inhaled in high concentrations. Lower concentrations affect the central nervous system (brain), the cardiovascular system (heart and blood vessels), and the pulmonary system (lungs).

25.     A CSX hazardous materials team did not arrive on the scene until over 2.5 hours after the Train Derailment.

26.     CSX did not control, mitigate, or remediate the release or extinguish the fire, but instead allowed it to burn, resulting in the spread of toxic smoke and particulates over a wide area, including the property of the Plaintiffs and members of the proposed Class. CSX allowed the UTLX rail car to burn for approximately twenty (20) hours, releasing dense clouds of toxic and noxious smoke, fumes, and vapors into the air.

27.     At least 87 people were forced to seek medical treatment at Blount Memorial Hospital in Maryville for symptoms related to exposure to the fire, including respiratory issues, skin irritation, and nausea, and at least 36 people were admitted to the hospital for further observation. At least ten first responders were also treated at the hospital after breathing the fumes, and had to go through a lengthy decontamination process.

28.     The ruptured UTLX rail car released acrylonitrile and other toxic chemicals to the soil, ground water and surface water, contaminating at least one drinking water well and contaminating Culton Creek, causing a fish kill.

29.     As a result of the derailment and the release of acrylonitrile into the surrounding environment, government officials warned residents near the derailment site not to drink well water due to concerns about groundwater contamination.

30.     Over 5,000 people were ordered to evacuate from their homes and businesses within about 2 miles from the Train Derailment, while other residents were required to shelter in place in their homes.  Shelters were opened by the local governments, and hundreds of people spent the night in the shelters. Others found their own accommodations outside the area. Numerous businesses were closed and highways were blocked in the area surrounding the evacuation zone.

31.     The mandatory evacuation lasted from the early morning of July 2, 2015 until the evening of July 3, 2015.

32.     The Environmental Protection Agency (EPA) stated that evacuees returning to their homes should be told that the smoke from the toxic chemical fire contained soot and particles that may have settled on their yard or gotten into their house and that smoke or fumes may have gotten trapped in their house.

## CLASS ALLEGATIONS

33.     Paragraphs 1-32 of this Complaint are hereby re-alleged and incorporated by reference herein.

34.     A class action is the proper form to bring the Plaintiffs' claims under Federal Rule of Civil Procedure 23 and 28 U.S.C. § 1332.

35.     The proposed Class is so numerous that joinder of all members would be impracticable. The exact number of members of the Class described herein is not yet known, but upon information and belief, is comprised of over 5,000 individuals.

36.     The geographic boundaries of the Class defined below include certain sections of Maryville and Blount County, Tennessee, which were covered by an evacuation order from local emergency response officials issued in response to the Train Derailment and toxic chemical fire. This geographic area is also referred to as "the Evacuation Zone." Within the Evacuation Zone

were a Subclass of residents who were not evacuated and were required to shelter in place. This Subclass can be certified pursuant to Fed. R. Civ. P. 23(c)(5).

37.     The geographic parameters of the mandatory Evacuation Zone were determined by emergency responders and will be more precisely delineated in Plaintiffs' Motion for Class Certification.

38.     The Class so represented by Plaintiffs in this action, and of which Plaintiffs are themselves members, is defined as follows (hereinafter "Class"):

> All natural persons, whether minor or adult, including any person claiming by, through or under a Class Member, who had a possessory interest in real property and who were physically present in the Evacuation Zone during and after the early hours of July 2, 2015, and who evacuated; and all natural persons, including minors and adults, who were physically present in the Evacuation Zone, who had a possessory interest in real property in the Evacuation Zone, but who were sheltered in place during or after the early morning hours of July 2, 2015.

> Excluded from the Class are those persons who would otherwise be Class members, but who or which are: (i) Defendants, or any of their employees, agents, insurers, contractors, and subcontractors, including employees of Defendant's agents, contractors or subcontractors, (ii) the Court, court personnel and their immediate families, (iii) the attorneys for any of the Parties and members of their law firms; (iv) making a claim for personal injury for which they sought medical treatment; and (v) Opt Outs.

39.     Each of the Class Representative Plaintiffs were physically present at their residences during and after the early morning hours of July 2, 2015. The Class Representative

Plaintiffs, with the exception of Plaintiffs James Christie and Doreene Christie, who were sheltered in place, were advised by emergency responders that they had to evacuate their homes as a result of the Train Derailment. All of the Class Representative Plaintiffs followed the orders of the emergency responders.

