| | | | |
|---|---|---|---|
| CHARLES TIPTON, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:15-CV-311-TAV-CCS |
| | ) | | |
| CSX TRANSPORTATION, INC., and | ) | | *Lead Case Consolidated with* |
| UNION TANK CAR COMPANY, | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |
| DEDRA JONES, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:15-CV-337-TAV-CCS |
| | ) | | |
| CSX TRANSPORTATION, INC., and | ) | | *as consolidated with* |
| UNION TANK CAR COMPANY, | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |
| KELLI JOHNSON, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:15-CV-497-TAV-CCS |
| | ) | | |
| CSX TRANSPORTATION, INC., and | ) | | |
| UNION TANK CAR COMPANY, | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |
| SAM HALL, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:15-CV-346-TAV-CCS |
| | ) | | |
| CSX TRANSPORTATION, INC., and | ) | | |
| UNION TANK CAR COMPANY, | ) | | |
| | ) | | |
| Defendants. | ) | | |

# MEMORANDUM OPINION AND ORDER

This civil action is before the Court on the motions to dismiss filed by defendants CSX Transportation, Inc. ("CSX") and Union Tank Car Company ("UTC") in the above-captioned cases [3:15-cv-311 ("*Tipton*") Docs. 62, 64; 3:15-cv-346 ("*Hall*") Docs. 37, 41; 3:15-cv-497 ("*Johnson*") Docs. 27, 36].[1]  Plaintiffs responded in opposition [*Tipton* Doc. 77; *Hall* Doc. 56; *Johnson* Docs. 38, 43].  Defendants replied [*Tipton* Docs. 89, 90; *Hall* Docs. 69, 70; *Johnson* Docs. 40, 47].  Plaintiffs then filed a supplemental response [*Tipton* Doc. 95; *Hall* Doc. 74; *Johnson* Docs. 27, 36], to which defendants replied [*Tipton* Doc. 96; *Hall* Doc. 75; *Johnson* Doc. 49].  Thereafter, plaintiffs filed a second supplemental response [*Tipton* Doc. 107], to which defendants replied [*Tipton* Doc. 111].

After the parties briefed the motions to dismiss, they submitted a joint motion to consolidate the *Tipton*, *Jones*, and *Johnson* cases, and to file a Master Consolidated Class Action Complaint ("consolidated complaint") [*Tipton* Doc. 108], which the Court granted [*Tipton* Doc. 110].  Pursuant to the parties' joint motion, the Court ordered that it will review the pending motions to dismiss in the *Tipton* and *Johnson* cases in light of the newly-filed consolidated complaint [*Tipton* Doc. 110].[2]  The consolidated complaint does not affect the

---

[1] Defendants also filed motions to dismiss in 3:15-cv-337 ("*Jones*"), which have since been denied as moot [*Tipton* Doc. 110].

[2] The Court notes that the Consolidated Class Action Complaint [Doc. 114] only contains causes of action for nuisance and negligence.  The previous amended complaint in *Johnson*— which was superseded by the Consolidated Class Action Complaint—also contained causes of action for gross negligence, negligence per se, and strict liability, and sought punitive damages [*Johnson* Doc. 23].  Defendants addressed each of the causes of action in their motions to dismiss [Doc. 27, 36].  The Court, however, will only consider defendants' arguments in the *Johnson* motions to dismiss as to negligence and nuisance, as these are the only remaining causes of action in the consolidated complaint.

2

complaint or filings in the *Hall* case. For the reasons stated herein, the Court will grant in part and deny in part defendants' motions.

## I.      Background[3]

Plaintiffs filed suit against defendants CSX and UTC as a result of a train derailment and subsequent release of toxic chemicals and fire in Maryville, Tennessee on July 1, 2015 [*Tipton* Doc. 114 ¶ 1; *Hall* Doc. 34 ¶ 1]. Plaintiffs allege that defendant CSX was operating a train that consisted of two locomotives, forty-five loaded rail cars carrying mixed freight, and twelve empty railcars from Cincinnati, Ohio to Waycross, Georgia, on July 1, 2015 [*Tipton* Doc. 114 ¶ 13; *Hall* Doc. 34 ¶ 16]. Twenty-seven of the rail cars were carrying hazardous substances, including acrylonitrile, propane, and asphalt [*Tipton* Doc. 114 ¶ 13; *Hall* Doc. 34 ¶ 16].

One of the railcars carrying acrylonitrile, which defendant UTC owned, derailed in Blount County, Tennessee [*Tipton* Doc. 114 ¶¶ 14, 18; *Hall* Doc. 34 ¶¶ 17, 21]. CSX allegedly dragged the derailed car for approximately nine miles before eventually stopping in Maryville, Tennessee [*Tipton* Doc. 114 ¶ 14; *Hall* Doc. 34 ¶ 17]. Before the train stopped, however, the derailed tank car caught fire [*Tipton* Doc. 114 ¶ 14; *Hall* Doc. 34 ¶ 17]. Plaintiffs allege that the derailment caused acrylonitrile and other toxic chemicals to be released into the soil, ground water, and surface water, contaminating at least one drinking-water well and Culton Creek [*Tipton* Doc. 114 ¶ 28; *Hall* Doc. 34 ¶ 44]. Over 5,000

---

[3] For the purposes of a motion to dismiss, the Court takes plaintiffs' factual allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that "when ruling on a defendant's motion to dismiss, a judge must accept as true all factual allegations contained in the complaint." (citations omitted)).

individuals within two miles of the derailment were ordered to evacuate from their homes and businesses from the morning of July 2, 2015, until July 3, 2015 [*Tipton* Doc. 114 ¶ 30; *Hall* Doc. 34 ¶ 33].

Plaintiffs in the consolidated class action suit represent a class of individuals "who had a possessory interest in real property and who were physically present in the Evacuation Zone during and after the early hours of July 2, 2015," and who either evacuated their homes or sheltered in place during this incident [*Tipton* Doc. 114 ¶ 38].[4] They filed suit against defendants CSX and UTC, alleging private nuisance and negligence [*see generally Tipton* Doc. 114]. In the consolidated complaint, plaintiffs submit that the Environmental Protection Agency cautioned that smoke from the toxic chemical fire contained soot and particles that may have settled on their yards or in their homes, and that smoke or fumes may have gotten trapped in their homes [*Id.* ¶ 32]. They allege that they have suffered property damage, inconvenience, fear, anxiety, aggravation, and mental anguish, among other things [*Id.* ¶¶ 5–10]. Defendants state that certain portions of plaintiffs' claims are barred by the Tennessee economic loss doctrine, are preempted by federal law, and fail to state a claim as to negligence or nuisance [*Tipton* Docs. 62, 64; *Johnson* Docs. 27, 36].

Plaintiffs in *Hall* include law enforcement officers who were sent to the area surrounding the train derailment in order to evacuate residents [*Hall* Doc. 34 ¶ 1]. They submit that while performing the evacuation, they were exposed to smoke and vapors containing toxic chemicals and were hospitalized for more than twenty-four hours as a result [*Id.*]. They continue to suffer injuries to their health, emotional distress, and fear of future

---

[4] This class does not include anyone who suffered personal injuries as a result of the train derailment for which they sought medical treatment [*Tipton* Doc. 114 ¶ 38].

illness as a result [*Id.*]. They filed suit against defendants CSX and UTC, alleging negligence as to both defendants, and recklessness as to CSX [*see generally Hall* Doc. 34].[5] Defendants state that Tennessee's policemen and firemen's rule categorically bars law enforcement officers from recovering damages for injuries that arise from risks that are peculiar to their employment, that certain portions of their claims are preempted by federal law, and that they fail to state a claim as to negligence or recklessness [*Hall* Docs. 38, 42].

## II. Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure sets forth a liberal pleading standard. *Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004). It requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557)).

---

[5] The *Hall* plaintiffs validly amended the complaint, and thus the amended complaint supersedes the original complaint. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306–07 (6th Cir. 2000) (finding that when the plaintiff filed an amended complaint, the new complaint controlled going forward). Consequently, defendants' original motions to dismiss [*Hall* Docs. 25, 27] are now moot.

5

In deciding a Rule 12(b)(6) motion to dismiss, the Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In doing so, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## III. Tennessee's Policemen and Firemen's Rule

The Court will first consider defendants' arguments that the claims in *Hall* should be dismissed in their entirety under Tennessee's policemen and firemen's rule [*Hall* Docs. 38, 42]. The Tennessee Supreme Court has stated that firefighters and police officers are precluded from recovering damages "for injuries arising out of risks peculiar to their employment," pursuant to the "policemen and firemen's rule." *Carson v. Headrick*, 900 S.W.2d 685, 691 (Tenn. 1995).

