IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | |
|---|---|
| CHARLES TIPTON, et al., | ) |
| | ) |
|  Plaintiffs, | ) |
| | ) |
| v. | )   No. 3:15-CV-311-TAV-CCS |
| | ) |
| CSX TRANSPORTATION, INC., et al., | ) |
| | ) |
|  Defendants. | ) |

## DEFENDANT UNION TANK CAR COMPANY'S
## TRIAL BRIEF

Union Tank Car Company ("UTC"), through counsel and pursuant to the Court's Scheduling Order [Docs. 85, 148, & 235], provides this trial brief to assist the Court in addressing legal issues likely to arise at trial. While the parties have not identified any novel or unusual questions of law, this brief is intended to highlight the issues of fact and the evidence that UTC anticipates will be introduced at trial.

### I. INTRODUCTION

On July 1, 2015, a CSX Transportation, Inc. ("CSX") train comprised of 57 cars, including the Tank Car, was traveling from Cincinnati, Ohio to Waycross, Georgia. (Plaintiffs' Master Consolidated Class Action Complaint (Doc. 114) ("Compl."), ¶13.) Shortly before midnight on July 1, 2015, the Tank Car derailed. (*Id.*, ¶14.) Plaintiffs assert that the cause of the derailment was the failure of a journal roller bearing manufactured by Amsted/Brenco. (*Id.*, ¶15.)

Plaintiffs' claims against UTC sound in negligence. Based on the Court's summary judgment rulings (Docs. 241 and 252), a genuine issue of material fact remains "as to what

UTC employees should have observed during the 2013 inspection and whether those observations would have warranted replacement of the Incident Bearing." (Doc. 241 PageID#: 9201.) In order to prove such a breach, Plaintiffs must establish that the journal roller bearing on UTLX 901717 (the "Tank Car") was "defective" within the meaning of 49 CFR § 215.115 when UTC requalified the Tank Car in 2013. (*See* Doc. 241, PageID#: 9201.) Separately, the Court held that a genuine issue of material fact exists as to whether UTC's qualification was a "substantial reconditioning" of the Tank Car such that the ten-year statute of repose recommenced. (*Id.* at PageID# 9161. The proof will demonstrate that the answer to these issues is no.

## II. ANTICPATED ISSUES AT TRIAL

**A. Plaintiffs must prove that the journal roller bearing was "defective" within the meaning of 49 C.F.R. § 215.115(a) when the Tank Car was qualified in 2013.**

The Federal Railroad Administration's regulations require tank car owners to periodically inspect and "qualify" their cars for continued service. *See* 49 C.F.R. 180.509. These periodic qualifications must occur every ten years and entail a comprehensive inspection of various components of the Tank Car, including the bearing at issue in this case (the "Incident Bearing"). *See id.*; *see also* 49 C.F.R. § 180.511.[1] In this case, UTC qualified the Tank Car while it was at UTC's Cleveland, Texas shop from August 2013 and October 2013. In its memorandum opinion on UTC's summary judgment motion, the Court held that factual

---

[1] The qualification process for tank cars is a time-interval maintenance requirement specific to owners of tank cars and should not be conflated with any inspection duties imposed on shippers and carriers before a tank car is placed in transit. *See, e.g.*, 49 C.F.R. § 173.31(d) ("No person may offer for transportation a tank car containing a hazardous material . . . unless that person determines that the tank car is in proper condition and safe for transportation."); 49 C.F.R. § 215.13 (governing pre-departure inspections of freight cars).

2

issues existed as to what UTC employees should have observed during the 2013 qualification and whether those observations would have warranted replacement of the Incident Bearing.

The definition of "defective roller bearing" is set forth at 49 C.F.R. § 215.115:

(a) A railroad may not place or continue in service a car:

    (1) A roller bearing that shows signs of having been overheated as evidenced by –

        i. Discoloration; or

        ii. Other telltale signs of overheating such as damage to the seal or distortion of any bearing component;

    (2) A roller bearing with a –

        i. Loose or missing cap screw; or

        ii. Broken, missing, or improperly applied cap screw lock; or

    (3) A roller bearing with a seal that is loose or damaged or permits leakage of lubricant in clearly formed droplets.

