<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TENNESSEE
 2                 AT KNOXVILLE, TENNESSEE
   _____
 3  CHARLES TIPTON, et al.,        )
                                   )
 4          Plaintiffs,            )
                                   )
 5  vs.                            ) Case No. 3:15-cv-311
                                   )
 6  UNION TANK CAR COMPANY,        )
                                   )
 7  _____Defendant._____   )
</pre>

**EXCERPT TRANSCRIPT OF TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**Monday, March 5th, 2018**

<u>**APPEARANCES:**</u>

<u>**ON BEHALF OF THE PLAINTIFFS**</u>:

         GARY A. DAVIS, ESQ.
         DAVIS & WHITLOCK, P.C.
         21 Battery Park Avenue, Suite 206
         Asheville, NC 28801

         JEFF FRIEDMAN, ESQ.
         FRIEDMAN, DAZZIO, ZULANAS & BOWLING, P.C.
         3800 Corporate Woods Drive
         Birmingham, AL 35242

         BEECHER A. BARTLETT, JR., ESQ.
         KRAMER, RAYSON, LLP
         800 South Gay Street, Suite 2500
         Knoxville, TN 37929

         MARK P. BRYANT, ESQ.
         UNIVERSITY OF KENTUCKY
         101 Main Building
         Lexington, KY 40506

<u>**REPORTED BY:**</u>

Teresa S. Grandchamp, RMR, CRR
P.O. Box 1362
Knoxville, Tennessee 37901
(630) 842-0030

1    **APPEARANCES:**  (Continued)

2    **ON BEHALF OF THE DEFENDANT:**

3            MICHAEL J. KING, ESQ.
         PAINE BICKERS, LLP
4            900 South Gay Street, Suite 2200
         Knoxville, TN 37902
5
         MARK A. KIRCHER, ESQ.
6            JOSHUA B. FLEMING, ESQ.
         QUARLES & BRADY, LLP
7            135 North Pennsylvania Street, Suite 2400
         Indianapolis, IN 46204
8
                        *  *  *  *  *  *  *  *
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **INDEX**

2

3        **WITNESS FOR THE DEFENDANT:**                      **PAGE**

         **William R. Constantino**
4
         Direct Examination
5        By Mr. Fleming                                          5

6        Cross-Examination
         By Mr. Friedman                                        90
7

8        Redirect Examination
         By Mr. Fleming                                        165
9

10

                                    **EXHIBITS**
11
         **EXHIBIT** **(DESCRIPTION)**                  **ID:**    **IN EVID:**
12
         **Plaintiffs' Exhibit No. 144** (UTC         22          22
13       2004 Requalification)

14       **Plaintiffs' Exhibit No. 2** (UTLX          98          98
         General Purpose Tank Car)
15
         **Plaintiffs' Exhibit No. 24** (UTLX        112
16       Interoffice Memorandum)

17       **Plaintiffs' Exhibit No. 104**             140         140
         (Specification M-942)
18
         **Plaintiffs' Exhibit No. 15** (Brenco®     146         146
19       Railroad Bearings Installation and
         Maintenance Guide)
20
         **Plaintiffs' Exhibit No. 48** (UTC Car     163         163
21       Service Agreement)

22       **Defendant's Exhibit No. 111** (2013         8           8
         AAR Field Manual)
23
         **Defendant's Exhibit No. 14** (UTC Form      9           9
24       RES-082-2)

25       **Defendant's Exhibit No. 88** (Rule         11          11
         88.b.2 Inspection)

1

## EXHIBITS (Continued)

2

3   **Defendant's Exhibit No. 148**                18        19
        (M-932-83)

4   **Defendant's Exhibit No. 22** (UTLX           57        57
        Repair History 1/18/95 - 7/2/15)

5
        **Defendant's Exhibit No. 86** (8/29/17    59        59
6       E-mail Gallagher to Constantino)

7   **Defendant's Exhibit No. 112** (2013          65        65
        AAR Office Manual)

8
        **Defendant's Exhibit No. 2**              74        74
9       (Application for Approval)

10  **Defendant's Exhibit No. 17** (UTCC           76        76
        Service Agreement)

11
        **Defendant's Exhibit No. 87** (Rule       78        78
12      88.b.2 Inspection 3/2/04)

13  **Defendant's Exhibit No. 13** (2013           81        81
        Qualification File)

14
        **Defendant's Exhibit No. 93** (Average    84        84
15      Miles Per Year Stats)

16  **Defendant's Exhibit No. 20** (UTCC           87        87
        Final Disposition)

17
        **Defendant's Exhibit No. 140**            126
18      (Railroad Safety Report)

19  **Defendant's Exhibit No. 149**                171       171
        (November 1996 Memo)

20

21                    * * * * * * * *

22

23

24

25

1          (A portion of the trial was had but not

2                 requested to be transcribed.)

3          (The following excerpt of the trial

4           proceedings was had on March 5, 2018:)

5          (The witness was thereupon duly sworn.)

6          THE COURTROOM DEPUTY:  Have a seat, please.

7          Will you state and spell your name for the

8     record.

9          THE WITNESS:  My name is William R.

11:43AM  10     Constantino, C-o-n-s-t-a-n-t-i-n-o.

11          THE COURTROOM DEPUTY:  Thank you, sir.

12                   **WILLIAM R. CONSTANTINO**,

13     having been first duly sworn, was examined and

14     testified as follows:

15                   DIRECT EXAMINATION

16     BY MR. FLEMING:

17          Q.   I'll let you get some water first.

18          A.   Yes, sir, if I could.

19          Q.   Mr. Constantino, will you please state your

11:44AM  20     name.

21          A.   William R. Constantino.

22          Q.   Where are you employed?

23          A.   With Union Tank Car Company in Chicago,

24     Illinois.

25          Q.   In what capacity, sir?

A.    I am the president of the North American

Rail Leasing Group.  That covers both Union Tank Car

Company in the United States, as well as Procor in

Canada.

With respect to Union Tank Car Company, I'm

the general manager of the leasing business unit.

Q.    How long have you worked for Union Tank Car

Company?

A.    40 years as of January of this year.

Q.    Mr. Constantino, before we further

introduce you and the company, I wanted to address a

few topics that are likely at the front of the

jury's mind.

The jury's heard that the last time the

tank car was in Union Tank Car's possession was when

it was qualified in 2013.  Can you explain to the

jury, what is the qualification?

A.    Qualification is a mandated inspection.  It

looks at the car from top to bottom, from end to

end, makes sure that the car conforms to structural

integrity requirements, that its fittings are in

operation and good condition, and that all the

wheels and axles, bearings, couplers, running gear,

as it's called in the industry, is in sound

operating condition and conforms to the regulations.

1      Q.   So we inspect -- Union Tank Car inspects it

2   from stem to stern and top to bottom?

3      A.   Yes, sir.

4      Q.   How often is qualification required?

5      A.   The interval for qualification is 10 years.

6      Q.   What does qualification accomplish or what

7   is it intended to accomplish?

8      A.   It is to ensure, as I said, the structural

9   integrity of the tank and to ensure that in all

10   respects the railcar is in compliance with the rules

11   before it returns to service.

12      Q.   As part of the process, does Union Tank Car

13   follow certain rules to determine whether it can be

14   qualified?

15      A.   Yes, sir.

16      Q.   What are those rules?

17      A.   It is a mandate from the Code of Federal

18   Regulations, 49 C.F.R., part 180, specifically calls

19   out that hazardous material tank cars should undergo

20   qualification.  And then beyond that, you have

21   certain rules established by the American

22   Association of American Railroads, Rule 88.b, Rule

23   36.

24      Q.   And does Rule 36 -- we've heard a lot of

25   testimony about Rule 36.  Does Rule 36 set forth

1    when a roller bearing must be removed from service?

2        A.    It does.

3        Q.    And is Rule 36 contained within the field

4    manual of AAR interchange rules?

5        A.    It is.

6        Q.    Now, everyone agrees, including the

7    plaintiffs' expert, Mr. Whelan, that Rule 36 was

8    complied with here.

9            Other than Rule 36, is there any other rule

11:47AM  10    Union Tank Car is required to observe with respect

11    to the roller bearings?

12        A.    Not that I'm aware of, no.

13                    (Defendant's Exhibit 111 was

14                    marked/received into evidence.)

15    BY MR. FLEMING:

16        Q.    I want to show what's been marked as Union

17    Tank Car Exhibit -- or Defendant's Exhibit 111, to

18    which there is no objection, and we've drawn out

19    field service manual Rule 36.  And does Rule 36,

11:47AM  20    Mr. Constantino, identify the causes of removal or

21    causes for removal for journal roller bearings?

22        A.    It does.

23        Q.    And is part 3 the section of the rule that

24    defines the guidelines under which we inspect the

25    bearing?

1    A.    It does.

2    Q.    Could you just describe for the jury what

3    part 3 requires during a Rule 36 inspection.

4    A.    Well, you are to, in effect, rotate the

5    bearing and listen and feel for any disturbance that

6    would give indication of an internal problem with

7    the bearing.

8    Q.    And are -- repair shop inspectors and

9    technicians would follow this rule and do this

11:48AM 10    particular inspection and look for the conditions

11    during the Rule 88 qualification inspection?

12    A.    Yes, as part of Rule 88.b, you do have to

13    inspect various aspects of running gear componentry,

14    the truck's wheels.  You do a visual inspection to

15    begin with on the bearings themselves looking for

16    any visible signs of distress and then proceed, as

17    allowed, to do that rotation exam that I discussed.

18                        (Defendant's Exhibit 14 was

19                         marked/received into evidence.)

11:48AM 20    BY MR. FLEMING:

21    Q.    Speaking of the inbound inspection, I want

22    to next show Defendant's Exhibit 14, to which there

23    is no objection.

24         What is the form we have up in front of you

25    right now, the RES-82-2?

1    A.    This is an internal UTC document that we

2  use, and we put it in the hands of our inspector,

3  the initial person that overviews the condition of

4  the car after it's been received at one of our

5  repair shops, and it's a checklist of things that

6  they have to go through and look at and ascertain

7  conditions.

8    Q.    And is this the inbound inspection form

9  from the 2013 qualification?

11:49AM  10    A.    Yes, sir.

11    Q.    I want to draw your attention to line No.

12  17.  What does line No. 17 reflect from this inbound

13  inspection?

14    A.    That the inbound inspector overviewed all

15  the bearings on the car in his walk-around of the

16  car and his inspection.

17    Q.    And were any -- was there any significance

18  that the boxes were left blank?

19    A.    Well, that's indicative of no issues or

11:50AM  20  defects being found.  There is a notation at the

21  bottom of each of these forms for the absence of

22  doubt; so everybody who looks at the document

23  understands that if there is no notation, no defect

24  was noted.

25    Q.    And is that the last time the bearings

1   would be reviewed?

2       A.   Well, once the car was put back into

3   service, it was reviewed by any number of folks.

4       Q.   Now, I mis- -- focusing on the

5   qualification, after the inbound inspection, would

6   it then go to the Rule 88 inspection?

7       A.   Oh.   This document is, just as I said, the

8   inbound inspection document.   The car then

9   ultimately moves to various workstations within the

11:51AM 10   repair facility.   And -- excuse me -- when that car

11   gets to the work center that deals with truck and

12   brake and wheel issues, those bearings are inspected

13   once again.

14                    (Defendant's Exhibit 88 was

15                     marked/received into evidence.)

16   BY MR. FLEMING:

17       Q.   And so I'd like to next show you

18   Exhibit 88, Defendant's Exhibit 88, to which there

19   is no objection, and ask you if this -- ask you to

11:51AM 20   tell the jury:   What is this document?

21       A.   This is the checklist that is followed at

22   that work center where the actual Rule 88 inspection

23   is done.

24       Q.   And we'll pull up the larger box so

25   everyone can see that this lists -- what does it

1    tell -- or what does the inspector do?  Can you just

2    describe that generally.

3        A.    Well, there is a fairly long list of

4    individual items that that inspector must review,

5    and then he ascertains whether or not that

6    particular item passes or fails and whether or not

7    repair is required or not.

8        Q.    And during this inspection is a wheel

9    bearing inspection performed?

11:52AM  10    A.    Yes.

11       Q.    Is that the 36 -- the Rule 36 inspection?

12       A.    Yes.

13       Q.    And on this document, what is the result of

14   the wheel bearing inspection?

15       A.    That those bearings passed inspection and

16   that no repair was required.

17       Q.    Where was the qualification performed; what

18   facility?

19       A.    This particular shopping that we're talking

11:52AM  20   about today is Cleveland, Texas.

21       Q.    And at the time in 2013, was Cleveland --

22   was Union Tank Car's shop an AAR-approved shop?

23       A.    It is an AAR-certified facility.  Was then

24   and is today.

25       Q.    What does it mean to be an AAR-approved

1    shop?

2        A.    That you have documented that the people at

3    the repair facility are trained, that they are

4    certified to perform certain inspections using

5    inspection techniques, that they conform to the AAR

6    interchange rules in their inspection and repair of

7    equipment.

8        Q.    Does the FRA and AAR audit us to maintain

9    that certification?

11:53AM  10        A.    The AAR has audit rights to come in and

11    inspect a facility and to question people and review

12    their processes, as does the Federal Railroad

13    Administration, the FRA.

14        Q.    Is Union Tank Car Company the only company

15    that operates AAR-approved repair shops?

16        A.    No, sir.

17        Q.    Sir, based on your review of the 2013

18    qualification and, in particular, Exhibits 14 and

19    88, when the car departed from Cleveland, Texas, had

11:54AM  20    it passed inspection and was it qualified for use in

21    interchange?

22        A.    Yes.

23        Q.    Based on your review of the 2013

24    qualification records and on your review of Exhibits

25    14 and 88, when the tank car left Cleveland, Texas,

1    did it comply with all applicable AAR rules?

2        A.    Yes, sir.

3        Q.    And if Union Tank Car had performed and

4    passed the AAR Rule 36 inspection, would the bearing

5    have also passed the inspection required by the Code

6    of Federal Regulations 215.115?

7            MR. FRIEDMAN:   Object to form.   Object to

8    that.   It's calling for speculation, calling for

9    expert testimony.

11:54AM 10            MR. FLEMING:   First of all, Your Honor --

11            MR. FRIEDMAN:   Lack of foundation.

12            MR. FLEMING:   First of all, Your Honor, we

13    did designate Mr. Constantino as an expert witness

14    to which there was no objection filed with the

15    Court.

16            That being said, this is not calling for an

17    expert's testimony.   There is a Code of Federal

18    Regulation that lays out similar conditions under

19    which the bearing is required to be --

11:54AM 20            THE COURT:   Why don't you ask a little more

21    foundation questions for your last question.

22    BY MR. FLEMING:

23        Q.    During the Rule 88 and 36 inspections that

24    were performed in Cleveland, Texas, is there any

25    indication in any of the repair records that the

1    Union Tank Car repair shop noted or discovered

2    discoloration or damage to the bearing seal?

3         A.   No, sir.

4         Q.   Any indication in the records that there

5    was any distortion of any bearing component?

6         A.   None.

7         Q.   Any indication in the record that Union

8    Tank Car found or discovered a loose or missing cap

9    screw?

11:55AM  10         A.   None whatsoever.

11        Q.   Any indication in the record or evidence

12   that Union Tank Car discovered broken, missing or

13   improperly-applied cap screw locks?

14        A.   No.

15        Q.   Was there any evidence in the Union Tank

16   Car repair records that Union Tank Car's Rule 36

17   inspection revealed a bearing with a seal that was

18   loose or damaged or that permitted leakage?

19        A.   No.

11:55AM  20         Q.   Sir, do you understand that those

21   conditions are the conditions called out in Code of

22   Federal Regulations 215.115?

23             MR. FRIEDMAN:  We object to this, leading

24   the witness.

25             MR. FLEMING:  I asked him foundationally if

1  he knows that those are the conditions.

2          THE COURT:  I'll overrule the objection.

3  BY MR. FLEMING:

4      Q.  Do you know, sir?

5      A.  The conditions that you outlined are from

6  the federal code but are likewise mirrored in Rule

7  36.

8      Q.  And as a consequence of that, when the tank

9  car left Union Tank Car, did Union Tank Car consider

11:56AM  10  it in compliance with Code of Federal Regulations

11  215.115?

12      A.  Yes.

13      Q.  Is anyone else required to follow Code of

14  Federal Regulations 215.115?

15      A.  While the car is in service, everyone who

16  has the opportunity to operate the car conforms to

17  the same set of regulations.

18      Q.  Who would that include?

19      A.  All the railroads handling the car, as well

11:56AM  20  as a shipper tendering that car into interchange

21  service.

22      Q.  Does Rule 88 or Rule 36 or any AAR rule

23  require that Union Tank Car or any repair shop

24  remove a bearing based on the life of the bearing or

25  age of the bearing?

1    A.    No, sir.

2    Q.    Is there any rule that you're aware of,

3  that Union Tank Car is aware of, that requires the

4  removal of a journal, a journal roller bearing at

5  10 years of service life?

6    A.    No, there is no such rule.

7    Q.    Are you aware of any tank car owner or

8  railroad that employs or imposes such a rule on its

9  roller bearings?

11:57AM  10    A.    No, I'm not.

11    Q.    Has Union Tank Car ever been told by Amsted

12  or any manufacturer of bearings or wheel sets that

13  the AAR -- that AAR-approved roller bearings must be

14  removed after 10 years?

15         MR. FRIEDMAN:  Your Honor, I don't know

16  what this is offered for, but it's clearly hearsay.

17  If they know, if there is any knowledge of that,

18  that's fine, but having been told, I object to that.

19         MR. FLEMING:  I'm asking if Union Tank Car

11:58AM  20  has ever been told by manufacturers.  The plaintiffs

21  have put into evidence or through their -- through

22  their expert that they contend the Brenco®

23  manufacturer told certain things, and it goes to

24  notice, not the truth of the matter.

25         MR. FRIEDMAN:  We withdraw our objection,

|  | |
|---|---|
| 1 | Your Honor, if that's the purpose they're asking. |
| 2 | THE COURT:  Thank you. |
| 3 | BY MR. FLEMING: |
| 4 | Q.  Let me repeat it, sir. |
| 5 | Has Union Tank Car ever been told by Amsted |
| 6 | or any manufacturer of bearings for wheel sets that |
| 7 | AAR-approved roller bearings must be removed after |
| 8 | 10 years? |
| 9 | A.  No, sir. |
| 11:58AM 10 | Q.  Instead, what do the AAR's manual for |
| 11 | standards and practices say with respect to the |
| 12 | journal roller bearings; how long must they be |
| 13 | designed or manufactured to last? |
| 14 | A.  The submission standard for getting AAR |
| 15 | approval for bearing design calls out that that |
| 16 | bearing must be reliable for a minimum of 500,000 |
| 17 | miles of over-the-road service. |
| 18 | (Defendant's Exhibit 148 was |
| 19 | marked for identification.) |
| 11:59AM 20 | MR. FLEMING:  Your Honor, we provided a |
| 21 | copy last week during Mr. Whelan's testimony, but I |
| 22 | would like to offer for admission and publication |
| 23 | Exhibit 148, which is a copy of Association of |
| 24 | American Railroads' Manual of Standards and |
| 25 | Recommended Practices, Specification M-934-82, which |

1    is the Standard for Freight Car Journal Roller

2    Bearings effective March 1, 1983.

3            And because we just provided it -- it

4    wasn't on our exhibit list -- I want to give the

5    plaintiffs an opportunity to object.

6            THE COURT:  Any objection?

7            MR. DAVIS:  Your Honor, we've seen this,

8    and, no, no objection.

9            THE COURT:  Thank you.  We'll admit 148.

11:59AM  10            (Defendant's Exhibit 148 was

11                    received into evidence.)

12    BY MR. FLEMING:

13       Q.   Mr. Constantino, is Exhibit 148 the

14    applicable section of M-934 that you were referring

15    to with respect to the 500,000-mile roller bearing

16    life?

17       A.   It is.

18       Q.   And is Exhibit 148 the 1983 version of AAR

19    M-932 -- 934, the version that would have applied to

12:00PM  20    the roller bearings in 1994?

21       A.   Yes, sir, it is.

22       Q.   Thank you.

23            Sir, the plaintiffs have told the jury that

24    following the 2013 qualification, Union Tank Car

25    knew that it would not have seen the tank car or the

1 roller bearings over the next 10 years; is that

2 true?

3     A.    No.  No, the car operating in service is

4 reviewed by many parties that report activity and

5 outcomes back to Union Tank.

6     Q.    Are there also devices that ensure that it

7 is monitored and inspected?

8     A.    Sure, there are multiple forms of

9 monitoring equipment in the North American rail

12:01PM 10 system that watch equipment for its location; hotbox

11 detectors to look at the condition of bearings,

12 acoustic high-impact detectors to look at the

13 condition of wheels.

14     Q.    Does the AAR also require that the

15 railroads keep -- participate in the process?

16     A.    Well, the instrumentation that I was

17 talking about is on railroad property.

18     Q.    I'm focusing more on -- I want to talk

19 about the AAR Rule 1.  Does the AAR also provide

12:01PM 20 that the railroads will participate in the

21 monitoring and inspection process?

22     A.    Well, all the major railroads are signators

23 to the interchange rules, which is a large body of

24 rules, and Rule No. 1 is very clear in that a

25 railroad accepting a freight car onto its line is

1    responsible for its condition.  Once they accept it,

2    they're responsible for it.

3        Q.   If a railroad or even the Union Tank Car

4    customer discovers a tank car in need of repair,

5    including in need of a wheel set or a bearing

6    replacement, are they empowered and obligated under

7    the AAR rules to take that car out of service?

8        A.   Well, I mentioned the interchange rules

9    before, and that is a collective agreement by all

12:02PM   10    the participation -- all the participants in the

11    industry to be conscientious, and if any railroad

12    found cause, they could take the wheel set off and

13    replace it.

14            Likewise, a shipper who noticed a car in

15    distress would report that back to Union Tank Car

16    rather than allow the car to continue in service.

17        Q.   So even though the car is out of Union Tank

18    Car's possession, the railroads and customers are

19    required and participating in the -- in ensuring

12:03PM   20    that the car's remaining in compliance with the

21    rules?