40.     A significant number of other residents of Blount County and Maryville, Tennessee, evacuated their homes, or were sheltered in place, in response to orders from emergency responders in a similar fashion as the individual Plaintiffs. The exact number of members of the proposed Class identified above is not precisely known, but it is estimated that the total number of all Class Members exceeds five thousand (5,000) people. The proposed Class is so numerous that joinder of individual members is impractical.

41.     With respect to the issues and claims raised herein, questions of law and fact common to Class Members predominate over any questions affecting only individual members of the Class. The only individual question affecting individual Members of the Class is the precise amount of damages to which each Class Member is entitled, and such damages may be reasonably and fully determined and calculated through the mechanism of a class action.  On the other hand, there are numerous questions of law or fact common to the Class, including, but not limited to:

i.      Whether the Defendants created a private nuisance as to Plaintiffs and other Class Members;

ii.     Whether the Train Derailment and toxic chemical fire were reasonably foreseeable by Defendants;

iii.    Whether Defendant CSX breached its duty of care to Plaintiffs to adequately inspect rail cars by a qualified inspector before operating the train;

iv.     Whether defendant CSX breached its duty of care to plaintiffs by failing to prevent

the UTLX tank car with defective roller bearings from being placed into service or continued in service;

v.      Whether defendant CSX breached its duty of care to plaintiffs by failing to maintain devices capable of detecting overheated rail car wheel roller bearings during operation of the train that derailed;

vi.     Whether defendant CSX breached its duty of care to plaintiffs by failing to keep adequate lookout and immediately stop the train during the 9 miles CSX dragged the derailed car before the derailed tank car ruptured and caught fire.

vii.    Whether defendant CSX breached its duty of care to plaintiffs by failing to immediately identify the toxic chemicals involved in the derailment, to immediately report the identity of the chemicals to emergency responders, and to warn emergency responders of the hazards associated with exposure to such chemicals;

viii.   Whether defendant CSX breached its duty of care to plaintiffs by failing to control, mitigate, and remediate the release of toxic chemicals and by failing to extinguish the toxic chemical fire as quickly and safely as possible;

ix.     Whether defendant UTLX breached its duty of care to plaintiffs with regard to its tank car that derailed by failing to properly manufacture the roller bearings that overheated and failed, by failing to properly inspect the roller bearings on the subject tank car to prevent their failure, by failing to prevent rail cars with defective roller bearings from being placed into service or continued in service, and by failing to repair or replace the roller bearings that failed prior to continuing to place the tank car in service;

x.      Whether the UTLX tank car wheel and roller bearings, as they existed immediately prior to the derailment, rupture, and toxic chemical fire, were defective and were

unreasonably dangerous when put to their intended, known, and foreseeable usage;

      xi.      Whether Defendants violated applicable federal statutes and regulations;

      xii.      Whether the jury should be permitted to infer negligence by Defendant CSX under the doctrine of *res ipsa loquitur*;

      xiii.      Whether and to what extent Defendants' actions and omissions have caused loss of use and enjoyment of property and other damages; and

      xiv.      Whether the Plaintiffs and the Class are entitled to compensatory damages.

42.      The claims of the representative Plaintiffs are typical of the claims of the  Class Members, including both evacuees and members who sheltered in place. The claims of all Members of the Class, including the Plaintiffs, depend on the showing that the acts and omissions of the Defendants give rise to the rights of the Plaintiffs to the relief sought herein and in showing that the damages were proximately caused by said acts and omissions of the Defendant.

43.      A class action is the superior method for the fair and efficient adjudication of this controversy, because joinder of all Class Members is impracticable.  The relatively small size and nature of individual Class Members' claims would likely allow few Class Members to individually seek legal redress against Defendant for the wrongs complained of herein. Therefore, a class action is both the appropriate vehicle by which to adjudicate these claims and is essential to the interests of justice. Furthermore, a class action regarding the issues in this case creates no significant problems of manageability. To the extent manageability problems do arise, the Court can use management tools such as sub-classing or certification of particular issues for class-wide treatment.

44.      Plaintiffs can and will adequately represent and protect the interests of the Class and lack interests that conflict with or are antagonistic to the interests of other Class Members.

45.     Plaintiffs have retained attorneys competent and experienced in class action litigation. Plaintiffs and their attorneys have adequate resources, experience and commitment to litigate this matter.