The Tennessee Supreme Court has observed that situations requiring a police or fireman presence, "although commonplace and inevitable, are also routinely dangerous[.]" *Carson*, 900 S.W.2d at 690. Public policy considerations therefore weighed against allowing such officers to recover against citizens in tort for injuries "resulting from a risk the officer is

6

trained and hired to confront." *Id.* The rule intends to encourage citizens, regardless of whether they were negligent, "to seek help from municipal fire [and police] departments when needed," without fearing subsequent lawsuits by the police officers and firemen for any injuries they sustain as a result. *Bridges v. City of Memphis*, 952 S.W.2d 841, 848 (Tenn. Ct. App. 1997). Rather, compensation for their injuries is intended to be "borne by the public as a whole." *Carson*, 900 S.W.2d at 690.

In assessing whether this rule precludes a police officer or fireman's claims, "the salient question is whether the danger encountered by the employee is a danger that can be reasonably expected given the nature of the position of employment." *Jamison v. Ulrich*, 206 S.W.3d 419, 424 (Tenn. Ct. App. 2006). This rule will not operate to bar a plaintiff's claims when the police officer or fireman is injured "by a citizen's intentional, malicious, or reckless misconduct." *Carson*, 900 S.W.2d at 691. In those instances, a duty of care is owed to the police officer or fireman, and he or she may recover because police officers and firemen "are not employed to submit to intentional, reckless, or malicious injury." *Id.*

In taking the *Hall* plaintiffs' allegations as true, the Court finds that the Tennessee policemen and firemen's rule does not bar plaintiffs' claims. In their amended complaint, the *Hall* plaintiffs state that they spent several hours in the area near the train derailment before being informed of the identity of the toxic chemical that was being released [Doc. 34 ¶ 25]. They submit that being exposed to "unknown toxic chemicals in smoke, vapors, and fumes from a train derailment and fire is not the type of risk peculiar to plaintiffs' employment as law enforcement officers, nor is it the type of risk plaintiffs were hired, trained, or equipped to confront" [*Id.* ¶ 36]. Accordingly, the Court finds that the *Hall* plaintiffs have sufficiently

7

alleged that being exposed to toxic chemicals is not a reasonably expected danger, given the nature of the police officers' position of employment. As a result, the policemen and firemen's rule will not operate to preclude their claims against CSX and UTC.

The *Hall* plaintiffs have also sufficiently alleged that CSX acted recklessly. In the amended complaint, they allege that defendant CSX recklessly failed to keep an adequate lookout in order to notice that a tank car had derailed and was being dragged by the train [*Hall* Doc. 34 pp. 13–14]. As a result of CSX's reckless conduct, the *Hall* plaintiffs allege the tank car ruptured, caught fire, and caused their injuries [*Id.*]. The Court finds that the policemen and firemen's rule will not operate to preclude the *Hall* plaintiffs' claims against CSX, as they allege CSX acted recklessly, and plaintiffs were not employed to submit to reckless conduct. *Carson*, 900 S.W.2d at 691.

## IV. Tennessee's Economic Loss Doctrine

The Court now turns to defendants' arguments that plaintiffs' claims in the consolidated complaint should be dismissed under the Tennessee economic loss rule because they "offer[ ] no more than the bare assertion that they experienced 'real property damage' and 'personal injury damage'" [*Tipton* Doc. 65 p. 5; *see also Tipton* Doc. 63 pp. 11–13; *Johnson* Doc. 28 pp. 5–6; *Johnson* Doc. 37 pp. 11–13]. In response, plaintiffs submit two arguments: (1) they request the Court to reconsider its holding in *Ladd Landing*; and (2) in the alternative, they submit that their claims should not be dismissed because their complaints contain allegations of both property damage and personal injury [*Tipton* Doc. 77 pp. 7–14; *Johnson* Doc. 38 pp. 8–13].

8

Under the Tennessee economic loss rule, plaintiffs cannot recover "for purely economic loss absent physical injury or property damage." *United Textile Workers of Am., AFL-CIo v. Lear Siegler Seating Corp.* ("*Lear Siegler*"), 825 S.W.2d 83, 84–87 (Tenn. Ct. App. 1990) (affirming a trial court's holding that defendant was not liable to plaintiffs for their lost wages after its negligence forced their work facility to close, "because no physical harm accompanied the [plaintiffs'] economic loss").

Other judges in this district have stated that this rule typically only applies to claims relating to the sale of goods and services, and to products liability actions. *See, e.g.*, *Lick Branch Unit, LLC v. Reed*, No. 3:13-CV-203, 2014 WL 546696, at *16 (E.D. Tenn. Feb. 10, 2014) (J. Collier) (citing *Tan v. Wilbur Smith Assocs., Inc.*, No. 2:09-CV-25, 2011 WL 3421320, at *6 (E.D. Tenn. Aug. 4, 2011) (J. Mattice); *Ham v. Swift Transp. Co.*, 694 F. Supp. 915, 922 (W.D. Tenn. 2010)).[6]  When this Court considered the economic loss rule, however, it respectfully disagreed with *Ham* and other cases that held that the Tennessee Supreme Court would not be likely to extend the economic loss rule to the tort situations presented in those cases. *Ladd Landing, LLC v. Tenn. Valley Auth. ("Ladd Landing")*, 874

---

[6] In *Ham*, the court considered the application of the economic loss rule to negligence claims arising from agreements between the plaintiffs and the defendant, who operated a trade school, for the provision of testing services for commercial drivers licenses. *Ham*, 694 F. Supp. 2d at 922.  The court found that the Tennessee Court of Appeals had "implicitly restricted the economic loss doctrine to claims involving products liability or the sale of goods, at least where the plaintiff can establish a sufficiently direct relationship between the defendant's negligent act and the plaintiff's economic loss." *Id.* (citing *McLean v. Bourget's Bike Works, Inc.*, No. M2003–01944–COA–R3–CV, 2005 WL 2493479, at *5 (Tenn. Ct. App. Oct. 7, 2005); *Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W. 3d 159, 173–74 (Tenn. Ct. App. 2001)).

9

F. Supp. 2d 727 (E.D. Tenn. 2012).[7]  This Court instead applied the economic loss rule to dismiss the plaintiffs' claims, as they did not own any real property that was physically damaged by the nearby chemical spill and only alleged that the "business income" of their respective businesses had diminished in value from the spill.  *Id.* at 733.

Upon review, the Court finds that it need not reconsider its holding in *Ladd Landing* as to whether the Tennessee economic loss doctrine would apply outside of the sale of goods or services and products liability context, as plaintiffs have made sufficient allegations of property damage in their complaints.[8]  Plaintiffs allege that the fire and release of toxic chemicals into the air, soil, and water after the train derailment "has caused and will continue to cause direct and substantial damages to plaintiffs and a class of other people similarly situated" [Doc. 114 ¶ 1].  Plaintiffs allege that the release of toxic chemicals into the ground caused government officials to warn residents "not to drink well water due to concerns about groundwater contamination," and that "the smoke from the toxic chemical fire contained soot and particles that may have settled on their yard or gotten into their house[,] and that smoke or fumes may have gotten trapped in their house" [*Id.* ¶¶ 29, 32].  The consolidated class

---

[7] This Court found that Tennessee courts have not limited the economic loss rule to the extent described in other district court cases from this state.  *Ladd Landing*, 874 F. Supp. 2d at 727.  Instead, it followed the *Lear Siegler* holding, which applied the economic loss rule in a tort context that did not involve a contract for the sale of goods or services or a products liability action.  *Id.*  This Court reasoned that, as *Lear Siegler* is a published opinion by the Tennessee Court of Appeals that has not been overruled or modified by a subsequent decision of the Tennessee Supreme Court, it is controlling authority.  *Id.*

[8] Defendants submit that plaintiffs have not suffered personal injury, as they expressly exclude from their classes anyone making a claim for personal injury "for which they sought medical treatment" [Doc. 114 ¶ 38].  As the Court finds that plaintiffs have alleged property damage, the Court does not need to consider whether plaintiffs have sufficiently alleged personal injuries.

10

complaint also contains specific allegations explaining how the named plaintiffs suffered property damages as a result of the derailment [*Id.* ¶¶ 5–7, 10, 54, 71, 79].

Construing the complaint in the light most favorable to plaintiffs, the Court finds that plaintiffs have pled sufficient facts to state a claim that they have suffered property damage under Rule 8. Unlike the plaintiffs in *Ladd Landing*, who did not own any real property that was physically damaged from the spill and who only alleged loss of business income, the plaintiffs in the instant suit represent a class of natural persons "who had a possessory interest in real property" [Doc. 114 ¶ 38]. Furthermore, the complaint contains allegations that plaintiffs suffered property damage [Doc. 114 ¶¶ 5–7, 10, 54, 71, 79].