(b)    (1)    A railroad may not continue in service a car that has a roller bearing whose truck was involved in a derailment unless the bearing has been inspected and tested by:

        i. Visual examination to determine whether it shows any sign of damage; and

        ii. Spinning freely its wheel set or manually rotating the bearing to determine whether the bearing makes any unusual noise.

    (2) The roller bearing shall be disassembled from the axle and inspected internally if –

        i. It shows any external sign of damage;

        ii. It makes any unusual noise when its wheel set is spun freely or the bearing is manually rotated;

        iii.    Its truck was involved in a derailment at a speed of more than 10 miles per hour; or

iv. Its truck was dragged on the ground for more than 200 feet.

(3) Each defective roller bearing shall be repaired or replaced before the car is placed back in service.

Plaintiffs have attempted to place subsection (b)(3) at issue; however, the only regulations applicable to the Incident Bearing are § 215.115(a) (1)-(3). The Tank Car had ***not*** derailed prior to the incident on July, 1, 2015. The requirements set forth in subsection (b) ***apply only to bearings on rail cars that have derailed***. Plaintiffs attempt to expand the application of subsection (b) to all bearings; however:

> Where a statute lists specific things followed by a more general one, the canon of ejusdem generis provides guidance. Under ejusdem generis, we attribute 'the same characteristic of discreteness shared by all the preceding items' to the term in question.

*U.S. v. Taylor*, 583 F. Supp. 2d 923, 935 (E.D. Tenn. 2008) (quoting *U.S. v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008)). Subsection (b)(1) specifically applies to "a roller bearing whose truck was involved in a derailment." Therefore, the Court must apply the "same characteristic of discreteness" to subsections (b)(2) and (b)(3).

Plaintiffs are left with proving the Incident Bearing was defective under subsection (a). To that end, the evidence adduced in discovery forecloses the prospect that Plaintiffs will meet this burden. UTC's 88.B.2 Inspection Report from the 2013 qualification plainly indicates that all four wheelsets were tested and only one was removed. *See* 88.B.2 Inspection Report (attached as "**Exhibit 1**"). As UTC's general manager of the leasing business unit, William Constantino, explained in his deposition:

> If the Rule 36 inspection had uncovered an issue that required further attention or change-out, it would be obviously documented on the repair writeup. You can't prove the null hypothesis. They inspected the car; they didn't find cause for attention; they didn't put any further entry into the repair writeup.

4

Constantino Dep., 97:9-15 (excerpts attached as "**Exhibit 2**"). Further, when asked why the remaining three wheelsets were not removed during the qualification, Mr. Constantino explained that:

> [t]here was no evidence based on the inspections performed, the profile of the car that was available to those repair forces, there was no history to suggest that that fleet of cars or that customer had had a problem.
>
> So while hindsight is a beautiful thing, there was no evidence, there was no hint, if you will, that would have led one to believe that that would have been a reasonable thing. You would have been removing a perfectly usable article that conformed with all the applicable rules for return to service.

*Id.* at 137:7-138:2.

Plaintiffs' sole expert, James Whelan, P.E., has testified that UTC's 2013 qualification was conducted in accordance with the AAR Interchange Rules:

> Q: So any rules that we're going to deal with today, we can limit your opinions to the AAR?
>
> A: Yeah. I think all my opinions are based on the AAR, that's correct.
>
> * * * *
>
> Q: What I want to know is, do you have any opinions as you sit here that Union Tank, as part of the 2013 qualification, failed to satisfy Rule 36 or Rule 88?
>
> A: No. . . .

Whelan Dep., 67:16-20; 175:7-11 (excerpts attached as "**Exhibit 3**"). Further, Whelan admits that the incident bearing passed qualification in 2013 using the AAR-approved methods:

> Q: You don't dispute – you're not meaning to dispute that the incident and mate Brenco bearings, during the 10-year qualification in 2013, that they passed the visual inspection or the inspection that was conducted during the qualification process? Do you have any reason or any evidence to suggest that they failed those inspections?

5

A: No.

*Id.* at 204:20-205:1.

Mr. Whelan's concession that the Incident Bearing passed the inspection during the qualification process is ultimately fatal to Plaintiffs' claims. By definition, if the Incident Bearing passed inspection, none of the conditions listed in 49 C.F.R. § 215.115 existed at the time of the qualification, and UTC properly permitted the Tank Car to return to service.