22        A.   Yes, sir, absolutely.

23        Q.   If someone other than Union Tank Car makes

24    the repair, who pays for it?

25        A.   Unless it is an abuse situation, it's Union

1    Tank Car Company that's financially responsible

2    ultimately to sponsor that repair.

3        Q.   Does that mean Union Tank Car's checkbook

4    follows its cars?

5        A.   Yes.

6        Q.   There has been a suggestion in the opening

7    statement that there was an issue with the bearing

8    adapter back in 20- -- in 2004 and a suggestion that

9    the car, 901717, had been submerged.

12:03PM  10                    (Plaintiffs' Exhibit 144 was

11                        marked/received into evidence.)

12    BY MR. FLEMING:

13        Q.   I'd like to show you Plaintiffs' Exhibit

14    144, particularly a page from Exhibit 144 which is

15    the qualification file for 901717 from 2004, and ask

16    you to take a look at line 15, and explain to the

17    jury what we're looking at.

18             THE COURT:  Is this document in evidence?

19             MR. FLEMING:  Well, no, there is no

12:04PM  20    objection to this document.

21             THE COURT:  No objection.

22             MR. FRIEDMAN:  No objection, Your Honor.

23    BY THE WITNESS:

24        A.   This is part of the car file, once again.

25    This is the inbound inspection document.  And with

1  respect to the bearing adapters, there was a

2  notation from that inbound inspector that those

3  adapters required additional attention when the car

4  got to a work center.

5  BY MR. FLEMING:

6     Q.   And, again, this is the same form that we

7  looked at under Exhibit 14, this RES-082-2, which is

8  the inbound inspection?

9     A.   Yes, sir.

12:05PM  10     Q.   This isn't the final inspection?

11     A.   No, it isn't.  It isn't a work document

12  itself; it's an inspection document.

13     Q.   What did we do to the bearing adapter

14  following this inbound inspection?

15     A.   When it -- when it moved -- when the car

16  moved on to the actual work center, the folks at

17  that point did inspect and ensure that the roller

18  bearing adapters were in compliance with the

19  criteria for continued service for those features.

12:05PM  20     Q.   Have you personally reviewed the 2004

21  qualification file?

22     A.   I have, yes.

23     MR. FLEMING:  And can you bring up the next

24  part of Exhibit 144, Ms. Bauer.  Can you zoom in?

25

BY MR. FLEMING:

Q.   Mr. Constantino, on Exhibit -- another page
of Exhibit 144 from the plaintiffs.  Is -- is there
an entry that reveals to you that we did, in fact,
inspect the bearing adapter?

A.   Yes.  And, in fact, based on the position,
it shows that all the bearings, A and B end of the
car, right and left side of the car, did have their
bearing adapters inspected, and there is a charge of
one hour to have accomplished that work.

Q.   When you say there is an entry that
reflects that the A and B and right and left
inspections occurred, is that the ABRL?

A.   It is, sir, yes.

Q.   Based on your review of Exhibit 144 and
particularly the inbound inspection report that
reflect the entry "may be water," is there anything
in the 2004 qualification records to suggest or
support that the bearing adapters were submerged?

A.   No, sir.

Q.   Are there other explanations for the entry
of "may be water"?

A.   They were rusty.

Q.   Where was this car leased and -- where was
this car leased and operated out of?

1    A.   It was operating in North America and

2  subject to the elements.

3    Q.   And was it primarily in the midwest where

4  INEOS was located?

5    A.   Well, most of the shipping records show an

6  Ohio origin point.  It did deliver material to

7  Michigan, as well as other locations.

8    Q.   And you're from Chicago and the midwest

9  area.  Does it rain and snow in the midwest?

12:08PM  10    A.   It does.

11    Q.   Based on -- well, if -- if this railcar

12  901717 had been submerged at any point in the

13  history of its existence, is that a big deal?

14    A.   Yes, sir, it certainly is.

15    Q.   Why?

16    A.   Well, the rules are very specific with

17  respect to bearing assemblies and brake systems, and

18  beyond that, you have every chance of other systems

19  of the car being compromised.

12:08PM  20    Q.   Can a wheel set or bearing -- well, let me

21  withdraw it and ask it this way:  Can a tank car

22  with a wheel set or a bearing that has been

23  submerged even be moved before being replaced or

24  reconditioned?

25    A.   No, sir.  The rules outline that the wheel

1    set is to be exchanged before the car makes another

2    move.

3        Q.    You raised the rules.  In fact, does Rule

4    36 contain a rule that says cause for removal is a

5    tank car that has -- that shows a roller bearing

6    that has been submerged?

7        A.    If there is any evidence in the course of a

8    Rule 36 inspection, yes.

9            MR. FLEMING:  Can you put up 111, Defense

12:09PM  10    Exhibit 111, which we were looking at a few minutes

11    ago, which is Rule 36.

12    BY MR. FLEMING:

13        Q.    And No. 2, under Cause For Removal, do you

14    see that, sir?

15        A.    I do.  Very clear.  "Damage from being

16    submerged or from electric arcing."

17        Q.    Is cause for removal?

18        A.    That's correct.

19        Q.    Are there also -- let me ask you:  What are

12:10PM  20    Why Made Codes?

21        A.    It is -- Why Made Codes are definitions,

22    explanations for the cause of performing a

23    particular repair.  They are used to standardize

24    language and to simplify reporting of repair

25    activity.

1      Q.    Are there distinct and separate Why Made

2   Codes for submersion?

3      A.    There are, yes.

4      Q.    If this car had ever been submerged,

5   would -- and in need of repair for submergence,

6   would those Why Made Codes be used to identify those

7   conditions?

8      A.    Yes, you should have evidence of the wheel

9   sets being exchanged and that Why Made Code would be

12:10PM  10   displayed.

11      Q.    And have you seen any record that such a

12   Why Made Code has been entered into the 2004 car

13   file?

14      A.    No, sir.

15      Q.    Can a railroad or a customer or even Union

16   Tank ever place into interchange a tank car that has

17   been submerged or in a flood?

18      A.    No.

19      Q.    In addition, in the opening, there was

12:11PM  20   suggestion that water may have reached the stencils

21   on the side of the car and infiltrated the

22   insulation.  Under the rules, could that car have

23   been returned to service without replacing every

24   wheel set and bearing?

25      A.    No, sir.

1      Q.   Is there any evidence in your review of the

2  car file in 2004 or otherwise to suggest that this

3  car has ever been submerged?

4      A.   None whatsoever.

5      Q.   If it had been -- well, I'll withdraw.

6           Now, I want to ask you a question.

7  Plaintiffs showed in opening Plaintiffs'

8  Exhibit 144, a specific part of Exhibit 144, a

9  specific page, and I'd like to call that up.

12:11PM 10           THE COURT:  Why don't we do this if we're

11  done:  It sounds like it's a little bit different

12  subject matter.  It might be a good time to take our

13  lunch break.

14           MR. FLEMING:  That's fine.

15           THE COURT:  I'm going to let the jury go

16  on, since we've been going a couple hours, and ask

17  the jury to be back at 1:30.

18                (Jurors excused from the courtroom.)

19           THE COURT:  All right.  Thank you.

12:12PM 20  Everyone may be seated.  And, Mr. Constantino, you

21  can step on down.

22           THE WITNESS:  Thank you.

23           THE COURT:  Mr. Davis, you wanted to raise

24  objections to the memorandum in an order filed this

25  morning by Judge Poplin.

 1          MR. DAVIS:  Yes, Your Honor.  I'm looking

 2     at Rule 72 of the Federal Rules of Civil Procedure,

 3     basically 72(a), and I'm sure the Judge -- I'm sure

 4     Your Honor is well aware of the standard for

 5     overruling a magistrate in a non-dispositive motion

 6     issue like this.  But we believe that this puts

 7     plaintiffs in a very untenable position with regard

 8     to these depositions, and as someone who has been

 9     taking expert depositions and defending expert

12:13PM 10     depositions for over 30 years, if these depositions

 11     can come in, I wouldn't know how to either take or

 12     defend those depositions, Your Honor, because

 13     basically what is happening here is that they're

 14     being able to convert a discovery deposition into a

 15     deposition for -- an expert discovery deposition

 16     into an expert deposition for trial.

 17          So whenever any plaintiffs' attorney or any

 18     defense attorney, for that matter, goes to take an

 19     expert's deposition, they have to consider that this

12:14PM 20     is going to be played at trial.  And it's going to

 21     have to be played -- they will have to cross-examine

 22     this witness just as if they're cross-examining the

 23     expert at trial, which totally destroys the

 24     discovery deposition under Rule 26(a) for experts.

 25          So, yes, you can take depositions for

1    proof.  It happens all the time, and that -- and at

2    that stage, the attorney taking the deposition or

3    defending the deposition both are aware that it's

4    going to be played at trial and they're going to be

5    doing their best to cross-examine the witness or

6    make objections.

7         The plaintiffs were taking the deposition

8    of Mr. Bullock.  So it's not like the plaintiffs

9    were going to make objections to what Mr. Bullock

12:15PM 10   was testifying to.

11        There was a general objection that

12   Mr. Bullock was being called as an expert but hadn't

13   provided an expert report.  So it was even more

14   difficult for Mr. Nichol, who took that deposition,

15   to know how to take the deposition when he didn't

16   even have an expert report.  He couldn't

17   cross-examine the expert based upon a report because

18   there wasn't one.

19        And, of course, what Mr. Nichol was doing

12:15PM 20   at the time was trying to discover the expert's

21   opinion since there was no report.  And so in the

22   process of doing so, he asked open-ended questions

23   about the expert's opinions to get them all out

24   there so he could then go back -- or plaintiffs

25   could go back and prepare to cross-examine

1    Mr. Bullock if he came to trial.

2         I just -- if this is allowed, then there is

3    no discovery depositions of experts anymore.  I

4    mean, there is no way that you'd go into a

5    deposition of an expert and take it as if you're

6    trying to discover the expert's opinions.  It will

7    have to be a full-on cross-examination with whatever

8    you can bring to that deposition in advance of even

9    asking the expert what their opinions are.

12:16PM  10        So that is the concern that we have.

11    That's the reason why we believe the magistrate

12    judge's decision on this issue is wrong.  And so far

13    I've been talking about Mr. Bullock, Dr. Bullock.

14    Mr. Fulk is even more difficult for any party to

15    deal with.

16         Mr. Fulk was plaintiffs' expert.  He was

17    withdrawn before trial.  And when the expert

18    deposition was taken by the defendant, of course

19    plaintiffs' attorney wasn't considering that that

12:16PM  20    was going to be played at trial.

21         Plaintiffs' attorney who defended that

22    deposition was objecting on occasion, but not from

23    the standpoint that when Mr. Fulk was expressing

24    opinions that they want to display to the jury now,

25    and so it's -- again, it turns the whole discovery

1  deposition idea on its head if a deposition that is

2  clearly a discovery deposition can be used at trial

3  to play the expert's opinions, even if the party who

4  sponsored that expert has withdrawn the expert.

5          So I -- the caselaw is both directions, and

6  I think the magistrate judge recognized that, and

7  I'm not going to comment on the legal analysis

8  behind this, but I'm just imploring the Court that,

9  based upon sound law practice, this just makes it

12:17PM 10  impossible to know how to do an expert deposition.

11          THE COURT:  All right.  Thank you.

12          Who is going to respond?

13          MR. KING:  Your Honor, I've only had a few

14  moments to look at Judge Poplin's order, so I'm

15  going to just address the comments that were

16  directly made by counsel now.

17          I begin by noting, Your Honor, that there

18  is no distinction in the rules about depositions.

19  This idea of a discovery deposition, proof

12:18PM 20  deposition, they don't exist.  A deposition is a

21  deposition.

22          The parties can choose to take that

23  deposition in whatever manner they see fit.  If they

24  want to ask open-ended questions, they can ask

25  open-ended questions.  If they want to do

cross-examination, they can do cross-examination.

The way the questions are asked may lead to rulings by the Court as to whether those questions are admissible. You can't ask, for example, your client a leading question. You object to the form; it comes in.

There may be other objections that come at trial, but that's a completely different issue. This concept of discovery versus a proof deposition, they basically do not exist.

Rule 32, as well as the hearsay rules under the Federal Rules of Evidence and Rule 32 of the Rule of Civil Procedure control this.

What we have in this case, Your Honor, in terms of precedence, I guess, we're setting is this: Under Tennessee law, comparative fault, and you go to -- go to trial, you prepare for trial, and everybody is expecting a case to be done a certain way, and then a week before the trial begins, one of the parties settle. And there is certainly nothing wrong with that. There is nothing at all that prohibits that. But at that point, because the plaintiffs have changed their strategy doesn't mean that defendants are then stuck with their change in strategy.

1    The reality is, Your Honor, that these

2    depositions were taken.  The witnesses were

3    unavailable.  They meet all the requirements of the

4    rule.

5    As it relates to Mr. Bullock's deposition,

6    the fact that they took a strategy in that

7    deposition to ask questions in a certain way and

8    they would have done it a different way doesn't make

9    that deposition inadmissible; it doesn't make its

12:20PM 10   use inadmissible.

11   With regard to Mr. Fulk, that answer, quite

12   frankly, Your Honor, is even simpler.  Mr. Fulk is

13   their expert.  If they want to ask Mr. Fulk

14   questions, bring Mr. Fulk.  That's as simple as it

15   gets.

16   But, Your Honor, with both of these

17   questions, and I think -- and this was argued during

18   the hearing, and, again, I've not had an opportunity

19   to go detailed into Judge Poplin's opinion, but

12:20PM 20   these were the same issues that were raised at the

21   hearing.  And the Court, Judge Poplin, took those

22   into consideration and decided, from what I

23   understand from the ruling, that the depositions

24   were admissible for all purposes.

25   And I think, Your Honor, that the decision

was correct, and we would ask the Court to uphold

the report recommendation of Judge Poplin.

THE COURT: All right. Thank you. I think

I understand the parties' positions and obviously

the standards applicable. I'll issue a ruling when

we get back from lunch.

So is there anything else? We've got

Mr. Constantino.

MR. KING: Yes, Your Honor. I just

12:20PM don't --

THE COURT: That will take a while.

MR. KING: It will. And for scheduling

purposes, I'm just asking the Court, at that point,

I think the plaintiffs' proof closed. We'll have

some motions we want to bring.

It might be helpful, because assuming,

based on the ruling right now, we're going to get

together at 3:00. We're probably going to talk

during lunch. But I'm not sure the videos, if we're

12:21PM going to play them, would be ready that quickly.

I know Mr. Constantino will take a while,

but if it would please the Court, we would suggest

that perhaps that when he's concluded at some point

this afternoon that we address the --

THE COURT: We might be ready for an

afternoon break by the time he's concluded.  So --

MR. KING:  I just don't know how much we're
going to be able to get on in terms of the videos
after that, given where we stand at this point,
especially since we may be in Judge Poplin's
courtroom at 3:00.

THE COURT:  Well --

MR. KING:  Actually, Dr. Bullock is a
reading.  It's not even a video.  Dr. Bullock's a --

THE COURT:  And also, keep in mind, for
purpose of keeping this trial going, we're not
adjourning court at 3:00.  I'm saying:  There is
three or four attorneys on each side.  Somebody is
going to go to Judge Poplin's courtroom, but --

MR. KING:  Oh, no.  What I meant --

THE COURT:  -- the remainder of the people
are going to stay here.

MR. KING:  I understand.  What I meant was:
In terms of presenting additional evidence, it may
depend upon what the final rulings are on that.

THE COURT:  I understand.  But, otherwise,
be prepared with testimony and evidence to get us
through to the end of the day.

MR. KING:  Thank you, Your Honor.

THE COURT:  All right.  We'll see everybody

1    back here at 1:30.

2              THE COURTROOM DEPUTY:  All rise.  This

3    honorable court should stand in recess until 1:30.

4                        (Whereupon, a lunch recess was

5                         had, after which the Trial

6                         Proceedings were resumed at the

7                         hour of 1:40 p.m. as follows:)

8              THE COURTROOM DEPUTY:  All rise.  Please

9    come to order and be seated.

01:40PM  10            THE COURT:  Let me just take a moment to

11    rule on plaintiffs' objections to Magistrate Judge

12    Poplin's order as that affects defendant's

13    presentation of evidence and the scheduled 3 p.m.

14    hearing today with Judge Poplin with respect to the

15    Bullock objections.

16              Specifically, plaintiffs object to the

17    order which permits defendants to introduce the

18    deposition testimony of Fulk and Bullock.

19              Federal Rule of Civil Procedure 72(a)

01:40PM  20    provides when a magistrate judge issues a ruling on

21    a non-dispositive matter, the parties may file

22    objections with the district court, and the rule

23    then provides the district judge must consider

24    timely objections and modify or set aside any part

25    of the order that is clearly erroneous or contrary

1    to law.

2             Here, having carefully reviewed Judge

3    Poplin's order and having considered the parties'

4    arguments before the lunch break, the Court will

5    overrule plaintiffs' objection.

6             For the depositions of both expert

7    witnesses, the Court did not hear argument that

8    Magistrate Judge Poplin misapplied any particular

9    statute, Rule of Civil Procedure, or Rule of

01:41PM 10   Evidence; rather, plaintiffs' arguments centered

11   upon an argument that permitting the admission of

12   depositions of this type would be unfairly

13   prejudicial to them and would make it more difficult

14   for attorneys in the future to take so-called

15   discovery depositions as opposed to expert

16   depositions intended for proof at trial.

17            But as the defendants have pointed out,

18   Rules 26 and 32, along with other pertinent Federal

19   Rules of Civil Procedure, do not draw any such

01:41PM 20   distinction; instead, parties are given great

21   latitude under the rules to depose witnesses,

22   including experts, on whatever topics they see fit.

23            Here, Judge Poplin found that both Fulk and

24   Bullock were timely and properly disclosed as expert

25   witnesses.  Indeed, Fulk was, at the time,

designated -- was designated as plaintiffs' own

testifying expert, and the Court would find it was

up to the parties to determine what topics they

wished to explore during these depositions, along

with how much preparation they wished to commit to

deposing these two particular witnesses.

And for all these reasons, the Court is not

convinced that permitting the admission of these

depositions would greatly increase the burden on

attorneys litigating cases in the federal court

system when preparing for depositions.

Moreover, the Court agrees with Judge

Poplin that plaintiffs have failed to specifically

identify what forms of unfair prejudice they would

suffer from the admission of these depositions.

Indeed, with respect to Fulk, because Fulk

was plaintiffs' own testifying expert witness, the

Court finds the risk of unfair prejudice or surprise

from his testimony to be particularly minimal,

given, among other things, that plaintiffs, as

defendants argued, could still or still remain free

to call him as a witness in this trial.

Therefore, as to the specific objection

regarding unfair prejudice plaintiffs have raised

today, the Court finds Judge Poplin's order was not

clearly erroneous or contrary to law, and having

reviewed the entire order in detail, the Court

agrees with the conclusions therein as a whole, and

the Court would, therefore, overrule plaintiffs'

objections to Judge Poplin's order.

Next, I'm going to go ahead and issue a

ruling on plaintiffs' objections to defendant's

designations for the deposition testimony of

Mr. Fulk. The Court is basing this ruling on the

list of designations, objections and responses

provided by counsel.

Plaintiffs' objections appear to be all

based on one ground, that certain designated

portions of the Fulk deposition are irrelevant in

light of the Court's summary judgment ruling,

specifically in regard to the preemption of an

alleged look-back duty under Tennessee law.

After ruling -- excuse me. After reviewing

the Fulk deposition, the Court is going to overrule

in part, sustain in part, these objections.

First, the Court will sustain plaintiffs'

objections as to pages 136 to 140. The Court finds

that this testimony does relate primarily to an

alleged look-back duty under Tennessee law, as well

as the design and maintenance of CSX railroad

tracks.  The Court has already held these topics to

be preempted under federal law.  Thus, the Court

finds this testimony would be irrelevant under Rule

401.  And even if it did have some marginal

relevance to other issues of consequence in this

case, it would be substantially more prejudicial

than probative under Rule 403.

Next, the Court will overrule plaintiffs'

objections as to pages 152 through 156 of the Fulk

deposition.  Although this testimony, to some

degree, touches on the preemptive matters just

discussed, the Court finds the primary subject

matter of this testimony is whether CSX personnel,

in fact, observed problems with the tank car but

failed to stop the train.  This directly bears on

CSX -- excuse me -- on UTC's affirmative defense of

comparative fault and is, therefore, relevant under

Rule 401.

Moreover, the Court finds the probative

value of this portion of the testimony is not

substantially outweighed by the danger of unfair

prejudice, including the danger the jury would

consider the testimony as evidence of preemptive

matters.

Accordingly, the Court will permit

1    defendant to introduce the designated portions on

2    pages 152 through 156 of the deposition but not the

3    designated portions on 136 to 140.

4           I wanted to take care of that.  We'll bring

5    our jury back in and continue with this witness.

6                          (Whereupon the following report of

7                           proceedings was had within the

8                           presence and hearing of

9                           the jury:)

01:46PM 10          THE COURT:  Thank you.  Everyone may be

11   seated.  We'll continue with the direct examination

12   of this witness.

13   BY MR. FLEMING:

14        Q.   Mr. Constantino, before we left off for

15   lunch, we were talking about one of the other

16   suggestions made in opening that water may have

17   reached the stenciling or infiltrated the insulation

18   on 901717, the tank car in question, prior to the

19   2004 qualification.  And I had broadcast

01:47PM 20   Exhibit 140- -- Plaintiffs' Exhibit 144 and a

21   particular page from that exhibit.

22           Could you tell the jury what we're looking

23   at.  What does this document reflect from Union Tank

24   Car?

25        A.   This is a document that was generated by

1    folks in the repair shop to itemize certain work

2    routines that they were going to go through while

3    processing the car at the repair shop.  That would

4    not have been part of the initial inspection upon

5    arrival.  This particular work order is something

6    that was in our electronic system of instructions to

7    repair shops.

8        Q.   And when you say this particular work order

9    was in your system, explain to the jury what you

01:48PM  10   mean by that order being in your system.

11       A.   Certainly.  If -- hopefully I can work this

12   correctly.