46.     Plaintiffs bring this action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all members of the previously defined Class of residents who have been damaged by the Train Derailment which required them to evacuate or shelter in place.

47.     In the alternative, pursuant to Fed. R. Civ. P. 23(c)(4)(A), Plaintiffs may move for certification of specific issues or elements of claims raised herein.

48.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

## CLAIMS

## COUNT ONE: PRIVATE NUISANCE

49.     Paragraphs 1-48 of this Complaint are hereby re-alleged and incorporated by reference herein.

50.     Plaintiffs and other members of the Class have an ownership or possessory interest in real property in or near Maryville, Tennessee, that lies within the proposed geographic boundaries of the above defined Class.

51.     Through their acts and omissions in causing or contributing to the Train Derailment and toxic chemical fire, Defendants have created a substantial and unreasonable interference with Plaintiffs' and other Class Members' use and enjoyment of their property.

52.     Defendants' acts and omissions in causing or contributing to the Train Derailment and toxic chemical fire forced the evacuation of Plaintiffs and the proposed Class Members from

their homes or forced them to shelter in place while the toxic chemical fire continued to release toxic smoke, fumes, and vapors.

53. The Train Derailment and toxic chemical fire, by causing toxic smoke to fill the surrounding area, resulting in the evacuation of some Plaintiffs and some Class Members and resulting in some Plaintiffs and some Class Members sheltering in place, annoyed and disturbed the free use of their property, and rendered the property's ordinary use of physical occupation uncomfortable. The Train Derailment and toxic chemical fire, by causing toxic smoke to fill the surrounding area, resulting in the evacuation of some Plaintiffs and some Class Members and resulting in some Plaintiffs and some Class Members sheltering in place, endangered life or health, gave offense to the senses, and obstructed the reasonable and comfortable use of their property. *See*, *e.g.*, *Freeman v. Norfolk Southern Corp.*, 2007 WL 2156753 at *2-*3 (E.D. Tenn., No. 3:03-CV-341, July 25, 2007).

54. The private nuisance created by Defendants is the proximate cause of damages to Plaintiffs and other members of the Class in the form of real property damage, personal property damage, loss of income, out-of-pocket expenses, loss of use and enjoyment of property, aggravation and inconvenience, and fear, anxiety and mental anguish.

55. Defendants are liable for the damages suffered by the Plaintiffs, as well as other Members of the Class as a result of Defendants' creation of a private nuisance.

## COUNT TWO: NEGLIGENCE

56. Paragraphs 1-55 of this Complaint are hereby re-alleged and incorporated by reference herein.

57. Defendant CSX owes a duty of care to Plaintiffs to design, operate, inspect, maintain, and repair its trains and railroad tracks used in the transport of toxic chemicals so as to

prevent derailments that would cause fires and release toxic chemicals into the surrounding community, including the duty to comply with all applicable federal and state regulations and industry safety standards. Defendant knew or reasonably should have known a breach of these duties would result in damages to Plaintiffs of the types which actually occurred in Maryville, Tennessee.

58.     Specifically, Defendant CSX owes a duty of care to Plaintiffs to adequately inspect rail cars by a qualified inspector before operating a train, including a duty to comply with 49 C.F.R. §§ 215.11, 215.13, CSX Operating Rules, and industry standards.

59.     Defendant CSX owes a duty of care to Plaintiffs to prevent rail cars with defective roller bearings from being placed into service or continued in service, including a duty to comply with 49 C.F.R. § 215.115, CSX Operating Rules, and industry standards.

60.     Defendant CSX owes a duty of care to Plaintiffs to maintain devices capable of detecting overheated rail car wheel roller bearings during operation of a train, including a duty to comply with CSX Operating Rules and industry standards.

61.     Defendant CSX owes a duty of care to Plaintiffs to keep a lookout during operation of a train so that it can determine if a rail car has derailed and immediately stop a train if a derailment has occurred, including a duty to comply with CSX Operating Rules and industry standards.

62.     Defendant CSX owes a duty of care to Plaintiffs to immediately identify the toxic chemicals involved in the derailment of tank cars and chemical fires and to immediately report the identity of the chemicals to emergency responders so that they can avoid exposure to the toxic chemicals, including a duty to comply with 49 C.F.R. §§ 172.600, 172.602, CSX Operating Rules and  industry standards.