Despite defendants' arguments that the property damage allegations are simply conclusory assertions [*Tipton* Doc. 63 p. 13; *Tipton* Doc. 65 p. 6; *Johnson* Doc. 28 p. 6; *Johnson* Doc. 37 p. 12], when reading these allegations in conjunction with the recitation of the relevant facts contained in each complaint, the Court finds that the property damage allegations are not "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citation omitted). As the Court concludes that plaintiffs have sufficiently alleged property damage in their complaints under Rule 8, the Tennessee economic loss doctrine—if applicable to the instant case—would not cause the Court to dismiss plaintiffs' claims in the consolidated complaint. Defendants' arguments with respect to the Tennessee economic loss doctrine therefore lack merit.

V.      **Federal Preemption**

Defendants also assert that plaintiffs' claims in both the consolidated complaint and *Hall* complaint should be dismissed because they are preempted by federal law. The

Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2. "The Supremacy Clause of Article VI provides Congress with the power to preempt state law." *Jordan v. Burlington N. Santa Fe R. Co.*, No. W200700436COAR3CV, 2009 WL 112561, at *5 (Tenn. Ct. App. Jan. 15, 2009) (citing *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368 (1986)). Whether Congress intended a federal regulation to supersede state law is the "critical question" in preemption analysis. *Id.*

The Supreme Court has held that "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). The state statute will not be preempted, however, unless preemption was Congress' "clear and manifest purpose." *Id.* at 664 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). If the statute contains an express preemption clause, as is the case with the statutes at issue in this dispute, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.*

Defendants argue that plaintiffs' claims are preempted by the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10101, *et seq.* ("ICCTA"), the Federal Railroad Safety Act, 49 U.S.C. § 20101, *et seq.* ("FRSA"), and the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, *et seq.* ("HMTA") [*Tipton* Docs. 62, 64; *Johnson* Docs. 28, 37; *Hall* Docs. 37, 41]. The Court will analyze each of these arguments in turn.

12

## A.    ICCTA Preemption

The ICCTA grants the Surface Transportation Board ("STB") exclusive jurisdiction over "(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities." 49 U.S.C. § 10501(b).  The ICCTA further provides that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.*

The Sixth Circuit has found that the ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Adrian & Blissfield R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 539–40 (6th Cir. 2008) (citing *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007)).  The Sixth Circuit noted that while states "retain their police powers, allowing them to create health and safety measures," those measures cannot be merely a pretext for interfering with rail service. *Id.* at 541.

State actions can be preempted by the ICCTA in two ways: (1) the state action is "categorically" or "facially" preempted when it would "directly conflict with exclusive federal regulation of railroads[;]" and (2) the state action may be preempted "as applied" if it has the effect of preventing or unreasonably interfering with railroad transportation. *Id.* at 540 (citation omitted); *see also Guild v. Kansas City S. Ry. Co.*, 541 F. App'x 362, 367–68

13

(5th Cir. 2013) (stating that "only laws that have the effect of managing or governing rail transportation will be expressly preempted" but that a law will be impliedly preempted if, as applied to the facts of that case, it would unreasonably burden or interfere with rail transportation.).   As defined in the ICCTA, transportation includes "a locomotive, car, vehicle, vessel, . . . or equipment of any kind related to the movement of passengers or property, or both, by rail," and "services related to that movement."  49 U.S.C. § 10102(9).

Turning first to CSX's ICCTA preemption argument, the Court notes that within the plaintiffs' common law negligence claim, they submit that CSX owes a duty of care to "design, operate, inspect, maintain, and repair its trains and railroad tracks used in the transport of toxic chemicals so as to prevent derailments," [*Tipton* Doc. 114 ¶ 57; *Hall* Doc. 34 ¶ 46].  They state that defendants knew or should have known that breaching these duties would result in the types of damages to plaintiffs that actually occurred [*Tipton* Doc. 114 ¶ 57; *Hall* Doc. 34 ¶ 46].   CSX alleges that the ICCTA preempts plaintiffs' "generic allegations" contained in this paragraph of the consolidated complaint[9] and *Hall* complaint to the extent they challenge the way CSX constructed and operated its trains and railroad tracks [*Tipton* Doc. 65 p. 9; *Johnson* Doc. 28 pp. 7–9; *see also Hall* Doc. 42 p. 14].

In response, plaintiffs state that CSX's argument conflicts with the way in which district courts within the Sixth Circuit have applied the ICCTA's preemption clause [*Tipton* Doc. 77 p. 14; *Johnson* Doc. 38 p. 14; *Hall* Doc. 56 p. 15].  They maintain that CSX does not identify how their nuisance or negligence claims "would amount to economic regulation or

---

[9] In their motions, defendants reference paragraph numbers in the original *Tipton* and *Johnson* complaints, which the Court has converted to represent the corresponding paragraph in the consolidated complaint, as the allegations in the original and consolidated complaints are nearly identical.

direct management of rail transportation," which plaintiffs state is what CSX is required to show for plaintiffs' claim to be preempted [*Tipton* Doc. 77 p. 17; *Johnson* Doc. 38 p. 17; *Hall* Doc. 56 p. 18].

In support of its motion, CSX cites to *Maynard v. CSX Transportation, Inc.*, 360 F. Supp. 2d 836 (E.D. Ky. Mar. 12, 2004), in which the plaintiffs filed suit against CSX for negligently allowing drainage to escape onto their properties from the tracks, and for common law nuisance from having its sidetracks periodically block the ingress and egress to plaintiffs' properties. In considering CSX's motion for summary judgment, the district court found that the sidetracks were an "essential part of CSX's railroad operations," and that the drainage problem was allegedly caused by the construction and/or maintenance of the tracks. Consequently, the court found that both claims were expressly preempted by the ICCTA. *Id.* at 843. The court also rejected the plaintiffs' argument that the FRSA should apply, noting that the common law remedies implicated in the case were not related to railroad safety, and thus not covered by the FRSA. *Id.* CSX also cites to *In re Katrina Canal Breaches Consolidated Litigation*, No. 05-4182, 2009 WL 224072 (E.D. La. Jan. 26, 2009), in which the district court found that a state law negligence claim pertaining to the design and construction of a railroad crossing and track was preempted by the ICCTA as it directly related to CSX's rail activity. *Id.* at *6.

In response, plaintiffs cite to *Smith v. CSX Transportation, Inc.*, No. 3:13-cv-2649, 2014 WL 3732622 (N.D. Ohio July 25, 2014), in which the plaintiffs, a class of residents who were evacuated after a chemical spill, claimed that CSX negligently installed used rail at the spill location, and failed to perform rail safety inspections. *Id.* at *1. The district court

15

found that the allegations pertained to railroad safety procedures, and did not amount to economic regulation of railroads, and thus the ICCTA did not preempt the plaintiffs' claims. *Id.* at \*2.

Plaintiffs also cite to *Watkins v. RJ Corman Railroad*, No. CIVA 7:09-114-KKC, 2010 WL 1710203 (E.D. Ky. 2010), in which the district court held that the ICCTA did not completely preempt the plaintiffs' claim that the railroad negligently caused or failed to prevent a fire inside of a railroad tunnel, because the relief sought would not amount to economic regulation of the railroad. *Id.* at \*3. In so holding, however, the court noted that the claim could not have the effect of managing or governing rail transportation because all of the railroad tracks had already been removed from that area and the railroad no longer operated that line. *Id.* Finally, plaintiffs also rely on *Elam v. Kansas City Southern Railway Co.*, 635 F.3d 796 (5th Cir. 2011), in which the Fifth Circuit noted that a "typical negligence claim seeking damages for a typical crossing accident . . . does not directly attempt to manage or govern a railroad's decisions in the economic realm." *Id.* at 813.

The Court notes that the purpose of Tennessee's negligence law is not to manage or govern rail transportation, and thus the allegations in paragraph 57 of the consolidated complaint and paragraph 46 of the *Hall* complaint are not expressly preempted by the ICCTA. *See Guild*, 541 F. App'x at 367 (finding the same for Mississippi's negligence law). To determine whether Tennessee's negligence law would be preempted as applied to the facts of this case, the Court must determine whether imposing the duties contained in paragraph 57 of the consolidated complaint and paragraph 46 of the *Hall* complaint would

unreasonably interfere or prevent rail transportation. *Adrian & Blissfield R. Co.*, 550 F.3d at 540.