Plaintiffs' only proof of any alleged defect is the age of the lubricant inside the Incident Bearing. Notably, the age of a wheel bearing's lubrication is *not* among the factors relevant to deciding whether a bearing is "defective" under the Federal regulations. Therefore, Mr. Whelan's view that the Incident Bearing's lubricant was "past its useful life" does not alter the outcome of this case. Whelan Dep., 175:7-14. In order to prove the UTC was negligent by allowing the tank car to reenter service although the incident bearing's internal lubricant was more than ten years old, Mr. Whelan must still point to evidence that the Incident Bearing was "defective" pursuant to 49 C.F.R. § 215.115. He cannot do so.

Again, it is undisputed that UTC performed its 2013 qualification in accordance with the AAR Interchange Rules. Further, because § 215.115(a) in no way connects the defectiveness of a roller bearing to the age of its lubricant, any attempt by Plaintiffs or their expert to expand the Federal regulations would be improper and preempted by the FRSA. Accordingly, Plaintiffs' claims against UTC are preempted unless they can prove that the incident bearing "showed signs of having been overheated" or had a "loose or missing cap screw," a "broken, missing, or improperly applied cap screw lock," or a "seal that is loose or

6

damaged" when the Tank Car was requalified in 2013. *Id.* Absent proof of one of these "defects," UTC will be entitled to a directed verdict on preemption grounds.

For these reasons, Plaintiffs cannot meet their burden of establishing that the incident bearing was "defective" within the meaning of 49 C.F.R. § 215.115(a). Therefore, Plaintiffs' claims against UTC are preempted.

**B. Even if Plaintiffs could prove the bearing was "defective" under § 215.115(a), Plaintiffs' claims are nevertheless barred by Tenn. Code Ann. § 29-28-102 because the Tank Car was not "substantially reconditioned" during the 2013 qualification.**

Even if Plaintiffs could prove that the bearing was "defective" as that term is defined in 49 C.F.R. § 215.115(a), Union Tank would nevertheless be entitled to directed verdict on statute of repose grounds because the 2013 qualification was not a "substantial reconditioning" of the Tank Car. Tennessee's Product Liability Act provides in pertinent part:

> Any action against a manufacturer or seller of a product for injury to person or property caused by its defective or unreasonably dangerous condition must be brought within . . . six (6) years of the date of injury, [and] in any even the action must be brought within ten (10) years from the date on which the product was first purchased for use or consumption . . . .

Tenn. Code Ann. § 29-28-103(a).

In *Fugate v. AAA Machinery and Equipment Company*, this Court held that "a piece of machinery that is substantially rebuilt or reconditioned becomes a 'new' product for the purpose of a products liability action and that a new statute of limitations begins to run from the date of its sale." 593 F.Supp. 392, 393 (E.D. Tenn. 1984). For the "substantial reconditioning" exception to apply, the defendant must be "engaged in the business" of reconditioning products. *Rollins v. Cherokee Warehouses, Inc.*, 635 F. Supp. 136, 138 (E.D. Tenn. 1986) (quoting Tenn. Code Ann. § 29-28-102(7)). Further, the exception does not

7

apply to repairs only. *Richardson v. Gallo Equip. Co.*, 990 F.2d 330, 331 (7th Cir. 1993); *Lillard v. Positive Safety Mfg. Co.*, No. 89-18-II, 1989 WL 54912, at *2 (Tenn. Ct. App. May 24, 1989).

Tank car owners are obligated to perform a series of inspections and repairs every ten years to "qualify" their cars for continued service. Specifically, 49 C.F.R. § 180.511 requires: (a) a visual inspection of the tank car; (b) an inspection and testing of the structural integrity of the tank; (c) an inspection of the tank's "shell thickness"; (d) an inspection an inspection of the tank's thermal protection system, tank head puncture resistance system, coupler vertical restraint system, and system used to protect discontinuities; (e) an inspection and testing of the lining and coating inside the tank; (f) a "leakage pressure test"; (g) a "hydrostatic test"; and (h) an inspection of the "service equipment." 49 C.F.R. § 180.511.