13            If you look at this area right in here

14   (indicating), it says Order No. followed by a

15   five-digit code.  That is an internal system that we

16   use to highlight to all the repair shops in our

17   network a certain scope of work, an item that the

18   shop needs to pay attention to and a routine of

19   inspection and work that we want them to do.

01:49PM  20            This particular project is a company repair

21   project No. 60202.

22       Q.   Does that mean that project 60202 pre- --

23   already existed and was called out to be performed

24   on a tank car if it came in and showed indications

25   necessary for project 60202 to be completed?

1      A.    Right.   Our procedure is --

2           MR. FRIEDMAN:   Your Honor, I hate to

3    interrupt Mr. Constantino.   I believe this calls for

4    speculation.   This witness has no firsthand

5    knowledge of what he's talking about other than

6    reading a document and speculating as to what it

7    means.   It's either -- at this point, it's either

8    insufficient foundation laid for the testimony or

9    it's just rank speculation.

01:49PM 10           MR. FLEMING:   Your Honor, I'm laying the

11   foundation.   This witness was employed by Union Tank

12   Car at the time.   He's familiar with this project.

13   Plaintiffs first raised this issue in opening and

14   Mr. Constantino is fully familiar with this -- with

15   this particular insulation issue.

16           THE COURT:   I'll overrule the objection.

17   Go ahead.

18   BY THE WITNESS:

19      A.    Within our system, we capture project

01:50PM 20   detail and assign project numbers.   At the same

21   time, we look at groups of cars or types of cars

22   that will be subject to the program and that

23   inspection.

24           This particular project number is something

25   that was established when I was directly involved in

1 that area of the business, and when this issue first

2 came up, there was a very simple explanation as to

3 the language used, and I recognized the project

4 number right off the top looking at the work order.

5 BY MR. FLEMING:

6   Q. What was the issue with respect to wet

7 insulation?  Can you tell the jury?

8   A. Yes.  As more cars of this particular type

9 were brought into the fleet, our engineering group

01:51PM 10 and our repair people determined that the

11 combination of insulation -- this car has both

12 fiberglass insulation and also ceramic fiber

13 insulation for thermal protection.  But it was

14 determined that that combination had a tendency to

15 wick, pull in atmospheric moisture, humidity, and

16 hold on to it as opposed to plastic, just to let it

17 evaporate.

18   And it was determined that the best way to

19 allow that excess moisture to evacuate was to just

01:52PM 20 drill a series of holes along the bottom centerline

21 of the car.  And that's what that project calls out

22 for.

23   Q. Was the insulation that we're talking

24 about, was it inside the tank jacket itself?

25   A. All insulation materials are covered by the

1    exterior jacket and are layered on top of the inner

2    tank.  So it -- yes, the insulation material is

3    in-between those two features.

4        Q.    When did this project originate?

5        A.    That goes back to -- the letter was

6    published in 1996.

7        Q.    You mentioned a letter.  Were you able to

8    research this issue and discover that there was a

9    project memo created that was disseminated to the

01:52PM 10    repair fleet?

11        A.    Yes.

12        Q.    And were you able to bring a copy of that

13    with you today?

14        A.    It was secured.

15        MR. FRIEDMAN:  Your Honor, this is the

16    first time we're hearing of this.  We haven't seen

17    it to this day.  This is nothing but surprise by

18    ambush.  And we've asked for all these documents

19    years ago.  We would at least like to see it before

01:53PM 20    there is any testimony about it.  And we'd object to

21    it anyway.

22        MR. FLEMING:  Your Honor, the first time we

23    heard about an insulation issue in the last three

24    years was in opening statement.  None of -- none of

25    this case has been about the insulation in this car

1  whatsoever.  The insulation has nothing to do with

2  the bearings or the truck equipment and a statement

3  was made that it's evidence of submersion.

4         Mr. Constantino --

5         THE COURT:  Opening statement or is there

6  some proof that's been presented that you're seeking

7  to rebut or address?

8         MR. FLEMING:  At this point, the plaintiffs

9  have not been able to submit, but I anticipate they

01:53PM  10  will on cross.  If Your Honor would like me to hold

11  this until redirect.

12        THE COURT:  If we can hold off then.  Right

13  now, since it's not on the exhibit list and in light

14  of the objection, I'll sustain the objection for the

15  time being.

16        MR. FRIEDMAN:  Your Honor, may I see a copy

17  of it?

18        Thank you.

19  BY MR. FLEMING:

01:54PM  20     Q.   Was the letter that was generated, however,

21  disseminated to the repair fleet?

22     A.   Yes.  The address -- excuse me -- at the

23  top of that letter was to all plant managers, which

24  is our designation for the managers of those repair

25  installations that were in the network at the time.

        1      Q.    And when you look at Exhibit 144 and the

        2   notation that's in front of us, it calls out the

        3   60202.  Is that confirmation that that project was

        4   completed during the 2004 qualification?

        5      A.    Yes.

        6      Q.    Is there any indication from that document

        7   or as it relates to the wet insulation project that

        8   has anything to do with or establishes that this car

        9   was submerged?

01:55PM 10          MR. FRIEDMAN:  Your Honor, that's leading,

       11   and it's trying to get into a document that we've

       12   first seen just moments ago.

       13          THE COURT:  I thought you were talking

       14   about -- are you talking about the document that

       15   we're not introducing or are you talking about 144?

       16          MR. FLEMING:  I'm talking about 144.

       17          I'll rephrase.

       18          THE COURT:  Thank you.

       19   BY MR. FLEMING:

01:55PM 20      Q.    You've reviewed the 2004 qualification car

       21   file; correct?

       22      A.    Correct, yes.

       23      Q.    Is there anything in the 2004 qualification

       24   car file that indicates that this tank car had been

       25   submerged prior to that shop request?

1    A.    Nothing.   No -- no designations of that at

2  all.

3    Q.    And does that include this wet insulation

4  callout on Plaintiffs' Exhibit 144?

5    A.    This project has absolutely nothing to do

6  with that.

7    Q.    Mr. Constantino, where do you live?

8    A.    I live in a suburb of Chicago called

9  Oswego, Illinois.

01:56PM  10    Q.    How old are you?

11    A.    I'll be 63 years old this year.

12    Q.    Are you married?

13    A.    Yes.

14    Q.    Do you have any children?

15    A.    Three adult children.

16    Q.    Do you have any grandchildren?

17    A.    Three grandchildren.

18    Q.    Where did you go to school?

19    A.    I went to school at a state school, Western

01:56PM  20  Illinois University in Macomb, Illinois.

21    Q.    Did you obtain any degrees?

22    A.    A Bachelor of Business degree.

23    Q.    And, again, explain your current

24  occupation.

25    A.    President of North American Rail Leasing on

1    a day-to-day basis functioning as a general manager

2    of Union Tank Car leasing business unit.

3        Q.   And you had mentioned earlier that -- the

4    names Union Tank Car's fleet and Procor.  Just

5    explain to the jury what Procor -- the difference

6    between Procor and Union Tank Car.

7        A.   Well, as I mentioned before, I'm also

8    responsible for Procor, Limited, and they are a

9    Canadian-based company.  They lease freight cars,

01:57PM 10   primarily tank cars, in the Canadian marketplace,

11   and functionally they do the same thing in Canada

12   that Union Tank does in the United States.

13        There are some specialty considerations

14   dealing in domestic Canadian leasing and

15   transportation and Procor is expert at handling

16   those things.

17        Q.   And as president of the group fleet, are

18   you responsible ultimately for the repair and

19   maintenance of the entire fleet in North America?

01:57PM 20       A.   Ultimately accountable to make sure that

21   the fleet continues to operate in a compliant

22   manner.

23        Q.   Briefly tell the jury how it is you

24   matriculated to president of the company, or just

25   give a brief history of how you -- your jobs that

1    you worked for at Union Tank.

2        A.    When I -- when I started on with Union

3    Tank, I was a trainee, and after six months of

4    becoming familiar with the industry and what the

5    business did, I moved on to a customer service

6    representative position in our Pittsburgh office.

7    That dealt with customers and maintenance issues and

8    railroads and marketing issues, program management.

9            After two years there, I came back to

01:58PM 10   Chicago and took a position doing budgeting,

11   contract renewals, program management, dismantling

12   activity.

13           Moved from there and became manager first

14   and then director of our new-car marketing efforts,

15   which was heavily involved with our manufacturing

16   unit and our engineering folks, and got a deep

17   appreciation for building and engineering cars.

18           From there, I came back into more of a

19   generalized line management role with repair

01:59PM 20   services and railroad services reporting to me, as

21   well as planning, budgeting, market research.

22           And today I have the whole business unit

23   reporting to me, which includes accounting,

24   engineering for the fleet, as well as sales and

25   marketing and portfolio management operations.

1    Q.    Now, you didn't -- I noticed that you

2    didn't mention you're an engineer.  You're not an

3    engineer, are you?

4    A.    No, I'm not a degreed engineer.

5    Q.    Does the fleet engineering group report to

6    you?

7    A.    They do.

8    Q.    Do you routinely interface, interact with

9    fleet engineering?

01:59PM 10    A.    Yes.  Joe Perez reports directly to me and

11    I interface with both Joe and his reports whenever I

12    want.

13    Q.    Through your interface with fleet

14    engineering and in your experience with the company,

15    are you intimately familiar with Union Tank Car's

16    repairs of its fleet and the standards to which

17    we -- you hold the repair units to?

18    A.    Yes.  Those repair standards, inspection

19    standards and qualification of repair methods come

02:00PM 20    out of Joe's group, and we routinely talk about

21    that.

22    Q.    How long has Union Tank Car been operating

23    tank cars?

24    A.    The incorporation date for Union Tank Car

25    Company as a standalone entity is back to 1891.  So

1       about 127 years at this point.

2            Q.   And what is it that Union Tank Car does?

3            A.   We -- we build, repair, design, maintain,

4       and own a fleet of railway tank cars.

5            Q.   And the headquarters are where?

6            A.   We're located -- the headquarters are in

7       Chicago, Illinois.

8            Q.   Do you have other locations that Union Tank

9       Car operates?

02:01PM 10           A.   Yes.  We have two manufacturing locations.

11      The largest is in Alexandria, Louisiana.  We have

12      another facility in Sheldon, Texas, which is just

13      outside of Houston, and we have 12 full-service

14      repair shops scattered throughout North America,

15      Canada, United States, as well as one location in

16      Mexico.

17           Q.   And the repair shops -- the repair shop

18      that is at issue in the 2013 qualification we've

19      already established is Cleveland, Texas?

02:01PM 20           A.   Yes, sir.

21           Q.   How many employees does Union Tank Car

22      employ?

23           A.   For all our activities, manufacturing,

24      repair, leasing, at this point, the number's roughly

25      3,000 folks in the U.S.

1    Q.   Within North America, how many tank cars

2  does Union Tank Car own?

3    A.   Within North America, and I'll include the

4  Procor assigned units, but it's 125,000 units at

5  this point.

6    Q.   And within just the United States' fleet?

7    A.   100,000.

8    Q.   Within North America, how many tank cars

9  are there registered in population for use in

02:02PM 10  interchange?

11    A.   There is a facility that's maintained

12  that's -- that has an abbreviation called UMLER, and

13  it stands for Universal Machine Language Equipment

14  Register, and that's how everybody knows that

15  equipment is registered in North America, and that

16  database at the end of 2016 recorded that there was

17  about 418,000 tank cars.

18    Q.   And I use the word interchange.  Can you

19  just tell the jury in layman's term:  What does an

02:03PM 20  interchange mean?

21    A.   Interchange is an industry term, but any

22  time you move from an industrial site to a railroad

23  or from one railroad to another railroad, the car,

24  whether it's a tank car or a freight car, is moving

25  in interchange service.

1    Q.    What is the primary purpose of a tank car?

2    A.    Transporting bulk liquids.

3    Q.    What types of bulk liquids or commodities

4    do Union tank cars carry around the United States?

5    A.    Well, on the nonhazardous side, one of the

6    larger commodities by volume is vegetable oil.  We

7    transport corn syrup in tank cars.

8          On the hazardous material side, asphalt is

9    a very large volume of material moved, as well as

02:04PM 10    gasoline, jet fuel, crude oil, ethenol, and other

11    industrial chemicals.

12    Q.    Is one of those chemicals that our cars are

13    approved to carry acrylonitrile?

14    A.    Yes.

15    Q.    Now, is there also a difference between the

16    classification of cars, general purpose versus

17    pressure cars?

18    A.    Yes, there are.

19    Q.    Can you explain that to the jury.

02:04PM 20    A.    Yes.  Many of the commodities that I

21    mentioned earlier, vegetable oil, asphalt, those are

22    carried in general purpose cars.  That is a unit

23    that is meant to carry a product that is a liquid at

24    atmospheric pressure.

25          But you also have another class of cars

1    which are called pressure cars, and those are

2    thicker, more robust, stronger cars, and they're

3    used to carry products that would be gases if left

4    to atmosphere and the strength of the vessel

5    contains them and holds them as liquids in

6    transportation.

7         Q.   What kind of car was UTLX 901717?

8         A.   It was a pressure car.

9         Q.   Does Union Tank Car retain the ownership of

02:05PM  10   its leased cars?

11        A.   Yes.  The equipment that's marked UTLX in

12   our fleet is owned by the company.

13        Q.   And was UTLX 901717 a leased car?

14        A.   Yes, it was.

15        Q.   As part of a full -- well, let me ask you:

16   What type of leases does Union Tank Car offer?

17        A.   We offer -- the business model and most of

18   the commercial activity we do is full-service

19   leasing.  It's a contractual arrangement where our

02:06PM  20   customers have use of the equipment and we maintain

21   the records and do the administration and are

22   responsible for repairs.

23        Q.   As part of the full-service lease, do we

24   maintain financial responsibility for those repairs?

25        A.   Yes, we are.  And in the absence of abuse

1  or missing material.

2      Q.    What does that -- what does that mean?

3  Does that mean if a railroad performs maintenance,

4  we will reimburse them?  Explain how that works.

5      A.    Certainly.  Those repair records that we've

6  seen where the cars were -- the car was in a Union

7  Tank repair facility, those charges were for our

8  account.  We tabulated what the cost is but it was

9  our expense.

02:07PM  10      While the car is operating in interchange

11  service and a railroad or multiple railroads are in

12  possession, care and custody of the car, under the

13  rules, they have the right to determine that a

14  repair needs to be performed.  They make that repair

15  and they invoice Union Tank Car Company.

16                      (Defendant's Exhibit 22 was

17                       marked/received into evidence.)

18  BY MR. FLEMING:

19      Q.    Now I want to show you Exhibit -- Defense

02:07PM  20  Exhibit 22, and this is a non-objected-to -- in

21  fact, both parties have this on their witness

22  list -- or the exhibit list, and ask to you tell the

23  jury what Exhibit 22 reflects.

24      A.    This is a summarization of the repair

25  history experienced by UTLX 901717.

1      Q.   And what is the time frame that Exhibit 22

2   encompasses?  Is it from -- is it the complete life

3   of the car's history?

4      A.   Yes.  It reflects all repair events and

5   charges that have been documented from date of

6   construction until the car was removed from service.

7      Q.   So, for instance, on this part that's been

8   expanded out, we see that there was some -- the

9   first repairs on this car's history took place when?

02:08PM   10      A.   On this line here (indicating) -- that

11   didn't work.  January 18th, 1995.

12      Q.   And this first page of this multi-page

13   exhibit reflects a number of repairs that were

14   conducted between 1995 and 1999.  Who conducted

15   those repairs?

16      A.   Multiple railroads.  There were entries

17   listed there by CSXT, railroad -- the BN was also

18   listed, and we also have the IC, Illinois Central,

19   going back to October of 1996.

02:09PM   20      Q.   And then if we go to the last page of the

21   exhibit, just to get a frame of reference to the

22   time frame, when was -- when was the last repairs

23   performed on UTLX 901717?

24      A.   The absolute last line is dated

25   January 27th, 2015, and that was also a railroad

1    repair performed by the CSXT.

2         Q.   What was that for?

3         A.   The last entry was a Brenco® support which

4    was replaced completely.

5         Q.   And prior to that on December 5th, 2014.

6         A.   Yes.  The next to the last entry is

7    likewise a repair that was initiated by CSXT, and

8    that was the replacement of two brake shoes

9    complete.

02:10PM  10        Q.   I want to next show you -- well, let me --

11   before we leave this, when was the most -- what does

12   the third to the last entry reflect?

13        A.   Well, that is the final entry from the

14   shopping of the car at the Texas -- Cleveland, Texas

15   in 2013, and it simply highlights the fact that

16   before the car returned to service, it removed a

17   stencil that should not be there when the car was

18   refurbished and returned to service.

19                       (Defendant's Exhibit 86 was

02:11PM  20                        marked/received into evidence.)

21   BY MR. FLEMING:

22        Q.   Next I want to show you Defense Exhibit 86,

23   to which there is no objection, and it's actually a

24   duplicate of Plaintiffs' Exhibit 4, and ask you to

25   explain to the jury what this document shows and why

1    you had this document created.

2        A.   As part of our preparation for this

3    proceeding, I wanted to take a look at what our

4    history had been, in terms of wheel change-outs, and

5    so I asked an individual operating within my group

6    in Chicago to look at our record system on wheel

7    change-outs for the three-year period that we see

8    here, and they produced the data in summary form as

9    we see here, which outlines that almost 55,000 wheel

02:12PM  10    sets were changed out in that three-year period

11    reviewed, 2014, '15 and 2016.

12        Q.   And does -- how many wheel sets were

13    changed out by the railroads?

14        A.   Well, the vast majority of activity was

15    done in the field by railroads.  Almost 51,000 of

16    the 54,700 total were performed in the field by

17    railroads operating under the interchange rules.

18        Q.   What is the significance of that to you?

19        A.   Well, not -- the system works and the

02:13PM  20    interchange set of responsibilities work.  Railroads

21    may have applied those wheels, but Union Tank paid

22    for them as being our maintenance responsibility.

23        Q.   Before we talk about the specific tank car

24    further, I just -- the jury has heard a lot of

25    acronyms thrown about, and I want to try to put some

1    parameters around some of those and talk about the

2    industry a little bit.

3            How long has the railroad industry been

4    transporting commodities and chemicals in the United

5    States based on your experience?

6        A.   Well, there is documented evidence of tank

7    cars moving around back to the 1880's transporting

8    crude oil, kerosene, state-of-the-art commodities

9    such as they were back in the day.

02:13PM 10        Q.   Has the industry and the experience -- the

11   experience learned through the industry from that

12   over a century's worth of experience resulted in

13   detailed regulations and rules?

14       A.   Absolutely.  It's been a continuous

15   evolution of trying to improve safety and efficiency

16   at the railroad level, at the car company level,

17   through car design issues and operating roles.

18       Q.   And is Union Tank Car governed by many of

19   those rules?

02:14PM 20       A.   All of them.

21       Q.   Is it true that Union Tank Car answers to a

22   number of different agencies for the design,

23   manufacture and maintenance of its tank cars?

24       A.   Yes, it is.

25       Q.   Can you identify those that are what we

1    might call the rule-making side or the enforcement

2    side?

3        A.    At the highest level our activities are

4    covered by the Department of Transportation.  In the

5    hierarchy of things, the next agency is the Pipeline

6    and Hazardous Material Safety Administration.  They

7    govern the transport of hazardous materials through

8    all modes of transportation, truck, rail, water.

9    They're really the group that initiates new

02:15PM  10   rulemaking if a need arises.

11        The Federal Railroad Administration, the

12   FRA, is the enforcement arm.  They do

13   investigations.  They do audits.  They look at

14   records to ensure that participants in this industry

15   are in compliance with the letter and the intent of

16   the rules.

17       Q.    Is there anyone else under the FRA?

18       A.    Well, there are other groups which play a

19   role in self- -- in safe transportation.  NTSB,

02:16PM  20   National Transportation Safety Board, is an

21   independent investigatory body and they make

22   recommendations about how to improve safety.

23        You also have Department of Homeland

24   Security which looks at transportation security, as

25   well as hazardous materials.  And then you have TSA,

1    Transportation Safety Administration.

2        Q.    The jury has heard a lot about the AAR.

3    What does the AAR stand for?

4        A.    It's the Association of American Railroads.

5        Q.    By its name, it implies that it's made up

6    of just railroads.  Are there other members?

7        A.    No.  I mean, all the Class I railroads, the

8    largest railroads, Norfolk Southern, CSX, are

9    obviously members.  But Union Tank is an associate

02:16PM 10   member at the gold level because of our size and our

11   participation in various activities that AAR

12   sponsors.

13       Q.    Are we members of any committees?

14       A.    Joe Perez is a member of the tank car

15   committee, which is focused on design and

16   maintenance issues on tank cars.

17           We have UTC representation on the

18   arbitration committee, and we have representatives

19   sitting in on many of the other equipment-related

02:17PM 20   committees.

21       Q.    As part of its membership, did Union Tank

22   Car agree to be bound by the AAR rules?

23       A.    Yes.  A long time ago, because Union Tank

24   has been in the industry a long time, we signed off

25   and pledged to be -- to abide by the interchange

1    rules, along with all the other Class I railroads.

2        Q.    And how are the AAR interchange rules

3    communicated to the members like Union Tank Car?

4        A.    Well, there is two primary methods of

5    communication.  There is the field manual of

6    interchange rules which AAR updates routinely to

7    expand, clarify standing rules.  That's a guide

8    that's used in day-to-day operations in the field by

9    our folks in the repair shops, as well as folks

02:18PM 10    working out on the railroad on a day-to-day basis.

11        There is another major publication which is

12    the office manual of the interchange rules, and that

13    deals with definitions.  It highlights updates to

14    labor and material charges and is really an

15    accounting and back-office manual in terms of

16    communicating and handling things that are

17    transpiring between various members and folks that

18    are signed up to the interchange rules.

19        Q.    Now, you've mentioned the field manual and

02:19PM 20    we've talked about a number of the rules from the

21    field manual already, but I do want to show the jury

22    Exhibit 111, to which there is no objection and it's

23    already been discussed.