63.     Defendant CSX also owes a duty of care to Plaintiffs to control, mitigate, and remediate toxic chemical releases from derailment of its trains and to extinguish toxic chemical fires as quickly and safely as possible.

64.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs by failing to adequately inspect the tank car that derailed on July 1, 2015, prior to operation of the train, including violation of 49 C.F.R. §§ 215.11,    215.13, CSX Operating Rules, and industry standards.

65.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs by failing to prevent the UTLX tank car with defective roller bearings from being placed into service or continued in service, including violation of 49 C.F.R. § 215.115, CSX Operating Rules, and industry standards.

66.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs by failing to maintain devices capable of detecting overheated rail car wheel roller bearings during operation of the train that derailed, including violation of CSX Operating Rules and industry standards.

67.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs by failing to heed the warning from the defect detector if the overheated roller bearing was detected by a properly functioning overheat sensor, which is  also violation of CSX Operating Rules and industry standards.

68.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs by failing to keep adequate lookout and immediately stop the train during the 9 miles CSX dragged the derailed car before the derailed tank car ruptured and caught fire, which is  also violation of CSX Operating Rules and industry standards.

69.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs to immediately identify the toxic chemicals involved in the derailment of tank cars and chemical fires, to immediately report the identity of the chemicals to emergency responders, and to warn emergency responders of the hazard associated with exposure to such chemicals, which is also a violation of 49 C.F.R. §§ 172.600, 172.602, CSX Operating Rules and industry standards.

70.     Among other breaches, Defendant CSX breached its duty of care to Plaintiffs by failing to control, mitigate, and remediate the release of toxic chemicals and by failing to extinguish the toxic chemical fire as quickly and safely as possible.

71.     Each of the breaches of duty set out above were a cause in fact and a proximate cause of damages to Plaintiffs, including damages to their property.

72.     Defendant UTLX owes a duty of care to Plaintiffs to manufacture, inspect, maintain, and repair its tank cars, including the wheel roller bearings, used in the transport of toxic chemicals so as to prevent derailments and prevent rupture of the tank cars that would cause fires and release toxic chemicals into the surrounding community, including the duty to adequately inspect its rail cars before they are placed in service, as required by 49 C.F.R. §§ 215.11, 215.13, the duty to prevent rail cars with defective roller bearings from being placed into service or continued in service, as required by 49 C.F.R. § 215.115, and to the duty to comply with industry standards. Defendant UTLX knew or reasonably should have known a breach of this duty would result in damages to Plaintiffs of the types which actually occurred in Maryville, Tennessee.

73.     Among other breaches, Defendant UTLX breached its duty of care to Plaintiffs with regard to its tank car that derailed by failing to properly manufacture the roller bearings that overheated and failed, by failing to properly inspect the roller bearings on the subject tank car to prevent their failure, in violation of 49 C.F.R. §§ 215.11, 215.13, by failing to prevent rail cars with

defective roller bearings from being placed into service or continued in service, in violation of 49 C.F.R. § 215.115, and by failing to repair or replace the roller bearings that failed prior to continuing to place the tank car in service. These breaches were a cause in fact and a proximate cause of damages to Plaintiffs.

74.     The UTLX tank car wheel and roller bearings, as they existed immediately prior to the derailment, rupture, and toxic chemical fire, were defective and were unreasonably dangerous when put to their intended, known, and foreseeable usage.

75.     Defendants CSX and UTLX combined and concurred in the operation, inspection, maintenance, or repair of the tank car that caused and contributed to the Train Derailment and toxic chemical fire.

76.     The applicable federal regulations set out above were each enacted to protect a Class of citizens which includes the Plaintiffs. The damages to Plaintiffs are of the types that are prohibited by these statutes and regulations. Therefore, Defendants' violations constitute negligence *per se*.

77.     If Defendants' violations of statutes and regulations do not constitute negligence *per se*, they are strong evidence of negligence, in that the statutory and regulatory requirements violated by Defendants establish a minimum duty of care which was breached by Defendants.

78.     At all times relevant to this matter, Defendant CSX was in control of the train that derailed, the UTLX car that ruptured and caught fire, and the tracks upon which the train was operated. The derailment and fire that occurred are the types of occurrences that do not ordinarily occur in the absence of negligence, and therefore, under Tennessee law and the doctrine of *res ipsa loquitur*, the jury can infer negligence.