In both complaints, plaintiffs submit that CSX "owes a duty of care to plaintiffs to design, operate, inspect, maintain, and repair its trains and railroad tracks used in the transport of toxic chemicals so as to prevent derailments" [*Tipton* Doc. 114 ¶ 57; *Hall* Doc. 34 ¶ 46]. While the complaints identify other duties under both federal and state regulations that CSX owes to plaintiffs, the Court finds that this paragraph in each complaint pertains to the operation, maintenance, and construction of CSX's railroad and tracks, and that it has more than a remote or incidental effect on rail transportation. *Adrian & Blissfield R. Co.*, 550 F.3d at 539. The Court also finds this allegation "may reasonably be said to have the effect of managing or governing rail transportation," as rail transportation is defined in the ICCTA, and that it goes beyond the state's police powers. *Id.* Furthermore, imposing this duty on CSX could unreasonably interfere with its rail operations, as it pertains to CSX's design, operation, inspection, maintenance, and repair of its tracks and trains, which go to the core of CSX's railroad operations. Consequently, the Court finds that this duty is preempted as applied to this case. *Id.* at 540.

The cases plaintiffs cite in support of their argument are distinguishable from the instant case. Unlike *Smith*, the allegations in this paragraph of each complaint do not solely pertain to railroad safety procedures. *Smith*, 2014 WL 3732622, at *2. Rather, they also relate to the design and maintenance of the tracks and railroads themselves. Any finding of negligence with respect to these paragraphs could amount to economic regulation of the railroad, and thus would be preempted under ICCTA. *Contra id.* Additionally, in contrast

17

with *Watkins*, the allegations in this paragraph in each complaint could have the effect of governing rail transportation—particularly as to the maintenance and operation of the trains and railroad tracks—in light of the fact that CSX continues to operate railroads in the Maryville, Tennessee area. *Watkins*, 2010 WL 1710203 at *1.

Unlike *Elam*, the allegations in this paragraph also do not constitute a typical negligence claim from a "typical crossing accident," but rather seek to impose a duty on CSX with respect to how it designs, operates, and maintains its railroads tracks and trains. *Elam*, 635 F.3d at 813. The design, operation, and maintenance of railroad tracks and trains are "essential part[s] of CSX's railroad operations" and imposing this duty on CSX would amount to economically regulating the railroad. *Maynard*, 360 F. Supp. 2d at 843; *see also Guild*, 541 F. App'x at 368; *In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 224072, at *6. This sort of regulation falls within the STB's exclusive jurisdiction. 49 U.S.C. § 10501(b). *Contra Emerson v. Kansas City S. Ry. Co.*, 503 F. 3d 1126, 1132 (10th Cir. 2007) (finding that state remedies dictating how the railroad "should dispose of detritus or maintain drainage ditch vegetation" would not adversely affect the economic aspects of the railroad's operations that are subject to STB control, and thus state law claim was not preempted). As a result, the allegations in paragraph 57 of the consolidated complaint and paragraph 46 of the *Hall* complaint are preempted under the ICCTA.

### B. FRSA Preemption

The purpose of the FRSA is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009) (citing *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347

18

(2000)).  It authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety[,]" and includes an express preemption provision providing that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable."  *Id.* (quoting 49 U.S.C. §§ 20103, 20106(a)(2)).  The Federal Railroad Administrator ("FRA") has since been delegated the Secretary of Transportation's authority under the FRSA.  49 C.F.R. § 1.89(a).

The FRSA "preempts any state or local law, regulation, or order that is 'an additional or more stringent law, regulation, or order related to railroad safety and security.'"  *Smith*, 2014 WL 3732622, at *2 (citing 49 U.S.C. § 20106(a)(2)).  States may continue to enforce laws and regulations that relate to railroad safety until the FRA adopts a regulation "covering" the same subject matter.  *Nickels*, 560 F.3d at 429 (citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)) (finding that a "state-law negligence action is 'covered' and therefore preempted if a FRSA regulation 'substantially subsume[s]' the subject matter of the suit").

In 2007, Congress added a "[c]larification regarding State law causes of action" to the FSRA's preemption provision, which provides that "[n]othing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party" has failed to comply with a federal regulation or standard, the party's own plan or standard, or a state law, regulation, or order that is "not incompatible" with the FSRA, "so long as the requirements of § 20106(a)(2) are satisfied."  *Nickels*, 560 F.3d at 432; 49 U.S.C. § 20106(b)(1).  Under 49 U.S.C. § 20106(a)(2), "once the Secretary has issued a regulation covering the subject matter of a state law, regulation, or

order related to railroad safety, [the state law] is preempted unless it is necessary to address an essentially local safety hazard, is not incompatible with the federal regulation, and does not unreasonably burden interstate commerce." *Id.*

### 1. UTC is Subject to the FRSA

The Court first turns to UTC's argument that it is not subject to the three FRSA regulations to which plaintiffs cite in both complaints [*Tipton* Doc. 63 pp. 5–6; *Johnson* Doc. 37 pp. 5–6; *Hall* Doc. 38 pp. 9–10 (each citing 49 C.F.R. §§ 215.11, 215.13, 215.115)]. UTC submits that these regulations only apply to railroads, and as such do not impose any obligations on UTC [*Tipton* Doc. 63 pp. 5–6; *Johnson* Doc. 37 pp. 5–6; *Hall* Doc. 38 pp. 9–10]. Plaintiffs allege in the complaint that UTC owned the railcar that derailed, which CSX was operating during the derailment [*Tipton* Doc. 114 ¶¶ 14–15; *Hall* Doc. 34 ¶¶ 14–15].

The Court notes that Part 215 of the FRA specifically states that it "prescribes minimum Federal safety standards for railroad freight cars." 49 C.F.R. § 215.1. Railroad freight car is defined as "a car designed to carry freight, or railroad personnel, by rail." 49 C.F.R. § 215.5(c). Railroad is defined to include "all forms of non-highway ground transportation that run on rails or electromagnetic guideways[.]" 49 C.F.R. § 215.5(f). In keeping with the general thrust of the FRSA, which aims to cover every area of railroad safety, and with how the term is used in the relevant regulations, the Court finds that "railroad" is a broad enough term that covers "all forms" of movement by rail cars, and as such may apply to both owners and operators of rail freight cars.

The regulations at issue pertain to designating inspectors to inspect railroad freight cars for compliance, conducting pre-departure inspections, and prohibiting cars with

defective roller bearings from being placed into service. *See generally* 49 C.F.R. §§ 215.11, 215.13, 215.115. As the FRSA was intended to "prescribe regulations . . . for every area of railroad safety," and UTC owned the railroad freight car that was placed into service and eventually derailed, the Court finds that UTC is subject to the FRSA regulations to which plaintiffs cite in the complaints. 49 U.S.C. § 20103.

## 2. Allegations Preempted by the FRSA

CSX and UTC next allege that certain allegations in the complaint are preempted by the FRSA [*Tipton* Doc. 63 pp. 9–11; *Tipton* Doc. 65 pp. 10–13; *Johnson* Doc. 28 pp. 9–11; *Johnson* Doc. 37 pp. 9–11; *Hall* Doc. 38 pp. 13–14; *Hall* Doc. 42 pp. 15–18]. CSX submits that plaintiffs' allegations in consolidated complaint paragraphs 57–61, 63–68, and 70, and *Hall* complaint paragraphs 46–50, 52–57, 59, and 69–72, are preempted by the FRSA because they seek to add new requirements beyond those contained in the FRSA and expand certain FRSA regulations by suggesting additional duties are required under those provisions [*Tipton* Doc. 65 pp. 10–13; *Johnson* Doc. 28 p. 11; *Hall* Doc. 42 pp. 17–18].[10] UTC states that plaintiffs' nuisance and negligence claims in the consolidated complaint and negligence claims in the *Hall* complaint are similarly preempted by the FRSA [*Tipton* Doc. 63 p. 10; *Johnson* Doc. 37 p. 10; *Hall* Doc. 38 pp. 13–15]. In response, plaintiffs submit that they have pled specific violations of the FRSA's regulations, that the duties they allege in their complaint are not substantially subsumed by the FRSA, and that, even if the FRSA regulations do cover these requirements, they should be allowed because they are necessary

---

[10] As the Court has already found that plaintiffs' allegations in paragraphs 57 of the consolidated complaint and 46 of the *Hall* complaint are preempted by the ICCTA, *see supra* Section V.A., the Court will not consider whether they are also preempted by the FRSA.

to avoid a specific local hazard [*Tipton* Doc. 77 pp. 21–25; *Johnson* Doc. 38 pp. 19–21; *Hall* Doc. 56 pp. 20–25].