Consistent with the Federal regulations and the AAR Interchange Rules, UTC completed its qualification on August 28, 2013. *See* 88.B.2 Inspection Report. Mr. Constantino explained the qualification process as follows:

> A particular car comes into a repair shop and is due qualification. As part of that, you're going to follow our qualification plan and do the requisite inspections that pertain to vessel integrity, internal inspection, tank shell and head thickness measurements. You're going to assess the insulation of the car. You're going to qualify the service equipment, the valves, safety valve, top fittings.
>
> You're going to ensure that at the end of the day when you put everything back together again, you have compatible and appropriate gasket material, valves, O rings, seals, esthetically that the car is painted for metal protection and clarity of all the regulatory stenciling on the car. Now that is all on the car structure side of things.
>
> At the same time because we are part of and signatory to the interchange rules, we have to ensure that all the safety appliances associated with operation

8

> of rail in North America are intact, are within the framework of the rules. That's the end platforms and the handrails and the ladders.
>
> Then the closer you get to the ground, you have to ensure that the trucks are inspected and all the supporting gear pursuant to . . . Rule 88.[B] inspection is performed.
>
> And cascading from the 88.[B], you're going to inspect the bearings and the wheelsets to ensure that they remain serviceable pursuant to the terms of Rule 86[sic.]

Constantino Dep., 89:6-90:12.

Specific to the 2013 qualification of the Tank Car, Mr. Constantino further explained that the fourth wheelset on the tank car was replaced due to an AAR recall. Constantino Dep., 135:25-136:7. In addition to the replaced wheelset, UTC also made minor replacements to the Tank Car's yoke, end sill gratings, and truck bolster bowl. *See* 88.B.2 Inspection Report.

In sum, UTC's 2013 qualification included nothing more than a series of inspections and repairs that were required by the AAR's Interchange Rules and the Federal regulations. These activities hardly made the Tank Car a "new" product for purposes of the statute of repose. *Fugate*, 593 F. Supp. at 393. As a result, the *Fugate* exception to the statute of repose for "substantial reconditioning" does not apply, and Plaintiffs' claims are time-barred.

## C. Damages

UTC anticipates the damages proof will be limited to Plaintiffs' testimony (and perhaps introduction of some documentary evidence such as receipts). Neither side will likely call an expert to testify. There are several reasons. First, the sole Plaintiffs' expert who provided a report on the issue of damages only addressed the claim for "loss of use and enjoyment of property." Plaintiffs subsequently supplemented their initial disclosures stating the total damages for all six Plaintiffs for loss of use and enjoyment was less than $350 rendering the

9

introduction of expert testimony on this issue unnecessary. Second, Plaintiffs all testified that their properties were not damaged, and there will be no testimony regarding diminution in value of their properties. Finally, none of the Plaintiffs received medical treatment. No expert proof will be introduced on their claims of fear, anxiety and mental anguish.

### III. CONCLUSION

UTC respectfully suggests to the Court that the proof will clearly demonstrate that it properly followed the procedures set forth by the applicable regulations in qualifying the Tank Car during its 2013 inspection. As such, Plaintiffs' claims are preempted, and at the conclusion of Plaintiffs' proof, a directed verdict in favor of UTC should be granted.

Respectfully submitted,

/s/ Michael J. King
Michael J. King, TBPR# 015523
Paine Bickers, LLP
900 S. Gay St., Ste. 2200
Knoxville, TN 37902
Office: (865) 525-0880
Fax: (865) 521-7441
E-Mail: mjk@painebickers.com

Mark A. Kircher, *admitted pro hac vice*
Quarles & Brady LLP
411 East Wisconsin Avenue, Ste. 2350
Milwaukee, WI 53202-4426
Office: (414) 277-5347
Fax: (414) 271-3552
E-Mail: mark@quarles.com

Joshua B. Fleming, *admitted pro hac vice*
Jacob V. Bradley, *admitted pro hac vice*
Quarles & Brady LLP
135 North Pennsylvania Street
2400 BMO Building
Indianapolis, IN 46204
Office: (317) 399-2814
Fax: (317) 957-5014
E-Mail: josh.fleming@quarles.com
E-Mail: jacob.bradley@quarles.com

*Counsel for Union Tank Car Company*

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

/s/ Michael J. King
Michael J. King (BPR #015523)