24        Just for purposes of identifying, and

25    sparing them the detail of going through the

1    entirety of the manual, what does Exhibit 111

2    reflect?

3        A.    That is the cover sheet of the 2013 edition

4    of the AA- -- the field manual of the interchange

5    rules.

6        Q.    And if we turn to the third page --

7            MR. FLEMING:   Oops.

8            Can you just highlight the effective date,

9    Ms. Bauer.

02:20PM 10   BY MR. FLEMING:

11       Q.    Mr. Constantino, what is the effective date

12   of this document?

13       A.    July 1, 2013.

14       Q.    Does that indicate that this version,

15   Exhibit 111, was in effect at the time we performed

16   our qualification?

17       A.    Yes.

18       Q.    Those rules would have been the rules

19   governing our qualification or performance of Rule

02:20PM 20   36 and Rule 88 inspections?

21       A.    Yes, and the operation of the car in the

22   field thereafter, yes.

23                        (Defendant's Exhibit 112 was

24                         marked/received into evidence.)

25

BY MR. FLEMING:

1    Q.   And you next mentioned the office manual,

and, again, without -- well, sparing the jury the

detail, I'd like to show Exhibit 112, to which there

is no objection, just to identify it for the record,

and ask you to tell the jury if this is the

effective version for 2013 of the office manual.

    A.   Yes.  This -- this version was initially

effective January 1, but then a change went through,

and that change was effective April 1 of 2013.  So

it would have applied for the shopping that occurred

later in the year.

    Q.   Now, where are the Why Made Codes located

that we've talked a little bit about?

    A.   They are in both locations, both -- both in

the office manual, as well as the field manual.

    Q.   Are there also manuals of recommended

standards and practices that apply that are

promulgated by the AAR?

    A.   There certainly are, yes, sir.

    Q.   And we already discussed, and I won't

repeat, Exhibit 148, which is M-934.  Is that just

one example of the many standards that exist in the

AAR manuals?

    A.   Yes, sir.

1    Q.    So what's the legal life of a tank car?

2    A.    The maximum legal life is 50 years.

3    Q.    And where do we find that?

4    A.    You would find that outlined in Rule 88 of

5    the field manual.

6    Q.    And, again, that's Rule -- that's

7    Exhibit 111, Rule 88.

8            MR. FLEMING:   And if you -- Ms. Bauer, if

9    you would highlight Age or Section A down to Age.

02:22PM  10  There you go.

11   BY MR. FLEMING:

12   Q.    Mr. Constantino, what does the AAR -- is

13   this just confirmation of what you just told the

14   jury that --

15   A.    Yes, it is.

16   Q.    And so the 50 years applies to any car that

17   was built after 1974?

18   A.    That's correct.

19   Q.    Can the life of a tank car be extended by

02:22PM  20  qualification?

21   A.    Not beyond the 50 years called for in Rule

22   88, no, sir.

23   Q.    Is there a difference between tank cars and

24   freight cars, high-utilization cars?

25   A.    Yes, tank cars generally move fewer miles

1    on an annual basis than many other types of freight

2    cars.  You have coal unit trains.  You have grain

3    unit trains.  You have intermodal flat cars that are

4    moving coast to coast and they generate very high

5    miles.

6         But on the tank car side of things, that's

7    not the typical use for any tank car and wasn't for

8    this tank car.

9    Q.   What is the typical use for a tank car?

02:23PM 10    A.   Well, industry statistics supplied by the

11    AAR, once again, because they have access to

12    information on everything, suggests that the average

13    tank car moves about 18,000 miles a year, empty and

14    loaded.

15    Q.   And is that consistent with the information

16    on Union Tank Car's own fleet?

17    A.   Yes.

18    Q.   Are Union tank cars also at times used as

19    storage vessels for customers?

02:24PM 20    A.   They are, and that is at the choice of the

21    customer, but they can be, yes.

22    Q.   Is that part of the reason why the mileage

23    can be lower at times?

24    A.   Certainly, yes.

25    Q.   Does Union Tank Car manufacture all the

1    parts that end up on its tank cars?

2         A.    No.

3         Q.    Where do we get them?

4         A.    We purchase the parts that we need to

5    complete the total car from other AAR-certified

6    vendors.

7         Q.    Can Union Tank Car buy components that

8    require AAR approval from any company that

9    manufactures railcar components?

02:25PM  10         A.    To the extent that somebody can demonstrate

11    that they are a certified supplier of an approved

12    item, we would treat them as a possible supplier to

13    us, yes.

14         Q.    And was -- do you know who Amsted is?

15         A.    Yes.

16         Q.    Who is Amsted or what is Amsted?

17         A.    Amsted is a supplier of many different

18    types of railroad components but chiefly, as it

19    applies here, of roller bearings.

02:25PM  20         Q.    And do you understand that Amsted's Brenco®

21    roller bearings had achieved AAR approval?

22         A.    They were AAR approved for application and

23    use on railroad freight cars, not just tank cars.

24         Q.    When were the Brenco® bearings that we --

25    that are at issue in this case that were found on

1   the wheel set No. 3 manufactured?

2       A.   1994, as I believe they were original

3   equipment applied to the car when it was built.

4       Q.   I should have asked it different.  Were

5   they installed in 1994 on the tank car at issue?

6       A.   Yes.

7       Q.   And I want you to assume that Mr. Norris

8   testified that Brenco® or Amsted's bearings had

9   received unconditional approval from the AAR prior

02:26PM 10   to 1994.  Does that confirm for you that the Brenco®

11  bearings were approved for use in 1994 by the AAR?

12      A.   Yes.

13      Q.   And as a consequence, Brenco® would have

14  had to show the AAR that it complied with Section

15  M-934; do you agree?

16          MR. FRIEDMAN:  Your Honor, object to this.

17  There has not been sufficient foundation laid for

18  this testimony.  He is not testifying from the

19  standpoint of a bearing manufacturer, and there has

02:27PM 20  been absolutely no evidence of what Brenco® would

21  have had to represent to a third-party.

22          MR. FLEMING:  Your Honor, I'll withdraw and

23  move on to something else.

24          THE COURT:  Thank you.

25

1    BY MR. FLEMING:

2        Q.   Does the AAR monitor performance and issue

3    directives about certain products that it has

4    approved?

5        A.   Yes, they do.  They do monitor and have a

6    reporting system of what reliability and consumption

7    is for parts that have entered into use on

8    railroads.

9        Q.   And do those directives sometimes require

02:28PM 10   products to be removed from use?

11       A.   Sometimes, yes, sir, they do.

12       Q.   I want to go back up to Union Tank Car

13   Exhibit No. 14 that's been admitted into evidence

14   and draw your attention to the entry on line number

15   16, Wheels and Axles.  Could you explain to the jury

16   what the significance of that entry is.

17       A.   Yes.  Again, this is an inbound inspection

18   document, so kind of the first eyes on the car when

19   it has arrived on the property.  And that inspector

02:28PM 20   is looking at the wheels and axles that are mounted

21   on the car at that time.

22            And they do note here that the No. 4 wheel

23   set was of Southern manufacture, and it does record

24   Why Made Code of 70 which calls for the removal of a

25   Southern wheel.

1    Q.   Well, help the jury understand better.

2  What was the issue or what was the AAR directive

3  telling Union Tank Car to do at that time with

4  Southern wheels?

5    A.   Well, back -- the AAR and the individual

6  reporting roads had been monitoring the performance

7  of wheels produced by that particular manufacturer,

8  who has since gone out of business, and they

9  determined that the wheels themselves were not

02:29PM  10  reliable and up to snuff, if you will.

11    And after discussion, the AAR put out what

12  we call in the industry a maintenance advisory

13  indicating to all folks in the system that they

14  should be removed on-site the next time the car got

15  to a repair location or repair track and it was

16  inspected and found to have wheels built by

17  Southern.  They were to be removed and replaced, and

18  that's what happened.  And that -- that process

19  started in mid 2011, and the -- as I recall, the

02:30PM  20  maintenance advisory actually came out in August of

21  2011.

22    Q.   And there was an actual separate Why Made

23  Code for that particular item?

24    A.   In the course of setting out the

25  maintenance advisory, AAR did want to highlight and

1    track as those wheels were taken out of service, and

2    they did establish a separate Why Made Code, yes,

3    sir.

4    Q.   What's the significance of this example?

5    A.   Well, it certainly highlights the fact that

6    the inbound inspector is paying attention and

7    looking in detail at castings and wheels and he's in

8    close proximity to the bearings at all the locations

9    across the car. And based on the clear visual

02:31PM  10    evidence associated with that one wheel set, he

11    marked it to be removed.

12    Q.   Does it also reflect that the AAR is

13    monitoring the equipment in service?

14    A.   Yes. It's only one of many examples, as I

15    said before, where the system works; that when

16    enough data is collected to bring into question the

17    reliability of a component that's in service, the

18    AAR will move to ensure that there is expedited

19    removal of those components from service.

02:32PM  20    Q.   Based on your experience, 40 years in the

21    industry, are you confident that the AAR would do

22    the same thing if warranted on journal bearings?

23    A.   Yes, without question.

24    Q.   We've heard about journal bearings for the

25    last several days being referred to as no field

1 lubrication or no field lubricant bearings or NFL.

2 What does that mean?

3     A.   That the approval of the bearing and the

4 design of the bearing is predicated on the fact that

5 it not need maintenance in the field.

6     Q.   Is Union Tank Car at its repair shops even

7 permitted to perform maintenance beyond the Rule 36

8 or visual inspections that it performs on the roller

9 bearings?

02:33PM 10     A.   No, that is a different class of

11 certification.  In order to be a re-conditioner of

12 wheels and/or roller bearings, you have to comply

13 with a different set of standards, and Union Tank

14 does not perform those activities in our repair shop

15 network.

16     Q.   In fact, if Union Tank Car were to break

17 the seal of the lub- -- of the NFL bearing while it

18 had it in its possession to take a look inside, what

19 would have to happen?

02:33PM 20     A.   It would require the removal of that wheel

21 set from service.

22                      (Defendant's Exhibit 2 was

23                        marked/received into evidence.)

24 BY MR. FLEMING:

25     Q.   Let's talk specifically about the UTLX

1    901717.  I want to show you Exhibit 2, Defendant's

2    Exhibit 2, and just ask you -- and we'll expand it

3    where needed.  Look at the top first.  But could you

4    tell the jury what this document reflects.

5         A.    Every time an approved manufacturer of tank

6    cars intends to build a new production run of a

7    particular cartridge type, we need to file an

8    application with the Association of American

9    Railroads, and this is almost like a birth

02:34PM  10   certificate.  It is a certificate of construction.

11         This is where we highlight to the AAR, who

12   is the approving authority, how we intend to build a

13   particular set of tank cars and before we put them

14   into service.

15        Q.    And when was this certificate of

16   construction first submitted to the AAR?

17        A.    The date of this was June 29th of 1994.

18        Q.    And is this the application that applies to

19   the tank car in question based on the car numbers?

02:35PM  20        A.    Yes.  If you look to line 9, you'll see the

21   car number series would include 9017117 (sic).

22        Q.    And what was the -- what was the initial

23   commodity that was -- we were seeking approval to

24   carry?

25        A.    On line 11, you'll see acrylonitrile was

1    the commodity originally planned for these cars

2    after they were built and put into service.

3         Q.   And then was this -- did the tank car

4    committee of the AAR ultimately approve the

5    application?

6         A.   They did.  There is signature -- three

7    signature blocks at the bottom of this document, but

8    what you're referring to is a B. J. Pague, secretary

9    to the tank car committee of the AAR, acknowledging

02:36PM  10   acceptance and approval of this application by Union

11   Tank, and that was done September 20th, 1994.

12        Q.   Does that give Union Tank Car permission to

13   build and release these cars?

14        A.   Yes.

15                    (Defendant's Exhibit 17 was

16                     marked/received into evidence.)

17   BY MR. FLEMING:

18        Q.   Next I want to just briefly discuss Defense

19   Exhibit 17, to which there is no objection, and

02:36PM  20   corresponding Plaintiffs' Exhibit 48, and just ask

21   you briefly to identify the Union Tank Car Car

22   Service Agreement for the jury.  What does this

23   document reflect?

24        A.   Yes.  This is our master lease agreement

25   that we have in effect between our customers and

1   Union Tank.

2       Q.    And if we turn to -- well, let me ask you:

3   Who are the parties to this lease?

4       A.    Union Tank Car Company and Innovene, LLC,

5   which is a predecessor of INEOS.

6       Q.    And based on your understanding of the

7   lease history of this car, had it been on continuous

8   lease since 1994 to the same entity or its successor

9   entities?

02:37PM  10      A.    Yes.  It started off with B.P. Chemicals

11  and went from B.P. Chemicals to Innovene and then

12  from Innovene to INEOS, always in the same product

13  service, always in the same area of operation.

14      Q.    And if we turn to Rider No. 7, two things I

15  want to draw out.  One, if you can identify the cars

16  that are the subject.  What does this rider

17  demonstrate?

18      A.    Well, let me take one step back, and as

19  we're assigning individual cars, we're issuing

02:38PM  20  contract riders, and this is a contract rider to our

21  car service agreement.  It highlights economic

22  issues, but it does highlight here cars assigned,

23  and 901717 is one of the 15 cars assigned to this

24  contract rider.

25      Q.    And did you sign off on this?

1    A.    I did, yes.

2    Q.    That's your signature down at the bottom?

3    A.    Yes.

4    Q.    At the time we released the car or leased

5    it to B.P. Chemical in 19- -- end of 1994, when was

6    the next time we saw the car?

7    A.    When it was shopped at our facility in

8    2004.

9                         (Defendant's Exhibit 87 was

02:39PM  10                  marked/received into evidence.)

11    BY MR. FLEMING:

12    Q.    And if we look at Exhibit 87 -- well, let

13    me -- before I look at 87, was this the first

14    qualification that was called for following the

15    manufacture or the build date?

16    A.    That would have been the 10-year interval,

17    and it would have been the first time we would have

18    seen the car in a shop environment and gave us the

19    opportunity to do the qualification.

02:39PM  20    Q.    And where was that qualification performed?

21    A.    At our facility at El Dorado, Kansas.

22    Q.    We've already talked in some regard to the

23    2004 qualification, but I do want to look at Defense

24    Exhibit 87, to which there is no objection, which is

25    also Plaintiffs' Exhibit 5, and just ask you to

1    identify this document for the jury.

2        A.    It is the 88.b checklist of items that are

3    reviewed when a car is undergoing qualification or

4    the 88.b inspection itself.

5        Q.    And similar to what we already looked at

6    with respect to the 2013 88.b inspection, what does

7    this document demonstrate about the wheel bearings

8    in this case in 2004?

9        A.    That they likewise were reviewed as part of

02:40PM 10    the 88.b and they passed and no repair was required.

11        Q.    Would this 88.b inspection be where the

12    Rule 36 inspection would have been performed?

13        A.    Yes.

14        Q.    And just to reiterate, through your review

15    of the 2004 qualification or car file, did you see

16    any record that indicated or suggested that this car

17    had been submerged prior to our service in 2004?

18        A.    No.   There is no annotation, no record, no

19    suggestion at all that this car experienced such an

02:41PM 20    event.

21        Q.    And are our technicians required to look

22    for such evidence?

23        A.    They are inspecting all the components and

24    the car in general.   Not that anybody would think

25    about cars being submerged arriving at the shop, but

1    they would look, and if there was evidence, they

2    would address it.

3        Q.    Why wouldn't they think about it?

4        A.    Because, again, as we've talked about, if

5    that car experienced an event where the bearings had

6    been submerged, those wheels would have been

7    exchanged in the field, and they weren't.

8        Q.    And is that because, as you testified

9    earlier, they're not allowed to move until they're

02:41PM  10   replaced?

11       A.    Exactly.  Yes, sir.

12       Q.    When was the -- and if you need me to show

13   you Exhibit 22 again, I'm happy to, but when was the

14   next time we saw the tank car?

15       A.    2010.

16       Q.    What did we -- what work was done in 2010?

17       A.    The shopping at Cleveland, Texas in 2010

18   was the result of the customer wishing some of the

19   valves be altered and that we perform an interior

02:42PM  20   preparation regime, which we did while the car was

21   there.

22            Now, while it was there, we also did an

23   interchange inspection, made sure everything was in

24   compliance and any other repairs that were in

25   evidence before we returned the car to service.

1  Q.   Have you reviewed the 2010 car shop file?

2  A.   Yes.

3  Q.   Was there any indication in the 2010 car

4  shop file that the car had been submerged or in any

5  way didn't pass inspection?

6  A.   No.

7  Q.   Let me withdraw it and ask it a different

8  way.

9       Was there any indication in the 2010 car

02:43PM  10  shop file that the car had been submerged?

11  A.   None.

12  Q.   And then the next time we saw for

13  qualification was when?

14  A.   In 2013.

15  Q.   Three years later?

16  A.   Yes.

17            (Defendant's Exhibit 13 was

18             marked/received into evidence.)

19  BY MR. FLEMING:

02:43PM  20  Q.   I know we've already discussed this, so I'm

21  just going to confirm a few points.  I'd like to put

22  in front of you Defense Exhibit 13, to which there

23  is no objection.  I'm just looking at the first

24  page.  Can you tell the jury what Exhibit 13 is

25  comprised of or what it is.

1        A.    This is a -- again, a checklist of all the

2    different operations to be performed while the car

3    is in the repair shop.

4        Q.    Let me stop you.  Is Exhibit 13 the entire

5    car shop file for that event?

6        A.    No, not at all.

7        Q.    Okay.  What does Exhibit 13 contain?

8        A.    It is simply the checklist of those

9    operations that need to be performed while the car

02:44PM  10  is going through the repair shop.

11        Q.    Does the car file go along with the car

12    during qualification?

13        A.    Yes, it does follow the car at all the

14    different workstations that the car sees while

15    qualified, inspected and attended to.

16        Q.    Within the car file, is there a tank car

17    data report?

18        A.    Yes.

19        Q.    And that is going to be the next document

02:44PM  20  from the car -- from Exhibit 13 that I want to talk

21    about.

22            MR. FLEMING:  Can you just highlight the

23    car number, Ms. Bauer, up at the top left, and

24    expand that so that everyone can see.

25

BY MR. FLEMING:

Q.   Does it -- as she is doing that, does this reflect that this is, in fact, the tank car data report for UTLX 901717?

A.   Yes, sir, it does.

Q.   Within that document, is the information -- is the tank car build date also reflected?

A.   It is.

02:45PM   Q.   Where is the data from this document generated?  Where did we generate the data from?

A.   Some of the information comes from our own internal mechanical record system and some of the data is imported from both UMLER and Rail Link, another industry source of data.

Q.   And at the time of this qualification in 2013, did this data that's populated also include the total miles on the car as of 2013 or the shopping event in August through October of 2013?

02:46PM   A.   Yes, sir, it did.

Q.   What was the total miles reflected at this point on that car?

A.   The number displayed here is 193,763 miles.

Q.   Have you, as part of your preparation today, also studied other information to try to

1    arrive at the average mileage that this tank car

2    might have seen or has seen?

3         A.   We did take a look at the mileage history

4    for our entire fleet of cars of this type just as a

5    step one.  And then we also took a look at the

6    population, the group of cars that had been assigned

7    continuously to the same service, B.P., Innovene,

8    INEOS, and looked at the mileage accumulated there,

9    yes.

02:46PM  10                    (Defendant's Exhibit 93 was

11                         marked/received into evidence.)

12   BY MR. FLEMING:

13        Q.   Let me give you -- let me put up in front

14   of you Defense Exhibit 93, to which there is no

15   objection, also Plaintiffs' Exhibit 25, and just ask

16   you -- we'll expand it for you.

17             Why don't you explain to the jury what you

18   had done and what this data shows.

19        A.   Well, the top, the full fleet study, is, as

02:47PM  20   I said, all -- all cars of this particular type, and

21   that fleet average, total miles came in at a little

22   under 14,000 miles per year; 13,783.

23             And then with that as the foundation, we

24   took a look at the separate INEOS fleet, cars that

25   had been in continuous service, as I said before,

1  and that mileage history averaged out to 10,821

2  miles per year as an average; 11,000 miles a year.

3      Q.   And based on the 190,700 miles we saw on

4  the previous exhibit, is that consistent with what

5  your findings were?

6      A.   The math tracks, yes, sir.

7      Q.   And based on that average, how many miles

8  would you have expected that this car had on it on

9  the day of this incident, July 1st, 2015?

02:48PM 10      A.   Well, it was approximately 21 years old.

11  So right around 220,000 miles total, total life to

12  date.

13      Q.   Mr. Constantino -- hang on one second.

14  I'll clear the screen.

15          Mr. Constantino, we talked about your

16  removal -- Union Tank Car's removal of the Southern

17  wheel set during that 2013 qualification.  Why

18  didn't Union Tank Car replace all the wheel sets at

19  that time?

02:48PM 20      A.   Well, we inspected all the wheels and found

21  cause to only replace one.  The others were in

22  conformance with all the rules at that point in time

23  and had remaining service life, and -- and there

24  wasn't any reason to waste the utility that was

25  still in that equipment.

1    Q.    Does Union Tank Car have the ability to

2    identify the age of bearings through things like

3    visual inspections and other avenues of research?

4    A.    Yes.

5    Q.    Can you explain some of those.

6    A.    Well, we do know the date of manufacture or

7    reconditioning on bearings that are installed,

8    whether it's a new car or a car that we're

9    repairing.

02:49PM  10         We -- when it's done in the field, most of

11    the time we only know that the wheels have been

12    changed and we know that the bearings have been

13    changed along with the wheels.  We don't necessarily

14    get a report of age from the field location.  But

15    our database is built to tell us when wheel

16    change-outs are made, and to the extent we've

17    captured bearing data, we maintain it.

18    Q.    I want to talk, before we conclude, about

19    the actual incident.

02:50PM  20         How did Union Tank Car learn that there had

21    been a derailment of 901- -- well, of the train

22    carrying 901717?

23    A.    We picked up media reporting initially that

24    there had been a derailment and we started to make

25    inquiries of AAR, as well as the railroad, to try to

1       determine whether or not we were directly involved.

2            Q.    Were you personally involved in some of

3       those communications?