79.     Defendants' negligence is the proximate cause of damages to Plaintiffs and other

members of the Class in the form of real property damage, personal property damage, loss of income, out of pocket expenses, loss of use and enjoyment of property, aggravation and inconvenience, and fear, anxiety and mental anguish.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs and members of the above proposed Class respectfully request this Court to grant the following relief:

a)     That this case be certified as a Class action pursuant to applicable Rules of Civil Procedure;

b)     Award Plaintiffs and members of the Class damages in an amount greater than Five Million Dollars ($5,000,000) sufficient to compensate them for real property damage, personal property damage, loss of income, out of pocket expenses, loss of use and enjoyment of property, aggravation and inconvenience, and fear, anxiety and mental anguish;

c)     Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

d)     Award such other and further relief as this Court may deem just, proper, and equitable.

**A JURY IS DEMANDED TO TRY THIS CASE.**

This 10th day of June, 2016.

> */s/ James S. Whitlock*
> Gary A. Davis, Tenn. Bar No. 009766
> James S. Whitlock, NC Bar No. 34304 (admission *Pro Hac Vice*)
> DAVIS & WHITLOCK, P.C.
> 21 Battery Park Ave., Suite 206
> Asheville, NC 28801

T: (828) 622-0044
F: (828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

Jeffrey E. Friedman, Ala. Bar No. asb-6868-n77j
(admission *Pro Hac Vice*)
Matt D. Conn, Ala. Bar No. asb-9628-t83c (admission *Pro Hac Vice*)
FRIEDMAN, DAZZIO, ZULANAS & BOWLING, PC
3800 Corporate Woods Drive Birmingham, Alabama
35242
T: 205-278-7000
F: 205-278-7001
jfriedman@friedman-lawyers.com
mconn@friedman-lawyers.com

Beecher A. Bartlett, Jr., Tenn. Bar No. 010198
KRAMER RAYSON LLP
800 S. Gay Street, Ste. 2500
Knoxville, Tennessee 37929
T: (865) 525-5134
F: (865) 522-5723
bbartlett@kramer-rayson.com

L. Jeffrey Hagood, Tenn. Bar No. 012419
Todd J. Moody, Tenn. Bar No. 012444
HAGOOD MOODY HODGE PLC
900 S. Gay St., Suite 2100
Knoxville, TN 37902
T: (865) 525-7313

Craig L. Garrett, Tenn. Bar No. 10227
607 Smithview Dr.
Maryville, TN 37803
T: (865) 984-8200
F: (865) 981-2833
CGarrett@cgarrettlaw.com

Mark Bryant, Ky. Bar No. 08755 (admission *Pro Hac Vice*)
Emily Roark, Ky. Bar No. 88542 (admission *Pro Hac Vice*)
Bryant Law Center
601 Washington Street
Paducah, KY
T: (270) 442-1422
mark.bryant@bryantpsc.com

Emily.roark@bryantpsc.com

H. Douglas Nichol, Tenn. Bar No. 005080
Nichol & Associates
6759 Baum Drive
Knoxville, TN 37919
T: 865-588-7465
F: 865-588-2883
dnichol@nicholassociates.com

D. Blayne Honeycutt, La. Bar No. 18264 (admission *Pro Hac Vice*)
Calvin C. Fayard, Jr., La. Bar No. 5486 (admission *Pro Hac Vice*)
Wanda Edwards, La. Bar No. 27448 (admission *Pro Hac Vice*)
Fayard & Honeycutt, APC
519 Florida Avenue, SW
Denham Springs, LA 70726
T: 225-664-4193
F: 225-664-6925
calvinfayard@fayardlaw.com
dbhoneycutt@fayardlaw.com
wandaedwards@fayardlaw.com

David Karnas, Ariz. Bar No. 013728 (admission *Pro Hac Vice*)
Bellovin & Karnas, PC
4810 E. Broadway Boulevard
Tucson, AZ 85711
T: (520) 571-9700
karnas@bellovinkarnas.com

Steven Weinberger, Cal. Bar No. 132562 (admission *Pro Hac Vice*)
Layfield & Barrett, APC
7135 E Camelback Rd. Suite 230
Scottsdale, AZ 85251
T: (480) 440-0426
s.weinberger@layfieldbarrett.com

Kevin W. Shepherd, Tenn. Bar No. 012791
200 E. Broadway Avenue, Suite 410
Maryville, Tennessee 37804
T: (865) 982-8060
sheplaw@bellsouth.net

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ James S. Whitlock
Attorney