In paragraphs 58–59 and 64–65 of the consolidated complaint, and paragraphs 47–48 and 53–54 of the *Hall* complaint, plaintiffs allege that CSX breached its duty to adequately inspect rail cars and to prevent defective rail cars and cars with defective roller bearings from being placed into service, in violation of 49 C.F.R. §§ 215.11, 215.13, 215.115 [*Tipton* Doc. 114 ¶¶ 58–59, 64–65; *Hall* Doc. 34 ¶¶ 47–48, 53–54].

In paragraphs 60, 66, and 67 of the consolidated complaint, and paragraphs 49, 55 and 56 of the *Hall* complaint, plaintiffs allege that CSX breached its duty of care "to maintain devices capable of detecting overheated rail car wheel roller bearings during [train operation], including a duty to comply with CSX Operating Rules and industry standards" and to heed the warnings from those devices [*Tipton* Doc. 114 ¶ 60; *Hall* Doc. 34 ¶ 49].

In paragraphs 61 and 68 of the consolidated complaint, and paragraphs 50 and 57 of the *Hall* complaint, plaintiffs allege the CSX breached its duty of care to "keep a lookout during operation of a train so that it can determine if a rail car has derailed and immediately stop a train if a derailment has occurred, including a duty to comply with CSX Operating Rules and industry standards" [*Tipton* Doc. 114 ¶ 61; *Hall* Doc. 34 ¶ 50]. The *Hall* plaintiffs also allege that CSX failure to keep such a lookout amounts to recklessness [*Hall* Doc. 34 ¶¶ 69–70].

Paragraphs 72–73 of the consolidated complaint and paragraphs 61–62 of the *Hall* complaint similarly allege that UTC beached its duty to manufacture, inspect, maintain, and

22

repair its tank cars, in violation of 49 C.F.R. §§ 215.11, 215.13, 215.115 [*Tipton* Doc. 114 ¶¶ 72–73; *Hall* Doc. 34 ¶¶ 61–62].

As plaintiffs cite in the complaints, there are currently FRSA regulations relating to inspecting railcars [*Tipton* Doc. 114 ¶¶ 58–59; *Hall* Doc. 34 ¶¶ 47–48]. *See, e.g.*, 49 C.F.R. §§ 215.11, 215.13, 215.15 (pertaining to designated inspectors, pre-departure inspections, and periodic railcar inspections). While the complaint alleges a failure to comply with those statutory inspection requirements, the complaint also appears to submit that defendants' duties "includ[e]" other duties imposed from other sources, including the CSX Operating Rules and industry standards [*Tipton* Doc. 114 ¶¶ 58–59, 64–65, 72; *Hall* Doc. 34 ¶¶ 47–48, 53–54, 61].

To the extent plaintiffs allege CSX and UTC breached duties established statutorily under the FRSA or in their operating rules, these are not preempted, pursuant to the 2007 clarification to the FRSA. *See Smith*, 2014 WL 3732622, at *2–*3 (finding the plaintiffs' claims are not preempted because they did "not base a breach of duty claim on the failure to use inspection methods not required by federal regulations or by CSX policy that is based on federal regulations"); 49 U.S.C. § 20106(b)(1).

If, however, plaintiffs are alleging that CSX and UTC were subject to duties that go beyond those contained in the FRSA or in their operating rules, and if those purported duties are substantially subsumed by the FRSA, they will be preempted "unless [they are] necessary to address an essentially local safety hazard, [are] not incompatible with the federal regulation, and [do] not unreasonably burden interstate commerce." *See, e.g.*, *Nickels*, 560

23

F.3d at 433 (finding that, because 49 C.F.R. § 213.103 covers the issue of ballast size, plaintiffs' FELA claims were precluded).

### a. Substantially Subsumed by FRA Regulations

In considering whether the FRA regulations "substantially subsume" the same subject matter as these alleged inspection requirements, the Court finds that the FRA has enacted regulations for inspecting railcars before departure, and for who is qualified to perform such inspections. 49 C.F.R. §§ 215.11, 215.13. These inspection requirements cover the same subject matter as plaintiffs' allegations in paragraphs 58–59, 61, and 72 (and the corresponding breach paragraphs 64–65, 68, and 73) of the consolidated complaint, and paragraphs 47–48, 50, and 61 (and the corresponding breach paragraphs 53–54, 57, and 62) of the *Hall* complaint, as they relate to necessary visual inspections of the track and cars. *See, e.g.*, *In re Derailment Cases*, 416 F.3d 787, 794 (8th Cir. 2005) ("It is clear that the FRA's regulations are intended to prevent negligent inspection by setting forth minimum qualifications for inspectors, specifying certain aspects of freight cars that must be inspected, providing agency monitoring of the inspectors, and establishing a civil enforcement regime").

The FRA has also enacted regulations pertaining to overheated wheels and to defective roller bearings, *see* 49 C.F.R. §§ 215.103(h), 215.115, which the Court finds cover the same subject matter as plaintiffs' allegations in consolidated complaint paragraph 60 (and the corresponding breach paragraphs 66 and 67), and in *Hall* complaint paragraph 49 (and the corresponding breach paragraphs 55 and 56), relating to detecting overheated rail car

24

wheel roller bearings. Plaintiffs' allegations therefore attempt to impose additional duties in areas that are covered by FRA regulations.

### b. Not Necessary to Address Local Safety Hazards

The Court must now consider whether these additional regulations are needed to address local safety hazards, are not incompatible with federal regulations, and do not unreasonably burden interstate commerce. *Nickels*, 560 F.3d at 433. In their response to defendants' motion, plaintiffs only allege that these additional duties are necessary to prevent a local safety hazard, but do not make arguments as to the other two requirements [*Tipton* Doc. 77 pp. 24–25; *Hall* Doc. 56 pp. 24–25]. Plaintiffs maintain that CSX's failure to notice that a tank car had derailed would qualify as a specific local hazard because such a hazard is a unique occurrence that causes an imminent accident, rather than a generally dangerous condition [*Tipton* Doc. 77 pp. 24–25; *Hall* Doc. 56 pp. 24–25].

Local safety hazards must be ones that are "not capable of being adequately encompassed within uniform national standards" and are "*not statewide in character*." *Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.3d 567, 571 (6th Cir. 1991) (emphasis in original) (citing H.R. Rep. No. 91-1194, at 11 (1970)). Plaintiffs cite to *Woods v. CSX Transportation, Inc.*, No. 2:07-CV-29, 2008 WL 5070352 (N.D. Ind. Nov. 24, 2008), for the proposition that a specific, local hazard is a unique occurrence that would cause an accident to be imminent, rather than a generally dangerous condition. *Id.* at *7–*8. They maintain that a specific, local hazard occurred when the tank car derailed, and defendant CSX failed to maintain a proper lookout to notice [*Tipton* Doc. 77 pp. 24–25; *Hall* Doc. 56 pp. 24–25].

25

*Woods* involved a train accident in which a train struck a boy crossing the tracks. As the court noted in that case when analyzing whether there was a specific local safety hazard involved, "the possibility that children might walk near train tracks is a generally dangerous condition that uniform national standards can address." *Woods*, 2008 WL 5070352, at *8 (citing *Baker v. Canadian Nat'l/Illinois Cent. Ry. Co.*, 397 F. Supp. 2d 803, 813 (S.D. Miss. 2005) ("A condition that can be or is present at many, or most sites cannot be a specific, individual hazard.")). The court held that a specific hazard arose, however, when the train crew was alerted that the boy intended to cross the railroad tracks. *Id.* at *9. As a result, it held that the FRSA preempted the plaintiffs' claims relating to the train's excessive speed and failure to stop or reduce speed before this specific hazard arose. *Id.* The FRSA did not preempt, however, the plaintiffs' claims that related to the duty to slow or stop the train once the specific hazard arose, or to keep a proper lookout once there was evidence the boy intended to cross the tracks. *Id.*

Upon review, the Court finds that the additional duties plaintiffs attempt to impose on CSX and UTC in consolidated complaint paragraphs 58, 59, and 72 (and the corresponding breach paragraphs 64, 65, and 73), and *Hall* complaint paragraphs 47, 48 and 61 (and the corresponding breach paragraphs 53, 54, and 62), through the statements that CSX's and UTC's duties are ones "including" those under the FRA, their operating rules, and industry standards, are not necessary to prevent a local safety hazard. The FRA duties relating to inspecting rail cars and preventing defective roller bearings are comprehensive, and plaintiffs have not demonstrated how additional duties—whatever they may be—would be necessary in order to prevent a local harm. These duties relate to inspecting the railcar prior to it being

26

placed into service, and thus are capable of being uniformly applied across the nation and are not imposed in response to any specific local hazard in Maryville, Tennessee. Accordingly, to the extent plaintiffs attempt to impose additional duties on defendants in consolidated complaint paragraphs 58–59, 64–65, and 72–73, and *Hall* complaint paragraphs 47–48, 53–54, and 61–62, beyond those contained in the FRSA or in defendants' operating rules, such duties are preempted.