4            A.    No, I did not talk with AAR or CSX.  I had

5       Joe Perez talk to the various regulators, and we

6       have an AAR services group who routinely contacts

7       with the railroads, and they reached out to CSX for

8       any information that they would give us at that

9       point in time.

02:51PM 10           Q.    And during the course of the day, July 2nd,

11      after finding out, was Union Tank Car asked to

12      provide information by CSX and the FRA?

13           A.    Yes.  At the same time they -- they --

14      those bodies, FRA and the railroad, communicated to

15      us that we were directly involved, they made

16      requests of us for -- for information; what kind of

17      car was it and what was the maintenance history;

18      produce documentation, and all the requests for

19      information that were made of us, we complied with.

02:52PM 20           MR. FLEMING:  Before we ask the -- can you

21      put up Defense Exhibit No. 20, to which there is no

22      objection.

23                          (Defendant's Exhibit 20 was

24                           marked/received into evidence.)

25

BY MR. FLEMING:

    Q.   And I just want you to tell the jury what these records are that we're looking at in Exhibit 20.

    A.   Well, we maintain a lot of files that we've talked about today.  This one is a railroad damage file which is maintained in the Chicago office.  It outlines the course of events associated with a car that's been railroad damaged and how that situation is ultimately resolved.

    Q.   And what's the significance of these documents?  I mean, what does it -- what do these documents reflect?

    A.   Well, it reflects, number one, that the car has been damaged.  Number two, that the railroad has taken responsibility for the damage.  And then there is an economic reconciliation pursuant to the rules.  The railroad either pays the repair costs or pays the depreciated value in the event a car has been destroyed.

    Q.   And if we turn into this document to the second to the last page, looking at this document, can you tell the jury what this invoice reflects.

    A.   This is the Union Tank Car invoice tendered to CSX Transportation for the month of July 2015,

1    and it says it's for AAR repairs.

2         Q.    Turning to the next page, just looking at

3    the highlighted tank cars, can you tell the jury

4    what the significance of those two tank car numbers

5    are within this July invoice.

6         A.    Well, UTLX 901717 is why we're here.  The

7    companion car was traveling with the incident car,

8    and CSX settled under AAR interchange Rule 107 and

9    paid us the depreciated value for both of those --

02:55PM   10    both of those tanks.

11         Q.    And is that the value identified in

12    this ex- --

13         A.    Yes.

14         Q.    $60,061 for 901717 and $59,498 for --

15         A.    That's -- that's correct.

16         Q.    -- 901708?

17         A.    Yes.

18         Q.    None of the -- just so the jury is not

19    confused, none of the other cars listed on

02:55PM   20    Exhibit 20 have anything to do with this incident;

21    correct?

22         A.    They do not.  They were other cars damaged

23    at other locations and other dates that were just

24    part of the monthly settlement.

25         Q.    You testified that the FRA and CSX were

1  leading the investigation.  Are you aware that the

2  FRA completed its investigation and issued a summary

3  report of the incident?

4      A.   Yes, sir, they have completed their

5  investigation.

6      Q.   Following the completion of that report,

7  were -- at any time prior to that has the FRA issued

8  a violation notice to Union Tank Car or otherwise

9  criticized or penalized Union Tank Car Company?

02:56PM 10      A.   No, there has been no fine levied, citation

11  to Union Tank related to this event.

12           MR. FLEMING:  Your witness.

13           THE COURT:  Thank you.  Cross-examination.

14           MR. FRIEDMAN:  May it please the Court.

15           We need just a minute to change over.

16                 CROSS-EXAMINATION

17  BY MR. FRIEDMAN:

18      Q.   Mr. Constantino, we've never met.  My name

19  is Jeff Friedman.  I've read your deposition and

02:56PM 20  I've heard your testimony.  Let's cover a few

21  things, if we can, just on a preliminary basis.

22           You are here today speaking on behalf of

23  Union Tank Company; right?

24      A.   Yes, sir.

25      Q.   You're not speaking in your personal

1    capacity; you're speaking on behalf of the company?

2         A.    That's correct.

3         Q.    And you've done that frequently in the

4    past, haven't you?

5         A.    I wouldn't say frequently, but I have --

6         Q.    A number of times?

7         A.    -- testified in the past.

8         Q.    And when a legal matter like this comes up,

9    typically you're the person that the company turns

02:57PM 10   to; right?

11        A.    Yes, sir.

12        Q.    Okay.  And you're an executive with Union

13   Tank Company; correct?

14        A.    Yes.

15        Q.    You had no education in engineering?

16        A.    No, sir, just practical experience.

17        Q.    Right.  When you say "practical

18   experience," you've never personally done a Rule 36

19   inspection, have you?

02:57PM 20        A.    No.

21        Q.    You've never gotten dirt, grease under your

22   fingers getting down there and doing a Rule 88, have

23   you?

24        A.    I have been to our repair shops, but I'm

25   not certified, nor trained to do those inspections.

1    I've witnessed them being done.

2        Q.   Sure.  You've watched.

3            And when you talk about and you tell the

4    jury what we saw down there in Texas at Union Tank's

5    shop, you personally didn't see anything, did you,

6    sir?

7        A.   No.  What the documents that we've

8    discussed display to me and confirm.

9        Q.   You are looking at shop documents and then

02:58PM  10   interpreting them in coming up with a conclusion as

11   to what those people down there saw or didn't see;

12   correct?

13       A.   Yes.

14       Q.   And you've never met with those work crews

15   down there, have you, about this case?

16       A.   No.

17       Q.   And you know, though, who they are, don't

18   you, because their names are on the documents?

19       A.   I know some of the individuals, yes.

02:58PM  20       Q.   And you knew this case was pending; you

21   knew you were going to be talking about the repair

22   work and you knew you were going to face this jury,

23   didn't you?

24       A.   Yes, sir.

25       Q.   And you never took time to talk to a single

1    one of those people down there in Texas who actually

2    did the work?

3        A.    Well, some of the individuals are no longer

4    employed by Union Tank going back to the 2004

5    history.

6        Q.    Well, let me make it fair then.  There is

7    still people there who were there at the 2013

8    qualification; right?

9        A.    Yes.

02:59PM 10        Q.    No question of that because we asked about

11    some of them.

12        A.    Yes.

13        Q.    And they're still there.

14        A.    Yes.

15        Q.    And you didn't talk to them.

16        A.    No.

17        Q.    All right.  You never served on the -- on

18    any federal hazardous material board or agency, have

19    you?

02:59PM 20        A.    No, I have not.

21        Q.    You've never written or published any

22    papers concerning railroad safety or maintenance?

23        A.    No.

24        Q.    You've never worked or served under any

25    Federal Railroad Administration committees?

1    A.    No, I have not been employed in any

2   capacity by the FRA.

3    Q.    Well, you can serve on the committees

4   without being employed by them; right?

5    A.    I'm not aware of any committees sponsored

6   by the Federal Railroad Administration.

7    Q.    You have no formal education in industrial

8   hygiene?

9    A.    Correct.

03:00PM  10    Q.    Chemistry?

11    A.    No.

12    Q.    Never worked and done any kind of analysis

13   with grease or lubricants, have you?

14    A.    No.

15    Q.    You're not an expert in railroad tanker car

16   design?

17    A.    I have plenty of practical experience in

18   tank car design, yes, sir.  I'm very familiar with

19   tank car design.

03:00PM  20    Q.    All right.  I get that you're familiar, but

21   you've never actually designed a car.

22    A.    No.  As I said, I'm not an engineer.

23    Q.    And -- well, let me just get to something

24   then.  I think we've laid a little background.  Let

25   me just get to something that's been brought up in

1    your direct examination.

2          The lawyer for Union Tank talked about they

3    never heard anything about this tanker car being

4    submerged or being wet back in 2004.  You were asked

5    questions about that; right?

6          A.   Yes, sir.

7          Q.   As a matter of fact, when you gave your

8    deposition in August, August 30th of 2017, you

9    testified extensively about submerged tankers,

03:01PM   10   didn't you?

11         A.   We had a conversation about the rules and I

12   produced a document which was our communication to

13   our folks with respect to Hurricane Harvey which had

14   recently affected the Houston area, yes.

15         Q.   And as a matter of fact, one of the

16   statements you made in your deposition, that is, if

17   your equipment has been subjected to flooding, that

18   calls in a requirement under Rule 36 to change out

19   any roller bearings that have been subjected to

03:02PM   20   flooding or submerged; correct?

21         A.   Yes.

22         Q.   All right.  Now, at that point in August of

23   2017, Union Tank Car had not given us their

24   documents on the 2004 --

25              MR. FLEMING:  Your Honor --

1    MR. FRIEDMAN:  Let me finish my question,

2    please.

3    BY MR. FRIEDMAN:

4    Q.    Union Tank Car had not given us the

5    document on the first requalification.

6    MR. FLEMING:  Your Honor, he's violating a

7    Motion in Limine that was specifically filed on

8    discovery document productions; not to mention, I

9    don't believe the timing of that representation is

03:02PM 10    accurate at all.

11    MR. FRIEDMAN:  Your Honor, I'm responding

12    to a personal attack they made on me.  We did not

13    have the first requalification documents when we

14    took his deposition.

15    THE COURT:  Well, the objection -- and I'm

16    not going to get into lawyer attacks.  The objection

17    is it goes beyond what's allowed by a Motion in

18    Limine, and I don't recall that sitting right

19    here --

03:03PM 20    MR. FRIEDMAN:  Your Honor --

21    THE COURT:  -- in response to that.

22    MR. FRIEDMAN:  -- I don't recall it either.

23    I'll try to rephrase my question.

24    THE COURT:  Either that, or why don't

25    you -- if you can hold this subject matter or this

1    question until a break, we can look into that.  I

2    mean, you can try to rephrase it and see if there is

3    any objection.  I'll have to go back and --

4         MR. FRIEDMAN:  All right.  I'll rephrase

5    it.  I think I can overcome that objection.

6         THE COURT:  Go ahead.

7    BY MR. FRIEDMAN:

8         Q.   Mr. Constantino, do you remember being

9    asked any questions about the first requalification

03:03PM  10   in your deposition?  And if you need to see it, I'll

11   give it to you.

12        A.   I would appreciate that, yes.

13        Q.   Okay.  You don't recall one way or another

14   whether you were asked?

15        A.   No, I don't.

16        Q.   All right.  Then I'll give you an

17   opportunity to look at it and we'll follow Your

18   Honor's instruction and come back to it.

19             Now, you did testify, though, that any

03:03PM  20   bearing that's submerged, roller bearing, must be

21   attended to immediately; right?

22        A.   Yes.

23        Q.   Or if it comes to the attention of Union

24   Tank Car, Union Tank Car must attend to it

25   immediately?

1    A.    Correct.

2    Q.    There is no wiggle room in that; right?

3    A.    No, no.

4    Q.    All right.  Let's look then, if we can --

5         MR. FRIEDMAN:  Mr. Davis, would you bring

6    up Plaintiffs' 2.  This is going to be the --

7    Plaintiffs' 2 is that diagram of the Union Tank Car

8    tanker.

9                   (Plaintiffs' Exhibit 2 was

03:04PM   10                   marked/received into evidence.)

11   BY MR. FRIEDMAN:

12   Q.    Can you see that, Mr. Constantino?

13   A.    Yes, sir.

14   Q.    All right.  Now, just as a -- just as a

15   matter of orientation, the tanker car itself sits on

16   top of the trucks; would you agree with me?

17   A.    That's correct, yes.

18   Q.    And if you were -- if you were going to

19   drain a -- the insulation of a tanker, and I believe

03:05PM   20   this is specified in the work notes, but it's

21   drained at the very bottom?

22   A.    The bottom centerline of the car, yes, sir.

23   Q.    All right.  Now, as far as the -- the

24   roller bearing -- I want to get the right

25   nomenclature here.

1      As far as the roller bearing brackets,

2  those brackets would sit --

3      MR. FRIEDMAN:  Can you bring up -- can you

4  bring that up?

5  BY MR. FRIEDMAN:

6      Q.   The roller bearing brackets, they

7  are -- they sit right on -- they are located right

8  on top of the roller bearings; is that correct?

9      A.   If you're addressing the roller bearing

03:05PM  10  adapters --

11      Q.   Yes.

12      A.   -- yes.

13      Q.   Could you point those out to the ladies and

14  gentlemen of the jury, the adapters.  We see the

15  roller bearings.  The adapter should be right behind

16  it and a little bit above them.

17      A.   Right.  If we look here (indicating), it is

18  the blue area that sits on top of -- of the bearing.

19      Q.   All right.  Now, if water had gotten up to

03:06PM  20  those roller bearings or the roller bearing adapter

21  to the point that it would cause them to rust, the

22  roller bearings themselves would be submerged,

23  wouldn't they?

24      A.   No.  Rain.  Those roller bearing adapters

25  do not sit in a covered, sheltered area.  Rain, snow

1    does not -- it's not evidence of submersion by any

2    stretch of the imagination.

3        Q.   I don't think you understood my question.

4            If water were to submerge those adapters,

5    it would have to be at such a level that it would

6    rise above the roller bearings themselves, wouldn't

7    it?

8        A.   Yes.

9        Q.   All right.  Now, we talked about these

03:07PM 10   documents, and let me go through them real quickly.

11   There is Plaintiffs' 144.

12           Now --

13           MR. FRIEDMAN:  And, Mr. Davis, could you

14   bring that up right in the middle of that.

15   BY MR. FRIEDMAN:

16       Q.   Can you identify this Exhibit 144 for us,

17   Mr. Constantino?  That's the worksheet; right?

18       A.   This is the truck assembly conventional

19   document.  This is part of, once again, the inbound

03:08PM 20   inspection document --

21       Q.   Right.

22       A.   -- that we talked about earlier.

23       Q.   Right, that you talked about.

24           And this is a Union Tank Car document;

25   right?

1   A.   Yes.

2   Q.   And just for the ladies and gentlemen of

3   the jury, when these requalifications are done by

4   Union Tank, that's not done by the railroad and

5   that's not done by a lease or a lessee.  I mean,

6   that's your responsibility; right?  When I say

7   "your," I'm talking about Union Tank.

8   A.   Right.  But Union Tank Car is typically

9   called the lessor of this equipment.  So --

03:08PM  10   Q.   You're right.  Yeah.

11   Let me -- to the exclusion of all other

12   entities in the world, in creation, when these tanks

13   are requalified, that is on Union Tank; correct?

14   A.   It is Union Tank Car's financial

15   responsibility, but we do have qualification work

16   done in third-party certified repair shops.  So --

17   Q.   But not in this case?

18   A.   No, not in this case.  But I'm --

19   Q.   So in this case involving this tanker,

03:09PM  20   those requalifications, both in 2004 and 2013, they

21   were exclusively Union Tank?

22   A.   That is correct; yes, we did both

23   qualifications.

24   Q.   And the person who did this input, this

25   intake form, who made this notation right out here

1   to the right-hand side (indicating) --

2           MR. FRIEDMAN:  If we can bring that up.

3   BY MR. FRIEDMAN:

4       Q.   -- that says "may be water"?  That was a

5   Union Tank Car representative or employee; right?

6       A.   Yes.

7       Q.   Now, there were -- there was discussions

8   about How Codes or Why Codes.

9       A.   Why Made Codes.

03:09PM 10       Q.   Why Make Codes?

11       A.   Yes.

12       Q.   And that's w-h-y; right?

13       A.   Yes.

14       Q.   Make, m-a-k-e?

15       A.   M-a-d-e.

16       Q.   Oh, m-a-d-e.

17           So that's somebody on this form asking for

18   or responding to "Why did you make that notation?"

19   Right?

03:10PM 20       A.   Uh-huh, uh-huh.

21       Q.   Correct?

22       A.   Yes, it is.

23       Q.   And there is a code in this document here,

24   and you were asked about Why Made Codes; correct?

25   Right?

1    A.    Generally speaking, yes.

2    Q.    Yeah, you were asked on direct.

3          And this code for 01 for these bearing

4    adapters where they -- there is a reference that may

5    be subject to water, what does that 01 mean?

6    A.    Repair and replace.

7    Q.    I think it means -- and I'll show you if

8    you want to look, but I think it means they're worn

9    out.

03:10PM  10   A.    Worn and subject to repair or replacement.

11   Q.    Okay.

12   A.    That was on the inbound inspection

13   document, once again.

14   Q.    So we know one of two things.  It was

15   either you say it was rusted by snow and rain.

16   A.    Exposure to the elements.

17   Q.    Exposure to the elements.  Or submersion.

18   A.    No evidence to that effect.

19   Q.    Other than it was rusted and somebody wrote

03:11PM  20   water out there; right?

21   A.    I'll agree to that, yes.

22   Q.    And they also went so far as to say -- let

23   me -- let me not leave this hanging.  I believe I

24   went to the trouble of getting that.

25         MR. FRIEDMAN:  Gary, could you help me.  I

1  believe that is -- the Why Made Code would

2  be -- Defendant's 111, I believe, is the exhibit.

3          Here it is right here (indicating).

4          I'm going to have to go on ELMO, if I may.

5          By the way, ELMO is the name of this

6  contraption.

7          MR. DAVIS:  I have it.  Wait a minute.

8          MR. FRIEDMAN:  What are we going to do?

9          MR. DAVIS:  I'm going to show it.

03:12PM  10          MR. FRIEDMAN:  I'm sorry, Your Honor.  I've

11  got this right here.

12  BY MR. FRIEDMAN:

13      Q.  So, as background, Mr. Constantino -- go

14  ahead and get a drink of water.  We've been here for

15  a little while, but --

16          Okay.  So this Exhibit 111 is a part of

17  the -- of the field manual for interchange rules,

18  2013, and I'm reading from -- okay.  All right.  If

19  you recognize that page, page 288 of Exhibit 111.

03:13PM  20  Do you recognize that page, sir?

21      A.  Yes.

22      Q.  And does that have a definition of Why Made

23  Codes?

24      A.  Yeah.  Code 01, as highlighted here, is

25  equal to or defined as worn out.  That was the code

1    used at inspection.

2         Q.    So then can we agree that at the time the

3    tanker was taken in in 2004, there was a notation

4    made as to the bearing adapters that they may

5    be -- it says "may be water," and then the Why Made

6    Code indicates that the adapters were worn out,

7    according to your codes?

8         A.    You know, could we call back up the UTC

9    document once again, the inspection document?

03:14PM 10        Q.    Yes.

11              MR. DAVIS:  Go back to here?

12    BY THE WITNESS:

13        A.    Yes, the 01 code was used, and that implies

14    that they should be inspected for excessive wear.

15    Excessive wear has nothing to do with exposure to

16    the elements or rust.

17    BY MR. FRIEDMAN:

18        Q.    Well, maybe it's just so worn out, it's

19    about to fall apart.

03:15PM 20        A.    The -- the roller bearing adapter is a cast

21    piece of steel that's about six inches square.  It's

22    not likely to wear out or rust out.  It can break,

23    and that's cause for removal.

24              There are wear indications in the casting

25    itself that are subject to inspection to determine

1    finally whether or not the article is worn to the

2    point where it needs to be removed.

3        Q.   Mr. Constantino, I didn't say it was worn

4    out.  Union Tank said it was worn out, didn't they?

5        A.   On the initial inspection --

6        Q.   Yes.

7        A.   -- document where it was not the conclusive

8    inspection; it was the initial visual inspection of

9    the car.

03:16PM 10       Q.   I get that.  And then there is an initial

11   right beside the 01; right?  With a J.

12       A.   Yes.

13       Q.   And that identifies the person who was

14   doing the intake?

15       A.   Correct.

16       Q.   Correct?

17       A.   Yes.

18       Q.   All right.  And did you do anything to

19   track down this individual?

03:16PM 20       A.   I did not, no.

21       Q.   So it has the bearing adapters for L1 and

22   L2; correct?

23       A.   Yes.

24       Q.   And then it has L3 and L4; correct?

25       A.   Yes.

1    Q.   And that -- that would be the bearing

2  adapter for the adapter over the roller bearing that

3  failed that is the subject of this lawsuit; correct?

4    A.   It annotates the bearing adapters at all

5  four wheel positions on the car.

6    Q.   Right.

7    A.   Not just wheel four.

8    Q.   And it would include, though, the bearing

9  adapter for the bearing that failed in this case?

03:17PM 10    A.   Yes, sir.

11    Q.   And then if we go to the next page of

12  Exhibit 144.  This is dated March 4th of 2004.

13    A.   Uh-huh.

14    Q.   And if you look down in the middle of the

15  page -- now, I will say -- and this is not the same

16  document that was shown to you by counsel in your

17  direct examination because that document indicated,

18  I believe, that a third of an hour was spent looking

19  at the bearing adapters.  Do you recall that

03:18PM 20  testimony?

21    A.   No, not with respect to a third of an hour.

22    Q.   Okay.

23    A.   I said one hour.

24    Q.   I may be wrong on the time.  But this is

25  something different, I believe, that is represented

1    there.  But you'll see the reference to "inspect

2    bearing adapters."  Did I see that correctly?

3         A.   Yes.

4         Q.   Did I read that correctly?

5         A.   It has a -- off on the far right-hand side,

6    it records that 1.1 hour was spent inspecting the

7    roller bearing adapters in this particular document.

8         Q.   I'm going to ask you about the notation of

9    R&R.  Does that stand for remove and replace?

03:18PM   10         A.   Remove or renew are interchangeable terms.

11   But it is an inspection of the roller bearing

12   adapters looking for fit and wear patterns and

13   whether or not wear on that set of adapters is still

14   compliant with the rules.

15        Q.   Can you tell us whether it was replaced or

16   not?

17        A.   The absence of a material charge says that

18   the inspection performed at the particular work

19   station for those adapters proved out that the wear

03:19PM   20   was not excessive, that there was no other cause for

21   removal of those adapters, and they were returned to

22   service.

23        Q.   Mr. Constantino, you don't know that.

24   You're surmising that; right?

25        A.   We have trained inspectors who look at

1    these articles continuously who are trained to

2    identify and follow the rules.

3         Q.   So you --

4         A.   And they inspected --

5         Q.   You're hoping someone there does their job,

6    and based on that, you're concluding what you

7    believe they did; right?