Turning next to consolidated complaint paragraphs 60–61 (along with the corresponding breach allegations in paragraphs 66–68), and *Hall* complaint paragraphs 49–50 (along with the corresponding breach allegations in paragraphs 55–57), in which plaintiffs impose a duty on CSX to maintain devices capable of detecting overheated rail car wheel roller bearings and to keep a lookout during train operation, the Court notes that these duties have the potential to unreasonably burden interstate commerce. One of the primary aims of the FRSA preemption clause is to have laws and regulations relating to railroad safety be "nationally uniform to the extent practicable." *Nickels*, 560 F.3d at 429. Imposing a duty to maintain a device that can detect overheated rail car wheel roller bearings, and a duty to employ and train someone to keep a lookout for a derailed train car, would disrupt this uniform national regulatory scheme and undermine one of the FSRA's primary purposes.

The Court also finds that imposing a duty to keep a lookout to determine if a tank car has derailed and to stop the train if a derailment has occurred is not tailored to a specific local hazard. Even if a specific local hazard arose once the rail car derailed, the hazard that a rail car *may* derail, on the other hand, is a "generally dangerous condition that uniform national standards can address." *Woods*, 2008 WL 5070352, at *8. This condition—the possibility of

27

a rail car derailing—is capable of being present at many sites, and thus is not a specific, individual hazard. *Baker*, 397 F. Supp. 2d at 813. Accordingly, the duty to employ and train someone to keep a lookout for a derailed train car is not tailored to a specific local hazard, but rather to a generally dangerous condition.

Additionally, the Court finds that that these requirements are incompatible with the FRSA provisions that already pertain to wheel roller bearing inspection requirements and railcar inspection requirements contained in 49 C.F.R. §§ 215.1 *et seq.* and 49 C.F.R. 218.1 *et seq. See, e.g.*, *In re Derailment Cases*, 416 F.3d at 794 ("[T]here is no indication that the FRA meant to leave open a state tort cause of action to deter negligent inspection"). As a result, the allegations contained paragraphs 60–61 and 66–68 of the consolidated complaint and paragraphs 49–50 and 55–57 of the *Hall* complaint are preempted to the extent they impose duties beyond those included in the FRSA and CSX's Operating Rules.

Finally, CSX also submits that plaintiffs' allegations in paragraphs 63 and 70 of the consolidated complaint, and paragraphs 52, 59, and 71–72 of the *Hall* complaint, that CSX had a duty to control, mitigate, and remediate the chemical release after derailment, are preempted by the FRSA [*Tipton* Doc. 65 p. 13; *Hall* Doc. 42 p. 18]. The Court finds that these paragraphs are not substantially subsumed by the FRA, but rather relate primarily to CSX's duties for transporting hazardous materials, which are governed by the HMTA. Accordingly, these paragraphs are not preempted by the FRSA, and the Court will next address whether they are preempted by the HMTA.

## C.     HMTA Preemption

The HMTA "governs hazardous material storage, handling[,] and transportation." *Trimbur v. Norfolk S. Ry. Co.*, No. 2:13-CV-0160, 2015 WL 4755205, at *5 (S.D. Ohio Aug. 10, 2015).  Its purpose is "to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material" and it authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce."  49 U.S.C. §§ 5101, 5103(b)(1).  The regulations that the Secretary prescribes under the HMTA are called Hazardous Materials Regulations ("HMR"), and they apply to the transport of "hazardous material in commerce[,]" among other things.  *Trimbur*, 2015 WL 4755205, at *5 (citing 49 C.F.R. §§ 171–180.605); 49 U.S.C. § 5103(b)(1)(A)(i).

The HMTA expressly preempts any state law, regulation, or order that "is not substantively the same" as a regulation prescribed under the HMTA that relates to "the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing" of a package or container that is used in transporting hazardous materials in commerce, among other things.  49 U.S.C. § 5125(b)(1)(E).  "A non-federal requirement is 'not substantively the same' unless it 'conforms in every significant respect to the Federal requirement.'"  *Roth v. NorFalco LLC*, 651 F.3d 367, 377 (3rd Cir. 2011) (citing 49 C.F.R. § 107.202(d); H.R. Rep. No. 101–444, at 24 (1990)).  In order to determine whether something is preempted under the HMTA, courts must first determine whether 49 U.S.C. § 5125(b)(1) applies to the non-federal law, regulation, or order at issue; and then

29

whether that non-federal law, regulation, or order is "substantively the same" as conditions imposed in the HMR. *Roth*, 651 F.3d at 376.

The Sixth Circuit has found that FRSA preemption analysis may apply to regulations that fall under the HMTA, reasoning that FRSA preemption pertains to all rail safety regulations that are created by the Secretary, and "[c]learly, the HMTA is a law relating to railroad safety, even if regulations pursuant to it are promulgated by the Secretary directly, not by the FRA." *CSX Transp., Inc. v. Pub. Utils. Comm'n of Ohio*, 901 F.2d 497, 501 (6th Cir. 1990) (upholding application of FRSA preemption analysis when considering whether a train carrying hazardous waste should "be considered a railroad which happens to be carrying hazardous waste (thus suggesting application of the FRSA preemption provision) or hazardous waste which happens to be carried by rail (thus suggesting application of the HMTA preemption provision)"). Other courts have followed this same reasoning. *See, e.g.*, *Trimbur*, 2015 WL 4755205, at *5 ("Notably, the FRSA preemption analysis applies to the HMTA"); *Bradford v. Union Pac. R.R. Co.*, 491 F. Supp. 2d 831, 839 (W.D. Ark. 2007) ("[A] regulation affecting railroad safety promulgated pursuant to the HMTA takes FRSA's preemptive effect.").

The Court notes, however, that while the FRSA contains a savings clause that prevents state common law claims from being preempted, *see supra* Section V.B., there is competing jurisprudence as to whether the HMTA should preempt state common law claims. *Compare Roth*, 651 F.3d at 378 ("Absent from the HMTA preemption provision . . . is a savings clause exempting common law requirements from the bundle of those non-federal laws and regulations displaced by the federal scheme") *with Whitfield v. Triad Transp., Inc.*,

30

No. 4:07-CV-01206-SWW, 2008 WL 139082, at *2 (E.D. Ark. Jan. 10, 2008) (The HMTA "has a preemption clause, but in its 30-year history, it has never been held to completely preempt state common law claims.").

CSX argues that plaintiffs' claims in consolidated complaint paragraphs 62–63 and 69–70, and *Hall* complaint paragraphs 51–52 and 58–59, are preempted by the HMTA because they seek to add new requirements beyond those contained in the HMTA, and they also seek to expand certain HMTA regulations by suggesting additional duties are required under those provisions [*Tipton* Doc. 65 pp. 14–16; *Johnson* Doc. 28 pp. 11–13; *Hall* Doc. 42 pp. 18–21]. UTC submits that plaintiffs' negligence and nuisance claims are entirely preempted by HMTA as the Department of Transportation has exclusive jurisdiction over regulations pertaining to manufacturing, inspecting, maintaining, or repairing railway tank cars [*Tipton* Doc. 63 pp. 8–9; *Johnson* Doc. 37 pp. 8–9; *Hall* Doc. 38 pp. 10–13]. In response, plaintiffs submit that they have not expanded defendants' statutory duties in those claims that are covered by the HMTA, and that their remaining claims in those paragraphs are not regulated by the HMTA [*Tipton* Doc. 77 pp. 26–30; *Johnson* Doc. 38 pp. 21–22; *Hall* Doc. 56 pp. 26–30].

In consolidated complaint paragraphs 62 and 69, and *Hall* complaint paragraphs 51 and 58, plaintiffs allege that CSX breached its duty to "immediately identify the toxic chemicals involved in the derailment of tank cars and chemical fires and to immediately report the identity of the chemicals to emergency responders . . . including a duty to comply with 49 C.F.R. §§ 172.600, 172.602, CSX Operating Rules and industry standards" [*Tipton* Doc. 114 ¶¶ 62, 69; *Hall* Doc. 34 ¶¶ 51, 58]. CSX states that these allegations expand what

31

the HMTA requires and should be preempted to the extent they attempt to impose a duty on CSX to identify the chemicals, beyond the requirements contained in federal regulations [*Tipton* Doc. 65 pp. 15–16; *Hall* Doc. 42 pp. 19–21].