8         A.   The system works across the board within

9    our repair locations, our training, our procedures

03:20PM 10   has --

11        Q.   Mr. Constantino, did it work for the people

12   in Maryville, Tennessee?  Did the system work for

13   them?

14             MR. FLEMING:  Your Honor, objection,

15   argumentative.

16             MR. FRIEDMAN:  He set the --

17             MR. FLEMING:  And he's not -- he hasn't

18   allowed the witness to finish his answer.

19             THE COURT:  It's probably somewhat

03:20PM 20   argumentative, but I'll overrule the objection.

21   BY MR. FRIEDMAN:

22        Q.   Did the system work for people in

23   Maryville, Tennessee who were forced to evacuate

24   their homes?

25        A.   On that day, no.

1    Q.   Let's move on to Exhibit -- Rule 37 for

2  roller bearing adapters.  The same document, page

3  278.

4         MR. FLEMING:  What number is it?

5         MR. FRIEDMAN:  111.

6  BY MR. FRIEDMAN:

7    Q.   Yes, sir.  Have you seen this document

8  before, please, sir?

9    A.   I know of Rule 37.

03:21PM 10    Q.   There are requirements, are there not, for

11  the removal of roller bearing adapters; correct?

12    A.   There are conditions that, when seen,

13  require the removal of roller bearing adapters, yes.

14    Q.   Here is my question:  Does Union Tank Car

15  when they replace roller bearing adapters, do they

16  replace the roller bearings at the same time?

17    A.   No.

18    Q.   Okay.  So you can replace a worn roller

19  bearing adapter and leave the roller bearing there?

03:22PM 20    A.   Those two items are completely separate.

21  They are -- they are not attached.  They are

22  complementary to one another and part of a truck

23  system, but there is no dependency there.  If you

24  replace one article, you must replace another

25  article.

1      Q.   And that's a policy?

2      A.   That is -- is the structure of the rules.

3      Q.   You would agree with me, however, that a

4   roller bearing, a roller journal could not work

5   without a properly-functioning roller bearing

6   adapter?

7      A.   You would have a noncompliant truck set,

8   yes.

9      Q.   Now, let me go, if I may -- and I'm going

03:23PM 10   to take this out of order.

11              MR. FLEMING:  What exhibit is it?

12              MR. FRIEDMAN:  I'm going to show you.  I'll

13   show you.  It's Exhibit 12.  I'll give you our

14   number.  I think it's our 24.

15   BY MR. FRIEDMAN:

16      Q.   Let me show you Exhibit 24, and I do not

17   believe there is any objection to it.

18              MR. FLEMING:  What number?

19              MR. FRIEDMAN:  24.  Plaintiffs' 24.  It was

03:23PM 20   Deposition Exhibit 12 to Mr. Constantino.

21              MR. FLEMING:  Well, there is no objection

22   list.  So --

23              MR. FRIEDMAN:  Excuse me?

24              MR. FLEMING:  No, we did not -- we didn't

25   list an objection, Your Honor.

1          THE COURT:  I'm sorry.  There is no

2     objection?

3          MR. FLEMING:  There is a relevance

4     objection to the fact that it was issued August 28th

5     of 2017, but we did not lodge an objection on the

6     exhibit list.

7          I would argue that it is irrelevant given

8     that it postdates the accident several years or two

9     years after the accident.  It has absolutely no

03:24PM   10     relevance.

11          MR. FRIEDMAN:  I'll lay the predicate for

12     it, Your Honor.

13          THE COURT:  Go ahead.  We'll see.  And then

14     we'll allow -- we'll hear an objection if there

15     still is one.

16               (Plaintiffs' Exhibit 24 was marked

17                    for identification.)

18     BY MR. FRIEDMAN:

19          Q.   So you produced a memo dated August 28th of

03:24PM   20     2017 concerning storm-damaged cars at your

21     deposition.  Do you remember that?

22          A.   Yes, sir.

23          Q.   You were asked about it.

24          A.   Uh-huh.

25          Q.   And it talked about financial responsibility

1    for flood damage is similar to railroad damage.  If

2    a car is on railroad property, the railroad is

3    responsible.  Cars that are on customer property,

4    customer-leased storage sites or their customer

5    sites are the responsibility of the lessee.

6         A.    Uh-huh.

7         Q.    Is that consistent with your recollection?

8         A.    Yes.

9         Q.    Now, that -- how long has that policy been

03:25PM 10   in place?

11        A.    For my entire career.

12        Q.    Okay.  So the fact that this is just reduced

13   to writing in August of 2017 is beside the fact that

14   the policy was there in one form or another for --

15   going way back before 1994?

16        A.    I would agree with that, yes, sir.

17        Q.    Going all the way back before 2004.

18             MR. FRIEDMAN:  So we'd offer Plaintiffs'

19   24.

03:25PM 20            MR. FLEMING:  Again, the fact that the

21   policy exists doesn't do anything to make this

22   document that was issued two years after the

23   accident relate to anything to do with this

24   particular tank car, Your Honor.

25             THE COURT:  Well, it's probably -- I mean,

1    we've got the testimony.  Why don't we -- I don't

2    think we need the document.  So I'll sustain the

3    objection as to the introduction of the document but

4    keep in place the testimony related to the policy in

5    effect at the time.

6    BY MR. FRIEDMAN:

7        Q.   Is it -- was the policy in effect in 2004

8    also the same with respect to whenever water levels

9    reached the bottom of the jacket, which would be the

03:26PM 10   bottom of the insulation on a tank car, the car will

11   need to be shopped, inspected, replace damaged

12   insulation, clean out bottom outlet valves.  The

13   faster this work gets done, the better, as corrosion

14   will begin and continue to spread?

15       A.   If the water level would have gotten to the

16   bottom of the jacket of any car, it would have

17   exceeded the height of the bearings and the bearings

18   would have required change-out before the car moved

19   to shop.

03:27PM 20   Q.   Now, if we go to Exhibit 111 or back to

21   Exhibit 111.  Excuse me.  This is Plaintiffs'

22   Exhibit 144.  And you've been asked about this

23   already.

24            This time the -- previously I asked you

25   about the roller bearing adapter.  Now I'm talking

1    about -- I'm going to ask you some questions to

2    follow up on the tank itself, and I believe you were

3    asked a question and you were asked about a specific

4    work order number.  Let me just go back to that.  Do

5    you see that in front of you, Mr. Constantino?

6         A.    I do, yes, sir.

7         Q.    And this is an inbound inspection, wet

8    insulation, drill drain holes per project letter.

9         A.    Correct.

03:27PM  10         Q.    Okay.  Now, as I understand your testimony

11    about the project, this -- from what I've heard,

12    there was a project to deal with wet install- --

13    insulation around the bottom of the tanker cars;

14    right?

15         A.    It was a project established to install

16    drain holes so that moisture that had been sucked in

17    to the jacket space after gravity had taken it and

18    put it at the bottom of the car so that water could

19    leave.

03:28PM  20         Q.    Right.  And so you drain -- those holes

21    were drained so the water could be drained out?

22         A.    Yes.

23         Q.    And then the insulation was replaced?  I'll

24    show you on the next --

25         A.    No, no, no.  The -- this project requires

1    the drilling of three holes that are three-quarters

2    of an inch in diameter.

3         Q.   Okay.

4         A.   There is no insulation of substance that is

5    displaced by that activity.

6         Q.   All right.  Well, good, because the -- the

7    project letter order number was 60202.

8         A.   That's correct.

9         Q.   Now, I have a doc- -- another document in

03:29PM  10   front of you, that I'm going to put in front of you,

11   from the same exhibit.

12        This is -- okay.  Well, I'm just going to

13   read it.  This is a different order; okay?  Just for

14   the record, it's not 60202, it's 60235.  Did I read

15   that correctly?

16        A.   Yes, you did.

17        Q.   Do you see that?

18        And this talks about replacing new

19   insulation.  So that's a separate project.

03:30PM  20        A.   For somebody on the outside, it would be

21   very easy to jump to all sorts of speculation, but

22   let me explain to you exactly what's going on here.

23        Q.   Okay.

24        A.   In the order space, once again -- hopefully

25   I didn't wipe it out.  I just highlighted it.  But

1    it's 60235.  That was an internal tracking project

2    for qualifications.  And as you'll see, the first

3    line of this particular work order is

4    qualifications.

5           Now, as part of the structural integrity

6    testing that I was talking about earlier, we're

7    required to remove areas of the jacket to look at

8    certain welded attachments to the tank.  And the

9    only way to do that is to remove the jacket and

03:31PM  10   remove insulation and do a specific inspection of

11   the weld.

12          And what you see on this page completely is

13   remove and replace jacket, remove and replace

14   insulation, all of which are part of the process of

15   doing a qualification.  And the areas that are

16   looked at are small in comparison to the total size

17   of the car.

18       Q.   All right.  Mr. Constantino, thank you for

19   explaining that.

03:31PM  20          Can we agree that water, whether it's

21   trapped in the insulation in the tanker or whether

22   it infiltrates an adapter or roller bearing, that

23   could cause deterioration of the product, couldn't

24   it?

25       A.   Deterioration of a product.  Would you

1    afford me an explanation of what that means.

2         Q.    Yeah, I'll use the -- I'll use your own

3    language to do it.

4              If water levels reach the bottom of the

5    jacket on a tank car, the tank -- the car will need

6    to be shopped to inspect, replace damaged

7    insulation, clean out the bottom valves.  The faster

8    this work gets done, the better, as corrosion will

9    begin and continue to spread.

03:32PM  10       A.    Yes.    The first point of reference, as I

11   said earlier, this is a pressure car, and there is

12   no bottom outlet valve on this car.  So that was a

13   reference in the generic to the fleet at large.

14   That has no particular bearing to this car because

15   it doesn't have a bottom outlet, though.

16        Q.    Well, it has a bottom of the car -- the

17   bottom of the tanker, and if you had water trapped

18   up against it, it creates corrosion; correct?

19        A.    This particular car has a coating to the

03:33PM  20   tank itself prior to the application of insulation,

21   and both occasions where the car was qualified,

22   there was no indication of corrosion to the tank

23   based on our sonic inspection thickness readings

24   that were taken.

25        Q.    All right.

1     A.   Nor was there any corrosion evidenced to

2    the jacket itself.

3     Q.   I don't think you answered my question.  My

4    question is:  You need to remove the water to

5    prevent corrosion.  I didn't ask you if there was

6    corrosion.  I meant as a -- as a threshold issue,

7    water is bad for a tanker.  You need to move it to

8    prevent corrosion; correct?

9     A.   And I agree with that, and that is why back

03:33PM  10    in 1996, we established the project internally to

11    put the drain holes in a car; not this car, every

12    car when we saw it.

13     Q.   Mr. Constantino, before we move on from

14    that work that was done in 2004, I want to make sure

15    we have this and it's clear on the record.

16         Once work is done on a tanker, specifically

17    this tanker, the work that was done, the conditions

18    that were observed becomes part of the work file and

19    the history of the tanker for other Union Tank

03:34PM  20    employees or railroad employees to see and access;

21    correct?

22     A.   No, I disagree with that.

23     Q.   Union Tank keeps a complete record on its

24    tankers; correct?

25     A.   That I agree with.

1      Q.   And when that tanker is brought back in in

2    2013 for recertification, the information concerning

3    all the repairs of that -- that tanker are available

4    for review; correct?

5      A.   If somebody had requested the prior

6    records, yes.  One repair shop would have been able

7    to give it to another, yes.

8      Q.   Let me change gears just a minute.

9           Is it your testimony that you found out

03:35PM  10    about this derailment from watching television?

11      A.   No.  I think the first indication that I

12    got was from the Internet.  I do routinely go out

13    and look to see whether or not there are any events

14    ongoing that I should be aware of.

15      Q.   Okay.  And as a matter of fact, you found

16    out about the derailment not long after it happened?

17      A.   It was the same day, yes.

18      Q.   Same day.  The same day.  This is kind

19    of -- we're on the -- we're right before midnight.

03:36PM  20    So did you find out before midnight or after?

21      A.   It was the following morning.  But --

22      Q.   Okay.

23      A.   -- you know, the -- the event was still

24    ongoing.

25      Q.   And on behalf of Union Tank, you were given

1   certain responsibilities in regards to the

2   derailment, weren't you?

3       A.   I have an obligation to communicate

4   throughout the organization when such events occur.

5       Q.   Sure.  And you informed your superiors of

6   the derailment and the fact that a Union Tank Car

7   tanker was involved; right?

8       A.   When it was ultimately determined that it

9   was a UTLX tank car involved, yes, I did communicate

03:37PM 10  that up to the chain of command.

11      Q.   As well as to engineers?

12      A.   Joe Perez was aware of the event before we

13  were informed that it was our car.  So we were

14  already clued in to the need to pay attention and

15  cooperate if we were asked to produce any

16  information.

17      Q.   Now, speaking of Mr. Perez, he -- I don't

18  know -- his video was playing earlier this morning.

19  I don't know if you were here for that.  But

03:37PM 20  Mr. Perez, when his deposition was taken, he

21  testified on behalf of Union Tank Car and was their

22  spokesperson like you are here today in the trial;

23  is that your understanding?

24      A.   His deposition was taken on that basis,

25  yes.

1    Q.    Yeah.    And you've seen his deposition or

2    read it?

3    A.    I have read his deposition, yes.

4    Q.    And the other responsibility that you had

5    after learning of the derailment, you were tasked

6    with securing all data and information relating to

7    the tanker?

8    A.    Yes.    I communicated, put out a directive

9    to those folks that would have controlled paper or

03:38PM 10    electronic files, and once the identity of the car

11    was known, instructed them to secure those records.

12    Q.    Mr. Constantino, the information that's

13    been produced in this case about the work done on

14    the tanker in 2004, has that been produced to anyone

15    else, to your knowledge?

16    MR. FLEMING:    Your Honor, I'm going to

17    object to the question.    Again, we're talking about

18    a discovery issue, and now this question really

19    doesn't even make sense as to who else it would have

03:39PM 20    been produced to other than the plaintiffs and the

21    parties.

22    THE COURT:    Are you talking about from a

23    discovery standpoint?

24    MR. FRIEDMAN:    No, Your Honor, I'm talking

25    about authorities.    I'm talking about his first

1    responsibility was to gather all the relevant

2    information.

3              THE COURT:  So, with that --

4              MR. FLEMING:  I'll withdraw.

5              THE COURT:  You'll withdraw your objection.

6    Go ahead.

7    BY MR. FRIEDMAN:

8         Q.   I'm not talking about the legal process

9    that we're hearing today.  I'm talking about the

03:39PM  10   course of the investigation.

11              Were the repair records concerning what was

12   done to this tanker in 2004, were those produced to

13   anyone besides the context of this lawsuit?

14        A.   We were asked to produce mechanical data,

15   design data and maintenance history on the car and

16   did provide that to FRA, yes.

17        Q.   This is my question:  Can you tell us here

18   under oath that those 2004 records that we just went

19   over were ever produced to FRA?

03:40PM  20        A.   I have not seen a transmittal document.  I

21   believe that they were part of the repair package,

22   but I was not there when the records were conveyed.

23        Q.   In addition to Mr. Perez's deposition, you

24   also had the opportunity and I believe you did read

25   Craig Norris' deposition.

1      A.    Yes, sir.

2      Q.    He is the representative who testified in

3 this case on behalf of Brenco® and their parent

4 company, Amsted Rail, I believe --

5      A.    Yes, sir.

6      Q.    -- correct?

7            And he testified that as a courtesy to

8 Union Tank Car Company, he would have come and

9 inspected the mate bearing and looked at the grease

03:41PM 10 and done an evaluation.  Do you remember seeing his

11 testimony on that?

12      A.    Yes.

13      Q.    He was never asked to do that, was he?

14      A.    No, not -- not to my knowledge.

15      Q.    And as far as the questions you were asked

16 about how this incident occurred or what led to the

17 roller bearing failure, Union Tank Car never did any

18 independent analysis to come to a conclusion, did

19 they?

03:41PM 20      A.    We did not have an independent investigation,

21 no.

22      Q.    And when Mr. Perez said in his deposition

23 over and over that Union Tank Car had reached no

24 conclusion as to what caused this bearing to fail or

25 how it failed, that is the sum total of what Union

1    Tank Car has concluded independently; right?

2    A.    The -- we left that investigation of the

3    failure of that particular bearing up to the FRA

4    during the course of their overall investigation of

5    the incident.

6    Q.    Well, I'm glad you brought that up.

7         You were asked questions about the FRA's

8    report and what they came up with, and I believe

9    your lawyer even asked you whether Union Tank was

03:43PM  10   fined.  Do you remember that?

11   A.    Yes, sir.

12   Q.    They did come up with some recommendations,

13   though, didn't they, the FRA?

14        This is consistent with the Court's ruling.

15   I'm going to ask you this.  I'm not going to put it

16   up.

17        THE COURT:  Before you do that, it might be

18   a good time for an afternoon break anyway.

19        MR. FRIEDMAN:  Thank you, Your Honor.

03:43PM  20        THE COURT:  All right.  We'll go ahead and

21   take a break.  We'll let the jury take a break at

22   this time.

23             (Jurors excused from the courtroom.)

24        THE COURTROOM DEPUTY:  This honorable court

25   should stand in recess until 4 o'clock.

1    (A brief recess was taken.)

2    THE COURTROOM DEPUTY:  Please remain seated

3    and come to order.

4    THE COURT:  Thank you.  Everyone may be

5    seated.

6    You may continue.

7    MR. FRIEDMAN:  If it please the Court, Your

8    Honor.

9    Madam Courtroom Deputy, would you -- could

04:11PM 10    you pull up for the witness's view only an exhibit

11    that's been marked for identification purposes as

12    140.

13    THE COURTROOM DEPUTY:  140?

14    MR. FRIEDMAN:  Yes.  Which is the Office of

15    Railroad Safety Summary Report.  And if you could,

16    please, go to page 12 of that, the last page.

17    (Defendant's Exhibit 140 was

18    marked for identification.)

19    BY MR. FLEMING:

04:11PM 20    Q.    Mr. Constantino, before we left for the

21    afternoon break, I was asking you some questions

22    about the Office of Railroad Safety Summary Report,

23    and I realize you didn't have that in front of you,

24    and I apologize for that, sir.

25    I want to ask you a background question or

1    two.  Do you know from your personal knowledge

2    whether the FRA did a bearing failure analysis as

3    part of its investigation?

4         A.    Which bearing?

5         Q.    The mate bearing.

6         A.    I do not believe FRA by themselves did such

7    an inspection.

8         Q.    Now, with respect to -- I may have referred

9    to the bullet points on the last page as

04:12PM  10   recommendations, and if I did, I misspoke.  There is

11   a section under Probable Cause that says FRA

12   Actions.  Do you have that in front of you, sir?

13        A.    Yes.  And I appreciate that.  It's just

14   been expanded so I can read it.  Thank you.

15        Q.    And it -- right before the bullet points,

16   it says, "Specifically, the investigative guidance

17   requires investigators to:"  And then if you go down

18   to the fourth bullet point from the bottom, it says,

19   "Determine from the car history if the car was

04:13PM  20   involved with a flood or stored in a rainy or wet

21   environment."  Did I read that correctly?

22        A.    Yes, but I -- I believe it would be

23   important to appreciate the lead-in paragraph to

24   that which explains the FRA actions.

25             FRA is providing specific guidance in order

1  to provide consistent information and to collect

2  trending data for analysis, and it's instructing its

3  people in the field to pay specific attention to

4  certain items that should be data that should be

5  acquired during the course of any investigation.

6  That's -- that's what this paragraph is addressing.

7       Q.   And it also -- I didn't mean to cut you

8  off.  Were you through, sir?  Had you finished your

9  answer?

04:14PM  10       A.   Yes, sir.

11       Q.   And one of the recommendations that was

12  made to people in the field was to take note of the

13  bearings for -- the adapters for the bearings.  Do

14  you see that?  The second bullet point.

15       A.   Inspect the bearing adapters for manufacturer

16  installation flaws, yes.

17       Q.   Now, while we're on this, and I'll do this

18  in the -- in the sake of trying to expedite things.

19            There has been -- you testified about CSX

04:15PM  20  settling up with Union Tank for the cost of the

21  tanker.  Do you remember that testimony?

22       A.   For the depreciated value under Rule 107 of

23  the interchange rules, yes, sir.

24       Q.   And those interchange rules don't have

25  anything to do with liability in a court of law, do

1   they?

2        A.   No, they don't.

3        Q.   As a matter of fact, the document that you

4   have in front of you, the FRA that you've been asked

5   about, they found that the operating crew was

6   qualified, rested and fit for duty.  Did I read that

7   correctly?

8        A.   Yes.

9        Q.   That's on page 9?

04:15PM 10        A.   Yes.

11        Q.   "There was no evidence that the

12   qualifications or actions taken by the operating

13   crew caused or contributed to the accident."  Did I

14   read that correctly?

15        A.   Yes.

16        Q.   As a matter of fact, in your deposition

17   that was taken, I believe, and you correct me if I'm

18   wrong, but you said the actions of the CSX crew were

19   exemplary.  Do you remember your testimony in that

04:16PM 20   regard?

21        A.   No, my words on memory were that at that

22   point in time when the crew unquestionably

23   recognized they had a compromised consist that they

24   were able to bring the train to a controlled stop,

25   and I thought that was commendable of them the way

1    they operated.

2         Q.   At page 126 of your deposition, so I'm not

3    at risk of misquoting it, there is your answer:  (As

4    read)

5              "I think the crew in this case is to be

6               commended because at that point in time

7               they were unequivocally identified -- that

8               they -- where they unequivocally identified

9               they had a compromised train consist, they

04:17PM 10              acted in a professional manner to bring

11               that train to a controlled stop without any

12               further upset.  And that is -- I think that

13               is to be complemented."

14         A.   Yes.  Those are my exact words.

15         Q.   And that's why --

16         A.   My answer to your question is closer to

17    that than what you attributed to me, yes.

18         Q.   Well, either way, you didn't find fault

19    with the -- with the CSX crew in your deposition,

04:17PM 20    and it's not coincidence, is it, that the Office of

21    Railroad Safety doesn't find fault with them either,

22    did it -- does it?