In consolidated complaint paragraphs 63 and 70, and *Hall* complaint paragraphs 52 and 59, plaintiffs allege that CSX breached its duty to "control, mitigate, and remediate toxic chemical releases from derailment of its trains and to extinguish toxic chemical fires as quickly and safely as possible" [*Tipton* Doc. 114 ¶¶ 63, 70; *Hall* Doc. 34 ¶¶ 52, 59]. CSX submits that these duties "go well beyond what the regulations require" and thus should be dismissed [*Tipton* Doc. 65 p. 15; *Hall* Doc. 42 p. 20].

Turning first to the allegations that CSX must immediately identify the toxic chemicals, the Court notes that HMTA regulation 49 C.F.R. § 172.600 requires all entities and people who transport, store, or handle hazardous materials to have emergency response information "immediately available for use at all times" that the hazardous material is present. 49 C.F.R. § 172.602 states that the "emergency response information" includes "information that can be used in the mitigation of an incident involving hazardous materials and, as a minimum, must contain . . . (1) [t]he basic description and technical name of the hazardous material[.]" Consolidated complaint paragraphs 62 and 69, and *Hall* complaint paragraphs 51 and 58, call for CSX to have immediately identified the toxic chemical involved in the derailment, and reported that identity to the emergency responders [*Tipton* Doc. 114 ¶¶ 62, 69; *Hall* Doc. 34 ¶¶ 51, 58]. The Court finds that imposing this duty on CSX is consistent with the HMTA's requirements in 49 C.F.R. §§ 172.600 and 172.602.

32

Additionally, to the extent plaintiffs' allegations in consolidated complaint paragraphs 62–63 and 69–70, and *Hall* complaint paragraphs 51–52 and 58–59, expand the duties imposed in 49 C.F.R. §§ 172.600 and 172.602, the Court finds that the HMTA does not preempt such an expansion. As stated above, HMTA preemption focuses on laws, regulations, and orders that pertain to a package or container used for transporting hazardous materials. Any expansion of CSX's duties in consolidated complaint paragraphs 62–63 and 69–70, and *Hall* complaint paragraphs 51–52 and 58–59, do not relate to "the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing" of the container that was used in transporting the hazardous material in commerce. 49 U.S.C. § 5125(b)(1)(E). Rather, they pertain to CSX's response to the derailment, and mitigation of the damage from the toxic chemical spill and fire. Therefore, to the extent these paragraphs expand upon CSX's duties under the HMTA, such expansion of duties is not preempted under 49 U.S.C. § 5125(b)(1)(E). In sum, the Court finds that plaintiffs' claims in consolidated complaint paragraphs 62–63 and 69–70, and *Hall* complaint paragraphs 51–52 and 58–59, are not preempted by the HMTA.

Turning to plaintiffs' allegations against UTC in consolidated complaint paragraphs 72–73, and *Hall* complaint paragraphs 61–62, the Court first notes that, unlike in its allegations against CSX, plaintiffs do not allege that UTC violated any specific HMR provisions. Rather, they maintain that UTC had a duty to "manufacture, inspect, maintain, and repair its tank cars, including the wheel roller bearings, used in the transport of toxic chemicals so as to prevent derailments and prevent rupture of the tank cars," among other things [*Tipton* Doc. 114 ¶ 72; *Hall* Doc. 34 ¶ 61]. This language mirrors much of the

33

language contained in the HMTA preemption provision, and pertains to UTC's alleged duties with respect to the tank car that transported hazardous materials in commerce.[11] Accordingly, the Court finds that 49 U.S.C. § 5125(b)(1) applies to the state negligence law at issue.

The Court must next determine whether the state negligence law is "substantively the same" as the conditions imposed in the HMR. *Roth*, 651 F.3d at 376. Upon review of the seemingly conflicting caselaw, the Court finds that this case differs from *Roth v. NorFalco, LLC*, in which the Third Circuit found that the plaintiff's negligence and strict liability claims against a shipper for its tank car design were preempted under the HMTA, as the laws were not "substantively the same" as the HMR. 651 F.3d 367. In that case, the court held that the plaintiff's design claim would impose requirements on the shipper that were different than those contained in the HMR, and "the structure and purpose of the HMTA confirms what the text of § 5125(b)(1) makes plain: the HMTA preempts state common law claims that, if successful, would impose design requirements upon a package or container qualified for use in transporting hazardous materials in commerce." *Roth*, 651 F.3d at 379.

While plaintiffs do not highlight any manufacturing, inspection, maintenance, or repair requirements or duties they seek to impose on UTC through this suit, UTC's alleged violations in the complaint largely mirror those issues that the HMR are intended to cover and preempt. *See* 49 U.S.C. § 5125(b)(1)(E) ("manufacturing, . . . inspecting, . . .

---

[11] Plaintiffs maintain that the preemption provision only applies to a container used in transporting hazardous materials, rather than a tank car. The court disagrees. 49 U.S.C. § 5125(b)(1)(E) pertains to "a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce." The Court finds that the tank car at issue fits into this description, despite plaintiffs not alleging that it was a "container."

34

maintaining, . . . [and] repairing," of a package or container that is used in transporting hazardous materials in commerce). The HMTA's overarching purpose is "to protect against the risks to life, property, and the environment" from the transportation of hazardous materials, and the Court notes that plaintiffs' claim submits that UTC had general duties relating to preventing tank cars from derailing and rupturing, which are risks from transporting hazardous materials [*Tipton* Doc. 114 ¶ 72; *Hall* Doc. 34 ¶ 61]. 49 U.S.C. § 5101. Construing the complaint in the light most favorable to plaintiffs, the Court finds that plaintiffs have given UTC fair notice that they allege it has violated certain HMR provisions in its maintenance, inspection, manufacturing, and repair of its tank car used in transporting the toxic material, despite not explicitly citing to those provisions. *See Twombly*, 550 U.S. at 555; *Directv, Inc.*, 487 F.3d at 476. Thus, the Court finds that the duties plaintiffs allege UTC negligently violated are substantively the same as those in the HMR, and should not be preempted.

The Court finds that this holding also comports with the Sixth Circuit's understanding of HMTA preemption. As the Sixth Circuit has held that the FRSA preemption analysis applies to the HMTA, and the FRSA preemption section contains a savings clause that expressly states that state law claims for personal injury or property damage for failure to comply with a federal regulation or standard are not preempted, the Court finds that it would be consistent with the Sixth Circuit's holding to find that a common law negligence action is not preempted under the HMTA either.

In sum, the Court finds that plaintiffs' claims in consolidated complaint paragraphs 62–63, 69–70, and 72–73, and *Hall* complaint paragraphs 51–52, 58–59, and 61–62, are not preempted by the HMTA.

## VI. Failure to State a Claim

Defendants maintain that plaintiffs' claims in both the consolidated complaint and *Hall* complaint should be dismissed because they fail to state a claim. In the consolidated complaint, plaintiffs allege that CSX and UTC are liable for negligence and nuisance [*Tipton* Doc. 114]. In the *Hall* complaint, plaintiffs allege that CSX and UTC are liable for negligence, and that CSX is also liable for recklessness [*Hall* Doc. 34].[12] The Court will next analyze whether plaintiffs' complaints state a claim as to these claims.

### A. Nuisance

Defendants move the Court to dismiss plaintiffs' claims in the consolidated complaint for private nuisance, as they submit that plaintiffs have failed to state a claim with respect to this claim. Under Tennessee law, a private nuisance is "anything that annoys or disturbs the free use of one's property or that renders the property's ordinary use or physical occupation uncomfortable." *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 415 (Tenn. 2013). "As long as an interference with the use or enjoyment of property is substantial and unreasonable enough to be offensive or inconvenient, virtually any disturbance of the use or enjoyment of the property may amount to a nuisance." *Id.* (citing *Lane v. W.J. Curry & Sons,* 92 S.W.3d 355, 365 (Tenn. 2002)). This may include anything that "endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and

---

[12] CSX does not make a specific argument that plaintiffs' recklessness claim fails to state a claim.

36

comfortable use of the property." *Id.* (citing *Pate v. City of Martin,* 614 S.W.2d 46, 47 (Tenn. 1981)). Examples include "bad smells, noxious vapors, unbearable noises, [and] shocking spectacles[.]" *Id.* at 47 n.10.

Courts must make an individualized assessment in order to determine whether an activity or use of property amounts to a private nuisance, taking into consideration the surroundings; the nature, utility, and social value of the use; the harm involved; and its effect on a reasonable person. *Id.* at 415–16 (citing *Lane*, 92 S.W.3d at 364–65). Given the foregoing, Tennessee courts have held that a "key element" of a private nuisance claim is the "reasonableness" of a defendant's conduct. *In re Tennessee Valley Auth. Ash Spill Litig.*, 787 F. Supp. 2d 703, 724 (E.D. Tenn. 2011).