23         A.   No, I don't find that unusual.

24         Q.   If I may, I'd like to change gears just a

25    minute.

1    You were asked earlier about certain

2  regulations.  Specifically, you were asked about 49

3  C.F.R. 215.115 or 1-1-5.  Do you remember that?

4    A.   Yes.

5    Q.   C.F.R. is Code of Federal Regulations;

6  right?

7    A.   Correct.

8    Q.   And there are just whole volumes of

9  regulations.  Have you ever taken the time to go

04:18PM 10  through them all?  You don't have to answer that

11  question.  They're voluminous, though; correct?

12    A.   Yes, they are.

13    Q.   All right.  I want to limit my question to

14  the pertinent C.F.R. that you were asked about by

15  the lawyers for Union Tank on direct.

16    Specifically, you were asked about 49

17  C.F.R. 215.115, and you were asked whether or not a

18  railroad can place or continue a car in service that

19  had a roller bearing that showed signs of having

04:19PM 20  been overheated as evidenced by, and then there is a

21  couple things there.

22    Do you see discoloration or other telltale

23  signs of overheating, such as damage to the seal or

24  distortion of any bearing component?

25    A.   Yes.

1      Q.    Do you follow that?

2      A.    Yes.

3      Q.    There is also a kind of catchall if you go

4   down to item three of that code section, and it

5   says --

6            MR. FRIEDMAN:  Excuse me?

7            MR. FLEMING:  Go ahead.

8   BY MR. FRIEDMAN:

9      Q.    -- (as read) "Each defective roller bearing

04:19PM  10   shall be repaired or" -- "shall be repaired or

11   replaced before the car is placed back into

12   service."  Did I read that correctly?

13            MR. FLEMING:  Your Honor, I object to this

14   line of questioning.  Your Honor has already

15   identified this section as one that applies to the

16   issues that exist against my client with respect to

17   the 2013 qualification, and the interpretation by

18   plaintiffs' counsel of paragraph 3 to be a catchall

19   has not been determined as a matter of law and is

04:20PM  20   not set forth in this section of the Code of Federal

21   Regulations at all.  I think that's for the Court to

22   determine, not for him to advise the jury of.

23            MR. FRIEDMAN:  Your Honor, I will be happy

24   to rephrase that.

25            THE COURT:  All right.  Go ahead and

1    rephrase it and see if you can meet the objection.

2    BY MR. FRIEDMAN:

3        Q.    This is the point I'm trying to make:  You

4    were asked about, I believe, Section 1 and Section 2

5    in your direct examination.  There is a third

6    section that -- is there not, and that reads, "Each

7    defective roller bearing shall be repaired or

8    replaced before the car is placed back in service."

9    Did I read that correctly?

04:21PM 10        A.    You did read it correctly.

11        Q.    And this pertains, does it not, to

12    requalification?

13        A.    No, it pertains to Rule 36.

14        Q.    Okay.  Which is --

15        A.    Which is the inspection of roller bearings,

16    which is part of qualification.

17        Q.    So I may have gotten the nuance of it

18    wrong, but the substance of it is:  This pertains to

19    the requalification process and the examination of

04:21PM 20    bearings, doesn't it?

21        A.    It is related to.  It is independent,

22    however, because at any point in time where a

23    bearing is determined to be defective, it must be

24    removed and replaced.

25            It is not dependent on there being an

1    ongoing qualification of that car concurrent to the

2    determination of a defective bearing being on the

3    car.

4        Q.   I get what you're saying.  No one should

5    ever put a tanker car on a track with a defective

6    bearing; right?  We can agree on that.

7        A.   Such a car with a bearing determined to be

8    defective should not be returned to interchange

9    service.  The car is going to be on the track.

04:22PM  10        Q.   Now, I take from your testimony that it

11    applied -- this rule applies to everyone, not just

12    the owner of the tanker; right?

13        A.   That's correct.

14        Q.   But the owner of the tanker, in this case,

15    Union Tank Car Company, is the only company that

16    performed a requalification; right?

17        A.   Qualification, yes.  We performed

18    qualification inspections on the car twice.

19        Q.   I put -- I mistakenly called it a

04:23PM  20    requalification.  It's a qualification.

21        A.   Yes, sir, that's correct.

22        Q.   And that qualification, that's something

23    that is very detailed, isn't it?

24        A.   Yes.

25        Q.   For example, the qualification process that

 1    took place in 2014 and as well as 2004, they took

 2    weeks to perform, didn't they?

 3        A.   The average cycle time for a car going

 4    through our repair facility is between 45 and

 5    60 days.  That's not unusual.

 6        Q.   That's just not somebody walking by a --

 7    walking by a tanker car pointing a flashlight at the

 8    wheels and bearings, is it?

 9        A.   No.

04:23PM 10        Q.   It's much more complex?

11        A.   That's correct.

12        Q.   And when -- and the idea and the goal when

13    that tanker rolls out of there, in this case, when

14    it came out of the shop in Texas, you all put a

15    stencil on it.  You painted a stencil on the end of

16    the car; correct?

17        A.   There are many stencils on the car that

18    must be maintained, yes, sir.

19        Q.   Sure.  But at the end of it, at the end of

04:24PM 20    the 2013 re- -- excuse me -- qualification, not

21    requalification.  At the end of the 2013

22    qualification, that six-week process, or however

23    long it was, you -- Union Tank Car Company painted a

24    stencil on the side of the tanker telling the world

25    that the car had been qualified; correct?

1    A.    Yes.   The rules under 49 C.F.R. 180 do call

2    for the railcar to be marked in such a way to

3    identify where and when and what items were attended

4    to during qualification inspections.

5    Q.    And it also puts as part of what's painted

6    on the tanker the date for the next qualification,

7    and that date was 2023; correct?

8    A.    That's correct.

9    Q.    Did I understand your testimony earlier in

04:25PM 10   response to counsel's questions that Union Tank Car

11   is not allowed to take off a roller bearing and open

12   it to inspect it?

13   A.    The bearings are sealed and mounted.   If

14   there is any evidence of that seal being

15   compromised, that bearing must be removed from

16   service.

17        And I also said that Union Tank was not a

18   certified re-conditioner of bearings.   So, yes, we

19   do not rebuild bearings ourselves.

04:26PM 20   Q.    Well, what I'm -- what I'm questioning is:

21   Going back to this code section, this -- this C.F.R.

22   that you were asked about by your attorney, on the

23   second page under 2, it calls for or directs the

24   roller bearing shall be disassembled from the axle

25   and inspected internally if -- and then it has --

1    one, two, three, four -- four different conditions

2    there; is that correct?

3         A.    Yes.

4         Q.    But this -- and correct me if I'm wrong,

5    but this talks about inspecting the roller journal

6    internally.  Do you read -- is that how you read

7    that?

8         A.    What it says is that the roller bearing

9    itself must be disassembled and removed from the

04:27PM 10   axle.  Those roller bearings are press-fit onto the

11   axle journal, and you need special tooling and a lot

12   of effort to remove the roller bearing from the axle

13   itself.

14             Then it does say that in the presence of

15   certain conditions the bearing itself is to be

16   inspected internally.

17        Q.    Is it your testimony that y'all aren't

18   qualified at Union Tank to inspect a roller bearing

19   internally or it's something you just don't do?

04:28PM 20        A.    We don't do it.  The bearing, if any of the

21   conditions are seen or heard, pursuant to Rule 36,

22   it's considered failed and we take that wheel set

23   with those bearings and move them to a certified

24   location who could do that reconditioning.

25        Q.    So you would get another company to come in

1    and do the internal inspection that's referenced in

2    the C.F.R. here?

3         A.   In effect, we are putting that wheel set to

4    a re-conditioner for them to rebuild the bearing and

5    re-profile the wheel if, in fact, it requires it.

6         Q.   There are other standards that apply, such

7    as 49 C.F.R. 171.7.  Are you familiar with the

8    Hazardous Materials Transportation Act?

9         A.   Yes, I am.

04:29PM  10   Q.   I'm going to pull that up and ask you a

11   question about it.  It's 179.7, Quality Assurance

12   Program.

13        A.   Uh-huh.

14        Q.   "At a minimum, each tank car facility shall

15   have a quality assurance program approved by AAR

16   that" -- and if you go down -- one.  It says,

17   "Ensures the finished product conforms to the

18   requirements of the applicable specification and

19   regulations of this subchapter."  And, two, "Has the

04:30PM  20   means to detect any nonconformity in the

21   manufacturing, repair, inspection, testing, and

22   qualifications or maintenance program of the tank

23   car."  Did I read that correctly?

24        A.   Yes.

25        Q.   And if -- if that requirement calls for you

1    to remove and inspect the interior or open up a

2    roller bearing, is it your testimony that your shop

3    isn't qualified to do that?

4        A.    No, we cause that bearing to be removed

5    from service and put it in the hands of a certified

6    re-conditioner.

7        Q.    I know you testified that your repair shops

8    are subject to audits, but has that shop in Texas

9    ever been audited?

04:31PM 10        A.    Yes.  I don't off the top of my head know

11    the last date that they were visited by FRA or AAR

12    officials, but I know it's occurred.

13        Q.    All right.  I'm going to ask you to search

14    your mind -- your memory on this because we have not

15    found any audits for the Texas shop.  Are you

16    certain they exist?

17        A.    I am certain that FRA officials have been

18    on the premises and have reviewed the processes with

19    the people at that shop, which, from my perspective,

04:31PM 20    is an FRA audit.

21            I'm not so sure that FRA writes or

22    publishes an internal document, like an annual

23    report.  But I do know and have -- I do know that

24    FRA has been at that facility and their processes

25    have undergone FRA overview.

1    Q.   Let me end this line of questioning this

2    way:  Would you agree with me that you have never

3    seen a formal audit from the FRA for that Texas

4    repair location where the 2014 qualification took

5    place?

6    A.   That I would agree with, yes.  I've not

7    seen a document should it exist.

8                    (Plaintiffs' Exhibit 104 was

9                     marked/received into evidence.)

04:32PM  10    MR. FRIEDMAN:  Plaintiffs' Exhibit 104.

11    There has been no objection to it.  I believe it's

12    already in evidence.

13    BY MR. FRIEDMAN:

14    Q.   You were asked earlier today -- I know it

15    seems like a long time ago -- about a -- about a

16    bearing specification.  I believe it's

17    Exhibit -- yeah, Defendant's Exhibit 148.

18         Do you remember about the -- about the

19    questions you were asked about the standard for

04:33PM  20    roller journal bearings, Defendant's 148?  Do you

21    remember that line of questioning that you were

22    asked?

23    A.   Yes.

24    Q.   There is a separate standard, is there not,

25    Specification M-943, for --

1           MR. DAVIS:  942.

2           MR. FRIEDMAN:  Yeah.  I'm sorry.  It's

3    M-942.

4    BY MR. FRIEDMAN:

5       Q.   And that is a standard for journal roller

6    bearing grease.  Do you see that?

7       A.   Yes.

8       Q.   And it was adopted in 1975 and revised on

9    several occasions.  The latest one on this exhibit

04:34PM 10   would have been -- or it is listed as March 6, 1992.

11   Do you see that, sir?

12      A.   I see it, yes.

13      Q.   And that would have been the applicable

14   standard for the grease that was put in the Brenco®

15   bearing that was attached and made part of the Union

16   tank car that's the subject of this case --

17      A.   Yes, sir.

18      Q.   -- correct?

19           And you were asked about this, I believe,

04:34PM 20   in your deposition, and I believe you --

21           THE COURT:  Let me just clarify.  The

22   exhibit we're showing now, is that Exhibit 148 or is

23   that --

24           MR. FRIEDMAN:  I'm sorry, Your Honor.  For

25   the record, this is Exhibit 104.

1      THE COURT:  Plaintiffs' 104?

2      MR. FRIEDMAN:  Plaintiffs' 104.

3      THE COURT:  To which there is no objection?

4      MR. FRIEDMAN:  To which there is no

5  objection.

6      THE COURT:  Okay.  Thank you.

7  BY MR. FRIEDMAN:

8      Q.   And Plaintiffs' Exhibit 104, you were --

9  you've been asked about this in your deposition.  I

04:34PM 10  believe you testified about it, but I would like to

11  take a moment to ask you a question.

12      With respect to the previous exhibit, the

13  one that is the -- that relies -- that pertains to

14  roller journal bearings, you pointed out in response

15  to a question that that -- that those roller journal

16  bearings had a life, according to that document, of

17  500,000 miles.  Do you remember that?

18      A.   A minimum of 500,000.

19      Q.   Minimum life.

04:35PM 20      Is there in this standard for journal

21  roller bearing grease a 500,000-mile standard?

22      A.   Well, this is multiple pages, and I

23  can -- quite honestly, I can barely read the script.

24  If it could be enlarged, I could --

25      Q.   We'll do that.  We'll do that.

1    While he's enlarging the script, the

2  specification itself is four pages, and then it's

3  followed by a couple appendices.

4    So let's start with the -- let's start with

5  the standard.  Let's start with the Scope.  Do you

6  see anything there about 500,000 miles?

7    A.    No, sir.

8    Q.    And then Thickness, Oils and Inhibitors.

9  Anything there?

04:36PM 10    A.    No.

11    Q.    And then let's go to page 2, Oxidation

12  Inhibitor, Rust Inhibitors and Grease.

13    A.    There is no mileage statement in that

14  clause.

15    Q.    So does that take us all the way through

16  the second page?

17    A.    Yes.

18    Q.    And let's look at the third page.

19    A.    Could you afford me just to go back one

04:37PM 20  page and let's look at the bottom paragraph.

21    Q.    Yes, sir.

22    A.    Okay.  This particular clause outlines that

23  a sample of any grease attempting to achieve AAR

24  certification that needs to be supplied for an

25  eight-week test and then put into service trial.

1    But it does not state a lifetime mileage limitation

2    in that clause.

3         Q.   And then we'll go to the third page.  Is

4    there a reference to 500,000 miles on page 3 or 4?

5         A.   No, sir.

6         Q.   And the Appendix, I believe, that you were

7    referring to is on -- is Appendix D?

8         A.   Uh-huh.

9         Q.   And it's on page 8-169 of the exhibit.  Is

04:38PM 10   this the eight-week simulated service test for

11   qualifying roller bearing grease that --

12        A.   That was quality control.  Uh-huh.  That's

13   what I was referring to earlier.

14        Q.   Any reference to 500,000 miles in Appendix

15   D?

16        A.   No.  The principal fact is that the

17   lubrication standard embedded within the journal --

18   roller bearing journal approval is in sync with the

19   minimum service expectation for the bearing itself.

04:39PM 20       It does say within that standard that the

21   lubrication is -- must be such in order to provide

22   for the generally problem-free operation of the

23   bearing to the minimum life expectancy in the

24   standard.

25        Q.   And Appendix D references 49,000 miles for

1    the test, doesn't it?

2        A.   For the -- for the service trial test.

3        Q.   Right.

4        A.   That's not what I was speaking of.

5        Q.   Okay.  But there is no reference, and we

6    can agree, to 500,000 miles minimum life, is there,

7    for the grease?

8        A.   On the grease, that's correct.  Other than,

9    as I said, the attribution that lubrication, which

04:40PM 10   is grease, must be such that it allows the bearing

11   to continue to perform problem-free for the minimum

12   life expectation in the bearing standard.

13       Q.   No mileage given, is there?

14       A.   On the grease standards?

15       Q.   Yes.

16       A.   Correct.  On the bearing standard.

17       Q.   Yes, the bearing standard, we've covered

18   that.  We're heard that.  We're talking about the

19   grease standard now.

04:41PM 20       A.   And I'm saying that lubrication is the

21   equivalent to grease, and lubrication is articulated

22   in the bearing standard, and the bearing standard

23   says 500,000 miles.

24       Q.   But it doesn't show up in the grease

25   standard, the lubrication standard you just read.

1    A.    I've agreed to that, yes.

2    Q.    Now, I believe you've testified earlier,

3  and I want to follow up with this.  I know we're

4  getting late in the day, but -- but you've testified

5  that Union Tank Company did not have any indication

6  that there was a minimum or maximum life for grease

7  that was being put in the roller bearings being put

8  on its tank cars?

9    A.    What I have said is that there is no fixed

04:42PM 10  life associated with the bearings themselves.

11    Q.    All right.  But what about the grease?

12  There is with the grease, and y'all are on notice of

13  it, aren't you?

14    A.    If we're talking about the marketing

15  materials used by Brenco® in their bearings, I've

16  seen those documents.

17              (Plaintiffs' Exhibit 15 was

18                marked/received into evidence.)

19  BY MR. FRIEDMAN:

04:42PM 20    Q.    Right.  For example, on Plaintiffs' Exhibit

21  15 --

22         MR. DAVIS:  It's been admitted.

23         MR. FRIEDMAN:  Excuse me?

24         MR. DAVIS:  It's been admitted.

25         MR. FRIEDMAN:  It is.

BY MR. FRIEDMAN:

Q.   If you look at page 11 of Exhibit 15.  So Amsted Rail provides information concerning the products that you buy from them and put on your tankers, doesn't it?

A.   As I said, marketing materials, yes.

Q.   And they specifically deal with lubrication, don't they?

A.   They talk to lubrication.  The marketing materials, the Brenco® brochure is not the AAR standard.

Q.   Okay.  Let's get into that a little bit.

This is a representation from Amsted Rail, the maker of Brenco® bearings, to the people that buy their products, and that would include Union Tank Car, and if you look at page 11, which we're going to turn to --

A.   No, no, let's -- let's first look at page 1.

Q.   Well --

A.   And --

Q.   Excuse me, sir.  This is my job is to conduct this examination.  So --

A.   I apologize.

Q.   If you will go to page 11 and look at

1    Lubrication.

2           Now, it references Brenco® AAR class

3    bearings which are the bearings that we're talking

4    about in this case.  They are -- they are non-field

5    lubricated bear- -- sealed or tapered bearings;

6    correct?

7           A.    That's correct, yes, sir.

8           Q.    "The Brenco® bearing is designed with a

9    seal that with proper handling and care will run for

04:44PM 10   years without any substantial grease loss."  Did I

11   read that correctly?

12          A.    Yes, sir.

13          Q.    Then the next sentence, "Therefore, the

14   bearing is not to be lubricated while in service.

15   While grease life can vary with different service

16   conditions such as load, speed, temperature, and

17   environment..."  Have I read that correctly so far?

18          A.    Yes.

19          Q.    And "environment," I think you would agree

04:45PM 20   with me that includes moisture or the elements?

21          A.    These are sealed bearings.

22          Q.    They're subject to outside elements, aren't

23   they?  Condensation inside the bearing as a result

24   of what's going on outside, like submersion?

25          A.    That would disrupt the seal.  Then you'd

1    have a compromised bearing and it would have to be

2    removed from service.

3         Q.    Let me continue.  "...the grease in a

4    freight application will normally survive a minimum

5    of 10 years or 750,000 miles."  Did I read that

6    correctly?

7         A.    Yes, you did.

8         Q.    Now, they're being aggressive there with

9    respect to their mileage, aren't they?

04:46PM  10         A.    They are saying a minimum of 10 years and

11    they're highlighting a -- something in excess of the

12    AAR 500,000, yes.

13         Q.    So that would be fairly aggressive as it

14    pertains to mileage?

15         A.    Yes.

16         Q.    Now, this -- this phrase that they use,

17    you -- it's your testimony that you never knew of a

18    relationship between the life of a roller bearing

19    and the life of its grease?  Never heard that

04:46PM  20    before, or you heard it before in these materials?

21         A.    No, if there is a failure of lubrication,

22    then the bearing fails.

23         Q.    Right.

24         A.    I believe what I said was that just as

25    there is no finite life to a bearing, there is no

1    finite life to its grease.

2         Q.   Well, they're talking about surviving a

3    minimum of 10 years.  That's -- that's double the

4    warranty that they give on their roller bearings,

5    isn't it?

6         A.   And it's a minimum.

7         Q.   All right.  And it's not tied to the

8    mileage.  You can read the sentence.  It says

9    750,000 miles or -- 10 years or 750,000 miles.  You

04:47PM 10   know what that "or" means; right?

11        A.   It means or.

12        Q.   It means hot or cold.  It means laugh or

13   cry.  It means right or left.  It's giving you a

14   choice, isn't it?  One or the other?  Minimum of

15   10 years or 750,000 miles, isn't it?

16        A.   It really implies that the bearing's

17   ultimate life is a function of its ongoing

18   inspection, and at some point in time a bearing will

19   show cause to have it removed from service.

04:48PM 20        Q.   The longer a bearing remains in service,

21   the more likely it is to fail?

22        A.   No, I would disagree with that.  As -- as

23   was discussed earlier, many cars sit in storage for

24   long periods of time and you cannot make that

25   determination simply by the passage of time.  It's

1    utility; it's mileage; it's environment, terrain,

2    load.  That determines ultimately the condition of

3    the bearing.

4         Q.   Mr. Constantino, are you telling this jury

5    that y'all disregard the statement that -- that

6    Amsted Rail and Brenco® make about survival of a

7    minimum of 10 years?  Do you disregard that or do

8    you take it into account?

9         A.   No, it's taken into account because the

04:49PM  10   bearing is inspected per Rule 36 and Rule 88 at

11   10 years at a maximum in our environment during the

12   qualification process.

13        Q.   And those bearings, when they come in for

14   the requalification, when you get down there and

15   work with them, stamped on each end, it tells you

16   how old they are, doesn't it?

17        A.   Yes, it does.

18        Q.   It tells you when they went into service,

19   doesn't it?

04:49PM  20        A.   It does.

21        Q.   So not only do y'all have notice of this

22   survival life that comes from Brenco®, but when

23   they're requalified, there is a stamp that let's

24   those people know how long they have been in

25   service?

1     A.   The Brenco® communication is a minimum time

2   period.  Every time we inspect the car in our

3   facility and qualify it, it is a physical inspection

4   of the bearing, visual, if not more hands on than

5   that.

6     Q.   While we're talking about notice and

7   hands-on, you read James Whelan's deposition, didn't

8   you?

9     A.   Yes.

04:50PM  10     Q.   And you've already testified that you read

11   the deposition of the representative of the company

12   that made this bearing; right?

13     A.   Mr. Norris, yes.

14     Q.   And Mr. Norris said at the time that this

15   roller bearing was manufactured that they were using

16   Shell grease.

17     A.   Correct.

18     Q.   It's more likely than not that Shell grease

19   was used to pack those bearings and put into the

04:50PM  20   roller journals; right?

21     A.   I think "more likely than not" was his

22   words.

23     Q.   And you don't have any reason to disagree

24   with that, do you?

25     A.   I don't, no.

1    Q.   And you saw that James Whelan looked to get

2  the specs for the Shell grease that was put into

3  those roller bearings, didn't you?

4    A.   Yes.

5    Q.   And he testified that based on the Shell

6  specs that they stated the Association of American

7  Railroads developed a grease specification, AAR

8  M-942, revised in 1992, which is what we were just

9  talking about, designed to eliminate field

04:51PM 10  lubrication so that they only have to grease the

11  bearings when railcars are brought to the shop for

12  wheel repair.  This practice requires a grease

13  capable of performing in the bearings for hundreds

14  of thousands of kilometers or up to 10 years without

15  the need for re-lubrication.

16       Had you gotten this Shell information?

17    A.   I saw that information as part of

18  Mr. Whelan's deposition.

19    Q.   Did you ever take the time to go on Shell's

04:52PM 20  website to look at those product specifications for

21  yourself?

22    A.   No.

23    Q.   You never tried to do that?

24    A.   No.

25    Q.   You knew you were going to come down here

1  to Alabama -- excuse me -- to Tennessee.  You were

2  going to come down here and face this jury.  You

3  know that was one of the big issues in this case;

4  right?

5       A.  The issue is the bearing.

6       Q.  The issue of notice to Union Tank Car about

7  how long this grease is to last in those roller

8  bearings, you knew that was going to be an issue,

9  didn't you?

04:52PM  10       A.  It is the issue of bearing functionality,

11  and --

12       Q.  Sure.

13       A.  -- whether or not there is a date limit on

14  bearing life.

15       Q.  That's right.  And Shell says it's

16  10 years.

17          Have you ever done anything on behalf of

18  your company to verify that one way or another?

19          MR. FLEMING:  Objection, Your Honor,

04:53PM  20  argumentative and misstates that document, and we

21  don't know what Shell says because that document

22  hasn't been admitted into evidence.

23          MR. FRIEDMAN:  Well, it's been read into

24  evidence and it's part of the testimony in this

25  case, Your Honor, and this is cross-examination and

1    goes to the notice of --

2          THE COURT:  Reask your question.

3    BY MR. FRIEDMAN:

4      Q.    Okay.  Given the testimony in this case

5    before you were here and the testimony in the

6    depositions that you've read, have you done anything

7    to go on Shell's website or do any research to

8    verify whether or not the grease manufactured by

9    Shell that goes into those Brenco® bearings that are

04:53PM  10    attached to the Union tank car has a life, a maximum

11    life of 10 years, sir?

12      A.    No.

13      Q.    Does that -- is that important to you to

14    find out?

15      A.    What is important is that Brenco® provided

16    bearings that met the AAR standard and that were

17    stated to be such that they would have a minimum

18    operating life of 500,000 miles.

19      Q.    We just went over what Brenco® said.

04:54PM  20    Brenco® said minimum operating life of 10 years.

21      A.    Or 750,000 miles.

22      Q.    So you would --

23      A.    Or kilometers.

24      Q.    -- agree that age is a factor?

25      A.    No, no.  The AAR standard says what it

1    says.

2       Q.   Well, you have knowledge of this AAR

3    standard.  Would you agree that knowing what you

4    know or what you believe the AAR standard to be, it

5    would be wrong for Union Tank to put a roller

6    bearing for an unlimited period of time on its

7    tanker cars knowing that the AAR standard that's

8    being -- that -- let me stop it again.  I don't want

9    to make this a long question.  I want to make it

04:55PM 10    simple.  Okay?

11          You've testified here today that the

12    minimum life of a wheel set or the frequency of

13    changing out a wheel set on your tankers at Union

14    Tank is seven or eight years.  You did the math and

15    concluded that.

16       A.   We didn't -- we didn't get to that question

17    here, but it was part of my earlier testimony that

18    if you look at roughly 52,000 wheel sets being

19    changed out in a three-year period, and given a

04:55PM 20    fleet size during that period of roughly 75,000

21    units, that it would work out to, on the average,

22    all the wheel sets in the fleet being changed out in

23    roughly a seven-year period.

24       Q.   And that's -- that's on tankers.  That's

25    not on all your cars, but that's specific to

1    tankers.

2        A.    The vast majority of cars that we have in

3    the fleet are tank cars, yes, sir.

4        Q.    So your wheels on average are getting

5    changed out every seven or eight years?

6        A.    Yes, on the fleet.

7        Q.    And then you've got your -- Brenco®, your

8    manufacturer, telling you, look, you can get all

9    these miles out of this, but we're saying

04:56PM  10   10 -- 10 years is the minimum that you can go on the

11   grease.

12       A.    Or 750,000 miles.

13       Q.    Are you telling the ladies and gentlemen of

14   the jury that it's acceptable to ignore that

15   information you get from Brenco®?

16       A.    We're not ignoring that, and we're not

17   ignoring the bearing as I've talked about today.

18       Q.    So --

19       A.    That bearing is in service, was repeatedly

04:56PM  20   inspected by Union Tank and repeatedly inspected by

21   other members of the interchange rules while the car

22   was in service.

23       Q.    So this bearing, the unit that was involved

24   in the derailment had -- the wheel set that was

25   involved in the wheel -- in the derailment, that had

1    been in operation three times the life of a typical

2    wheel set?  21 years?

3         A.    Time-wise, yes.  Mileage wise, no.

4         Q.    So -- so it's three times longer than your

5    typical wheel set and twice the 10-year period that

6    Brenco® is talking about?

7         A.    Again, Brenco® mentions minimum.

8         Q.    So it's twice the minimum.

9         A.    Yes.

04:57PM 10        Q.    And that gives you -- and I say "you" --

11   Union Tank no cause for concern about putting that

12   tanker out there to carry something as hazardous as

13   acrylonitrile?

14        A.    No, the car conformed to the rules when we

15   saw it and the car was inspected while it was in

16   interchange service, had a couple minor repairs done

17   to it by CSX after we last saw the car, and,

18   otherwise, operated unremarkably up until that last

19   day.

04:58PM 20        Q.    Union Tank Car has not changed one thing

21   about the way they do business because of this

22   derailment?

23             MR. FLEMING:  Objection, relevance.  There

24   is no relevance to that question.  There is no

25   obligation for us to change anything following this

1    incident.

2         MR. FRIEDMAN:  We disagree.  This goes to

3    notice of a problem both before and after.

4         THE COURT:  I'm going to sustain the

5    objection.

6    BY MR. FRIEDMAN:

7         Q.   Mr. Constantino, where were you last week?

8         A.   I was in Chicago for part of the week.  I

9    was here later in the week.

04:59PM  10    Q.   But you weren't here in this courtroom?

11         A.   No, sir.

12         Q.   Let me go through a couple things with you

13   really quick, and I think these have been stipulated

14   to but I want to get them on the record, if I may.

15              On July 1st, 2015, the train that was

16   involved in the derailment, it was carrying nine

17   cars that were loaded with acrylonitrile?

18         A.   I accept that.

19         Q.   How many of those cars were Union Tank

05:00PM  20   cars; do you know?

21         A.   I don't know.

22         Q.   It was traveling from Cincinnati, Ohio to

23   Waycross, Georgia?

24         A.   That was the last segment of its overall

25   move, yes, sir.

1      Q.   The reason I brought that up is:  You

2  testified that this tank -- tank car operated in the

3  midwest.  That tank car operated in Georgia,

4  Tennessee, Alabama; southeastern states, didn't it?

5      A.   For part of its assignment to B.P.

6  Chemicals, Innovene, INEOS, yes.

7      Q.   And those were the last years of its

8  operation, not the first years?

9      A.   I would agree with that, yes.

05:01PM 10      Q.   16 of the cars on the train were carrying

11  propane gas?  Do you agree that 16 of the tanker

12  cars were carrying propane gas?

13      A.   I understand that some number were carrying

14  propane, yes.  I wouldn't dispute the number 16.

15      Q.   Yeah.  These were all admissions in the

16  Answer.

17           I think we've established that at the time

18  of the derailment and the time of both of the

19  qualifications, the tanker was owned by Union Tank?

05:02PM 20      A.   Yes, sir.

21      Q.   That the wheel set that came off was wheel

22  set No. 3 or axle No. 3?  What's your understanding

23  of the wheel set that came off?

24      A.   I'm just trying to --

25      Q.   Do you know?

1      A.   It's in the repair records.  I just don't

2  want to --

3      Q.   All right.  Give me --

4      A.   -- get trapped up between L3 and L4.

5      Q.   I want to ask you briefly about some

6  requests for admissions that we filed in this case.

7           Do you agree that Union Tank Car Company

8  does not have a system for keeping up with the age

9  of roller bearings on its tank cars?

05:03PM 10      A.   What we said was that we track them when

11  they're put on and monitor wheel change-outs but

12  don't necessarily track the age of the bearing put

13  on during a wheel exchange.

14           MR. FRIEDMAN:  Go to paragraph 30.

15  BY MR. FRIEDMAN:

16      Q.   I think this is a little more succinct.

17  This is the Answer to the Complaint.

18      A.   No, I agree with that.

19      Q.   Do you see that?  "UTC does not have a

05:04PM 20  system for keeping up with the age of roller

21  bearings on tank cars."  Do you --

22      A.   For systematically tracking the age of

23  roller bearings on its tank cars.

24           MR. FRIEDMAN:  Bring up 138, if you would.

25

BY MR. FRIEDMAN:

     Q.    "Union Tank Car has no knowledge of how
often its bearings fail on its tank cars or the
reasons for the bearing failures."  Do you agree
with that?

          MR. FLEMING:  Your Honor, is he showing him
a document that says this --

          MR. FRIEDMAN:  Yes.

          MR. FLEMING:  -- or is he just asking him
that question, because this is just an Answer?

          MR. FRIEDMAN:  Paragraph 31.

          MR. FLEMING:  Thank you.

BY MR. FRIEDMAN:

     Q.    31.  Do you see that?  Do you see that,
sir?

     A.    Yes.  And it says -- our Answer says, "We
admit that it does not have a system for tracking
bearing failures on its tank cars but to the
extent" --

     Q.    Are you reading now?

     A.    Yes.

     Q.    Continue.  Please continue.

     A.    -- "the allegation alleges or implies in
any way that UTC is liable or responsible, it is
specifically denied."  And I don't have to read the

 1    rest of it.

 2         Q.   Sure.   That's kind of legal language.   But

 3    just to --

 4         A.   That's correct.

 5         Q.   -- the extent that this issue is decided

 6    here, UTC admits that it does not have a system for

 7    tracking bearing failures on its tank cars; do you

 8    agree with that?

 9         A.   Tracking -- tracking wheel change-outs,

05:05PM 10    yes.

11         Q.   Roller bearing --

12         A.   Roller bearing failures, no.

13              MR. FRIEDMAN:   I want to make sure that we

14    have the lease put into evidence.   And I believe you

15    were asked a question about that.   I've got to find

16    my copy.   Do you have a copy of the lease?

17                        (Plaintiffs' Exhibit 48 was

18                         marked/received into evidence.)

19    BY MR. FRIEDMAN:

05:06PM 20    Q.   This is Exhibit 48.   There is no objection

21    to it.   You've seen this before, haven't you, sir?

22         A.   Yes, I have.

23         Q.   And you corrected me before when we were

24    talking about lessor and lessee.   Union Tank Car was

25    the lessor of the tank at the time of the

1    derailment?

2         A.   Yes, sir.

3         Q.   And there is a section in the lease that

4    designates maintenance, and I'm going to draw your

5    attention to that.  I believe it's Section 2.03.  Do

6    you see that, Maintenance of Cars?

7         A.   Yes, sir.

8         Q.   Now, just so we understand this lease, the

9    company that's leasing the tanker, they pay you a

05:07PM  10   monthly fee for that; right?

11        A.   That's correct, they do.

12        Q.   And out of that fee you guys pay all the

13   taxes; right?

14        A.   Yes.

15        Q.   And you make any other payments that are

16   necessary for the operation of the tanker; correct?

17        A.   Maintenance administration and car taxes,

18   yes, sir.

19        Q.   You keep up with all the paperwork?

05:07PM  20        A.   Yes, sir.

21        Q.   And then this Section 2.03, Maintenance of

22   Cars -- first of all, you mentioned in your

23   deposition, and I think it kind of succinctly

24   describes this lease, and I don't want to risk

25   misquoting you again, but you call it a full-service

1    lease?

2        A.    Yes, and I mentioned that earlier today,

3    also.

4        Q.    Okay.  And in this full-service lease, this

5    is the responsibility for maintenance that is

6    accepted by Union Tank Car?

7        A.    And it is a division of responsibilities

8    for maintenance articulated in the lease, yes.

9        Q.    Not- -- notwithstanding any lease agreement

05:08PM  10    where things are decided as to how responsibilities

11    would be distributed, the qualification issue is

12    something under the law that is nondelegable; that

13    is, solely the responsibility of Union Tank Car, is

14    it not?

15        A.    As car owner, yes.

16        Q.    Right.

17            MR. FRIEDMAN:  Thank you.  That's all the

18    questions I have.

19            THE COURT:  Thank you.  Redirect?

05:09PM  20            MR. FLEMING:  Can I have the ELMO, please.

21                    REDIRECT EXAMINATION

22    BY MR. FLEMING:

23        Q.    Mr. Constantino, on cross-examination,

24    Mr. Friedman asked you a question about the 2004

25    qualification records and whether or not they had

1  them when you were deposed.  Do you recall that

2  testimony?

3       A.   Yes, sir.

4       Q.   Do you recall being deposed in this case?

5       A.   Yes.

6       Q.   Do you recall being deposed?

7       A.   Yes.

8       Q.   When were you deposed?

9       A.   August 30th, 2017.

05:09PM 10       Q.   And is the document I have on the ELMO a

11  copy of your deposition?

12       A.   It is.

13       Q.   And I want to turn to the -- page 3 that

14  lists the exhibits from your deposition.  I want to

15  draw your attention to Exhibit No. 5.  What is

16  Exhibit No. 5?

17       A.   Rule 88.b-2 (sic) inspection from March

18  2nd, 2004.

19       Q.   And is the Rule 88.b.2 inspection from

05:10PM 20  March 2nd, 2004 the document that was produced by

21  Union Tank Car as part of the qualification file?

22       A.   Yes.

23            MR. FLEMING:  And if you could change to

24  Exhibit 87, please.  Can we switch over?

25

BY MR. FLEMING:

    Q.   And this is Union Tank Car's Exhibit 87, and if you'll expand on the deposition exhibit. We talked about Exhibit 87 earlier. Is Exhibit 87 Exhibit 5 to your deposition, sir?

    A.   It is. It is so marked.

    MR. FLEMING: And if you would reduce that.

BY MR. FLEMING:

    Q.   Does that help you recall that plaintiffs did, in fact, have and questioned you on documents from the qualification from 2004?

    A.   That's obviously correct, yes.

    Q.   You had asked Mr. Friedman --

    MR. FLEMING: And if I could go back to the ELMO.

BY MR. FLEMING:

    Q.   -- while he was asking you about the Brenco® Installation and Maintenance Guide whether you could start with page 2. Do you recall that testimony?

    A.   Yes.

    Q.   I wanted to give you an opportunity to tell the jury what it is from -- and I'm showing you Exhibit 15 of plaintiffs.

    A.   That is -- that is the page that I

1    was -- well --

2         Q.   Was page 2 the page you wished to discuss

3    or draw --

4         A.   I wanted to --

5         Q.   -- attention to?

6         A.   I wanted to highlight something on page 1,

7    also.

8         Q.   Hang on one second.

9         A.   Well, the --

05:11PM 10        Q.   No, I'll bring it.  This is page 1.

11        A.   The -- the -- the fact that -- what I

12   wanted to highlight is, again, this is a brochure,

13   but specifically it is calling out that what is

14   contained within the brochure are -- A, are class

15   bearings pursuant to certificates 5A and 2B at -- or

16   28 as issued by the AAR to Brenco® allowing them to

17   market certified AAR-approved bearings in commerce

18   for applications to railroads.

19        Q.   Does the second page of this document also

05:12PM 20   provide a disclaimer?  Can you see that enough?

21        A.   Well, in addition, any internal bearing

22   reconditioning work is to be carried out by an

23   approved reconditioning shop in accordance with AAR

24   standards and recommended practices, and that's

25   exactly what my testimony this afternoon has been.

1    Q.   Now, earlier we talked about and plaintiffs

2  talked with you briefly or in some detail about the

3  insulation project, and previously I attempted to

4  ask you about a letter, the project memo that was

5  issued in November of 1996.  Do you recall a memo

6  being drafted and circulated?

7    A.   I do recall the initial discussions about

8  the developing data that was coming up.  That was

9  between Joe Perez, an individual named Rick Koenig

05:13PM 10  and myself, and that led to a determination that a

11  company repair project should be established and

12  that our repair shops should receive instructions on

13  putting drain holes along the bottom centerline of

14  our cars, insulated cars.

15    MR. FLEMING:  Can I use the ELMO just for

16  the witness.

17    THE COURTROOM DEPUTY:  Thank you.

18  BY MR. FLEMING:

19    Q.   I want to show you just to ask you some

05:14PM 20  foundational questions.  Is the document that I've

21  put in front of you the memo that you guys -- that

22  you and your -- that you found in preparation for

23  today?

24    A.   Yes, sir.

25    Q.   And were you a recipient of this memo as

1    indicated on page 2?

2        A.    I was.

3        Q.    So, in 1996, you were a recipient of the

4    project memo?

5        A.    Yes.

6              MR. FLEMING:  Your Honor, this is a

7    business record that I would move for admission and

8    publication to the jury.

9              THE COURT:  Any objections?

05:15PM  10              MR. FRIEDMAN:  It was never produced.

11              MR. FLEMING:  Again, Your Honor, this

12    information -- the qualification file was in their

13    possession.  They didn't raise the issue of

14    insulation at any time before the opening statement.

15    We were given no notice that this would be at issue

16    in this case and we found this letter.  It's a

17    business record.  There is no prejudice.  They have

18    had an opportunity to review it and ask any

19    questions they have.

05:15PM  20              THE COURT:  All right.  So this particular

21    document has not been produced, but you're asking to

22    admit it into evidence based upon the opening

23    statement or based upon the questions of

24    cross-examination?

25              MR. FLEMING:  Correct.

1    THE COURT:  What's your response to that?

2    MR. FRIEDMAN:  My response is:  The issue

3 of these tanker cars being wet and causing the

4 roller bearings to fail has been in this case

5 from -- for months and months, and we -- this is

6 a -- it's got -- Your Honor, it's late in the day,

7 and in the interest of cooperation, I'll withdraw my

8 objection.

9    THE COURT:  All right.

05:16PM 10    MR. FRIEDMAN:  Thank you.  So we can move.

11    THE COURTROOM DEPUTY:  What number is it?

12    MR. FLEMING:  148.  I'm sorry.  149.

13    (Defendant's Exhibit 149 was

14    marked/received into evidence.)

15 BY MR. FLEMING:

16    Q.   And just to recall, the water that was at

17 issue for the insulation, that was water from the

18 atmosphere as opposed to water from any sort of

19 flood or submersion?

05:16PM 20    A.   Correct, yes.  Humidity and the heating and

21 cooling cycles and condensating atmospheric moisture

22 inside the jacket.

23    Q.   And this was insulation that, as you just

24 pointed out, was inside the jacket?

25    A.   That's correct, yes.

1    Q.   And was the corrosion that you were

2  discussing with Mr. Friedman corrosion that could

3  occur on the interior of the jacket and that's the

4  reason for the project, to eliminate that risk?

5    A.   It could have -- it would have been present

6  in the jacket anulus between the tank and the jacket

7  itself, and we wanted that water to evacuate and not

8  be a risk.

9    Q.   Did that water pose any risk to the trucks

05:17PM 10  or roller bearings at issue in this litigation?

11    A.   No.  The drain holes to be inserted were at

12  three locations along the bottom centerline of the

13  car, and all three locations are outside of the

14  wheel and axle sets for either end of the car.

15    Q.   Finally, Mr. Friedman had said that -- or

16  he showed you and read from the FRA summary report.

17  He read some of the FRA actions to be taken for

18  field guidance.  Do you recall that?

19    A.   Yes, sir.

05:18PM 20    Q.   And one of them was to look at the history

21  of the car to determine whether there is any

22  evidence of submersion or flood.  Do you remember

23  that?

24    A.   Yes.

25    Q.   And did you, sir, review the car history to

1    determine there was no evidence of any submersion or

2    flood in the history of this car?

3        A.    I reviewed the car history going back to

4    construction.  There is no commentary, evidence,

5    repair history that would suggest it was ever

6    submerged.

7                MR. FLEMING:  Your witness.

8                THE COURT:  Any recross?

9                MR. FRIEDMAN:  No, Your Honor.

05:18PM  10                THE COURT:  All right.  Thank you,

11   Mr. Constantino, you may be excused.

12                    (Which were all the proceedings

13                     requested to be transcribed at

14                     this time.)

15                * * * * * * * *

16

17

18

19

20

21

22

23

24

25

1          C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4          I, Teresa S. Grandchamp, RMR, CRR, do

5    hereby certify that I reported in machine shorthand

6    the above excerpt report of proceedings, that the

7    said witness(es) was/were duly sworn; that the

8    foregoing pages were transcribed under my personal

9    supervision and constitute a true and accurate

10   record of the proceedings.

11         I further certify that I am not an

12   attorney or counsel of any of the parties, nor an

13   employee or relative of any attorney or counsel

14   connected with the action, nor financially

15   interested in the action.

16         Transcript completed and signed on Friday,

17   January 4, 2019.

18

19

20         _____

           TERESA S. GRANDCHAMP, RMR, CRR
21         Official Court Reporter

22

23

24

25