In the consolidated complaint, plaintiffs allege that defendants created a substantial and unreasonable interference with plaintiffs' use and enjoyment of their properties by causing or contributing to the train derailment and subsequent toxic chemical fire [*Tipton* Doc. 114 ¶ 52]. Plaintiffs submit that the derailment and chemical fire caused toxic smoke, fumes, and vapor to be emitted into the air, which disturbed their ability to freely use their own properties, caused them to be evacuated, and rendered their properties' ordinary use uncomfortable [*Id.* ¶ 53]. Defendants submit that plaintiffs fail to state a claim for private nuisance because plaintiffs plead no facts to suggest that defendants' conduct was unreasonable, and plaintiffs allege no "continuing result" from the derailment, which

defendants submit is a required element of plaintiffs' claim [*Tipton* Doc. 63 pp. 13–15; *Tipton* 65 p. 17; *Johnson* Doc. 28 pp. 17–18; *Johnson* Doc. 37 pp. 14–15].[13]

Turning to defendants' first allegation, and construing the complaint in the light most favorable to plaintiffs, the Court finds that plaintiffs' complaint contains enough facts for the Court to reasonably infer that defendants acted unreasonably. Plaintiffs allege that, as a result of defendants' acts and omissions, a train derailed, causing toxic smoke, fumes, and vapors to fill the area surrounding, including plaintiffs' properties [*Tipton* Doc. 114 ¶¶ 49–55]. Thereafter, plaintiffs needed to be evacuated from their properties [*Id.*]. Plaintiffs claim that defendants' acts and omissions resulted in smoke, fumes, and vapors entering plaintiffs' properties and caused a necessary evacuation [*Id.*]. Plaintiffs thus allege an invasion of a legally protectable property interest as a result of defendants' acts or omissions. These allegations may rise to the level of what a reasonable person with ordinary sensibilities would consider an unreasonable interference with the use and enjoyment of his or her property. The Court finds that, taken together, the complaint contains sufficient factual content to allow the Court to reasonably infer that defendants' conduct was unreasonable.

Turning to defendants' next argument—that plaintiffs allege no "continuing result" from the derailment—the Court notes that under Tennessee law, an actionable claim for a private nuisance may involve a single act or conduct having a continuous effect on a

---

[13] Defendant UTC also submits that plaintiffs have not demonstrated how UTC is a landowner, which it alleges is a requirement under nuisance law. The Court disagrees with UTC's contention. Taking plaintiffs' allegations as true, UTC owned the railcar that derailed in Maryville, Tennessee. The Court finds that UTC's use of that railcar could provide grounds for a nuisance suit, and is thus sufficient to survive the Rule 8 standard. *See In re Tenn. Valley Auth. Ash Spill Litig.*, 805 F. Supp. 2d 468, 486 (E.D. Tenn. 2011) (describing how a particular activity—not simply a use of property—can amount to a nuisance).

plaintiff's legally protectable property interest. *In re Tenn. Valley Auth. Ash Spill Litig.*, No. 3:09-CV-009, 2012 WL 3647704, at *57–58 (E.D. Tenn. Aug. 23, 2012) (citing *Butcher v. Jefferson City Cabinet Co.,* 437 S.W.2d 256, 258 (Tenn. Ct. App. 1968) (considering a nuisance claim and noting that "[i]t is not necessary that the act or acts complained of be habitual or periodical. Where a single act produces a continuing result, the violation by a party may be complete without a reoccurrence of the violation")).

In the complaint, plaintiffs allege that, even after they returned to their homes after the evacuation order ended, the Environmental Protection Agency informed them that "smoke from the toxic chemical fire contained soot and particles that may have settled on their yard or gotten into their house and that smoke or fumes may have gotten trapped in their house" [Doc. 114 ¶ 32]. The Court thus finds that, construing the complaint in the light most favorable to plaintiffs and taking its allegations as true, plaintiffs' complaint contains enough facts to plausibly demonstrate how they are suffering from a continuing nuisance as a result of the toxic chemical fire. Accordingly, plaintiffs state claim for private nuisance that is plausible on its face.

### B.    Negligence

Defendants move the Court to dismiss plaintiffs' claims for negligence in both the consolidated complaint and the *Hall* complaint, as they submit that plaintiffs have failed to state a claim with respect to these claims. Under Tennessee law, a negligence claim requires proof of the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Hale v.*

39

*Ostrow*, 166 S.W. 3d 713, 716 (Tenn. 2005) (citing *Coln v. City of Savannah,* 966 S.W.2d 34, 39 (Tenn. 1998)).

Defendant CSX submits that plaintiffs' negligence claim "consists nothing more than bare allegations that CSX[ ] violated the three FRSA and the two HMTA regulations cited in the Complaint," and therefore should be dismissed for failure to state a claim [*Tipton* Doc. 65 p. 19; *see also Johnson* Doc. 28 pp. 13–15; *Hall* Doc. 42 pp. 21–23]. Defendant UTC submits that the federal regulations to which plaintiffs cite impose no obligations on UTC,[14] that plaintiffs' common law negligence claim fails to state a claim, and that this claim fails under the theory of res ipsa loquitur [*Tipton* Doc. 63 pp. 16–18; *Johnson* Doc. 37 pp. 16–17]. Plaintiffs state that the facts alleged in the complaint in support of the FRSA and HMTA violations "go well beyond what is necessary to create a plausible inference of the violations," [*Tipton* Doc. 77 p. 33; *see also Johnson* Doc. 38 pp. 22–24] and that they sufficiently plead a common law negligence claim.

Upon review, the Court disagrees with defendants' assertions. In the complaints, plaintiffs detail how both defendants allegedly owed a duty to inspect, maintain, and repair its rail cars and wheel roller bearings, to identify the toxic chemical involved in the derailment, and to control the toxic chemical release, among other things [*Tipton* Doc. 114 ¶¶ 56–63, 72; *Hall* Doc. 34 ¶¶ 45–52, 61]. Some—but not all—of these duties arise from the FRSA and the HMTA. Plaintiffs then allege how defendants breached these duties [*Tipton* Doc. 114 ¶¶ 64–70, 73; *Hall* Doc. 34 ¶¶ 53–59, 62], and how such breaches were both a proximate cause and cause in fact of plaintiffs' damages [*Tipton* Doc. 114 ¶¶ 71, 79; *Hall*

---

[14] The Court already addressed this argument in its FRSA preemption analysis, *supra* Section V.B., and found that UTC is subject to the regulations plead in the complaint.

Doc. 34 ¶¶ 60, 68]. The Court is able to "draw the reasonable inference" that each defendant's negligence was a proximate cause of the train derailment and subsequent chemical spill and fire, which caused plaintiffs property and personal injury damage.[15] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Accordingly, the Court finds that plaintiffs have stated a claim for negligence.

## VII. Conclusion

For these reasons, defendants' motions to dismiss [*Tipton* Docs. 62, 64; *Hall* Docs. 37, 41; *Johnson* Docs. 27, 36] are **GRANTED IN PART** and **DENIED IN PART**. The Court **DISMISSES** any claims based on the allegations in paragraph 57 of the consolidated complaint and paragraph 46 of the *Hall* complaint as preempted under the ICCTA [3:15-cv-311 Doc. 114 ¶ 57; 3:15-cv-346 Doc. 34 ¶ 46].

The Court also **DISMISSES** any claims based on the allegations in paragraphs 58–61, 64–68, and 72–73 of the consolidated complaint, and paragraphs 47–50, 53–57, and 61–62 of the *Hall* complaint, to the extent they impose additional duties on defendants beyond those contained in the FRSA or in defendants' operating rules [3:15-cv-311 Doc. 114 ¶¶ 58–61, 64–68, 72–73; 3:15-cv-346 Doc. 34 ¶¶ 47–50, 53–57, 61–62].

---

[15] In response to the consolidated complaint, UTC argues that plaintiffs' negligence claim arises under the theory of res ipsa loquitur. UTC maintains that it cannot be held liable under this theory because plaintiffs are unable to demonstrate that UTC had control of the train at the time of the incident. The Court disagrees with UTC's interpretation of plaintiffs' allegations set forth in the complaint, and also notes that plaintiffs allege that UTC negligently manufactured, inspected, maintained, and repaired its tank car, of which it had control at the time when it would have conducted such actions. Accordingly, the Court rejects UTC's argument that it cannot be held liable for negligence.

41

Finally, for the reasons stated herein, defendants' original motions to dismiss in the *Hall* case are **DENIED as moot** [3:15-cv-346 Docs. 25, 27].

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE